UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

GEORGINA FISHER
a/k/a Georgina Baratta,

                              Defendant.

**DECISION AND ORDER**

15-CR-19A

## I.  INTRODUCTION AND BACKGROUND

On May 14, 2015, defendant Georgina Fisher ("Fisher") filed a motion "for

an Order: (1) granting a hearing pursuant to *United States v. Monsanto*, 924 F.2d

1186 (2d Cir. 1991); (2) directing the United States to remove any *lis pendens* or

other restraints on Defendant's property; (3) striking certain forfeiture allegations

in the subject Indictment; and/or (4) granting any additional relief the Court

in its discretion deems appropriate."  (Dkt. No. 21.)  Central to the entire motion is

Fisher's contention that "the government restrains Ms. Fisher's home and bank

accounts with no allegation explaining why such assets are forfeitable.  Ms.

Fisher has established in the paragraphs above, in her Declaration, and in the

Declarations of Attorneys Andreozzi and Bell, that she has insufficient assets

with which to fund her defense without access to the equity in her home."  (Dkt.

No. 21-1 at 6.)  Additionally, "[i]n the event that the government fails to present at

the *Monsanto* hearing adequate evidence establishing probable cause that the

assets are subject to forfeiture, Defendant respectfully requests that the Court direct removal of the *lis pendens* on Ms. Fisher's home, and strike from the indictment the forfeiture allegation with respect to that property." (*Id.* at 6–7.) Notably missing from Fisher's motion and the papers that ensued was any challenge to the grand jury's determination of probable cause that Fisher violated 31 U.S.C. §§ 5324(a)(1) and 5324(d)(1).

After hearing from the parties and considering their papers, this Court granted Fisher's request for a *Monsanto* hearing. (Dkt. No. 37.) The Government appealed the decision to have a hearing. (Dkt. No. 41.) Judge Arcara affirmed this Court's order. (Dkt. No. 51.) The *Monsanto* hearing was scheduled for August 20, 2015, even after the Court denied a Government motion for reconsideration. (Dkt. Nos. 56, 57.) In denying reconsideration, the Court distinguished two cases that the Government has cited persistently in its opposition to a hearing: *Kaley v. United States*, 134 S. Ct. 1090 (2014), and *United States v. Cosme*, 796 F.3d 226 (2d Cir. 2015). Unlike this case, the defendants in *Kaley* decided not to challenge the factual nexus between the assets in question and the alleged criminal conduct; they sought a direct challenge to the grand jury's finding of probable cause for the main substantive offense. *See Kaley*, 134 S. Ct. at 1096 ("The District Court then concluded that it should hold a hearing, but only as to whether the restrained assets are traceable

to or involved in the alleged criminal conduct.  The Kaleys informed the court that they no longer disputed that issue; they wished to show only that the case against them is baseless.") (internal quotation marks and citations omitted).  Also unlike this case, *Cosme* was a "Second Circuit case in which 1) the defendant waived a *Monsanto* hearing, which is Fisher's only request here; 2) the defendant raised a completely different Fourth Amendment challenge that Fisher has not raised; and 3) the defendant won, and the case went back to the District Court for a hearing on that Fourth Amendment challenge."  (Dkt. No. 56 at 4.)  *See also Cosme*, 796 F.3d at 234–35 ("Here, however, as the government concedes in its brief on appeal, the grand jury did not vote on the forfeiture allegations, which were simply **notice provisions not subject to a grand jury vote**.  Accordingly, *Kaley* does not apply, and the district court was required to make its own probable cause finding **where none had yet been made in the case**.  The government argues that this error is harmless, but we disagree.  Although the substantive allegations in the indictment mention the assets in connection with the criminal conduct, at no point in this case has the government had to demonstrate that it had probable cause to restrain Cosme's assets as required by the Fourth Amendment.") (emphasis added) (citation omitted).

On August 20, 2015, the hearing did not occur.  The Court instead heard further argument from the parties, including further argument from the

3

Government as to why no hearing should occur.  The Government argued that it "made sufficient showing of probable cause by virtue of the indictment which included a forfeiture allegation, [and] nothing more is required."  (Dkt. No. 59 at 5.)  That comment prompted the following exchange, when the Court attempted to clarify whether the Government was arguing that the grand jury in this case actually voted to find a factual nexus between the conduct charged in the assets targeted for forfeiture:

> MAGISTRATE JUDGE SCOTT: Let me cut through this because I have a concern, I'm not sure what to do with this.  You have to help here.  Is it your position that the grand jury was actually presented the question whether there was probable cause, there was a nexus between the activity and the assets?
>
> [AUSA] KRESSE: Right.

(*Id.*)  The Government expanded on this view later when it explained that when the grand jurors "sign that indictment, Judge, it reads—again, it's a notice provision, but the indictment reads, and it's read verbatim to the grand jury, the grand jury alleges that, and then it says for the forfeiture.  So if the grand jury doesn't feel that there is a nexus for that forfeiture, it's not going to sign this document."  (*Id.* at 13.)  The Court continued to explore whether the grand jury found probable cause for forfeiture through this exchange:

> MAGISTRATE JUDGE SCOTT: When we talk about presented to the grand jury, what about instructions?  Was the grand jury given instructions?
>
> MS. KRESSE: We always instruct the jury on the law.

4

MAGISTRATE JUDGE SCOTT: On nexus?  On nexus?

MS. KRESSE: Well, Judge, I'll be honest—

MAGISTRATE JUDGE SCOTT: Well, for them to make the finding—
yeah, go ahead.

MS. KRESSE: I would have instructed the jury on the law.  I would
have instructed the jury on the law regarding forfeiture.

(*Id.* at 14.)

In further opposition to a hearing, the Government emphasized the

independent nature of the structuring statute.  According to the Government, "it

doesn't matter that it's completely clean money.  It doesn't matter that it's from a

legitimate paycheck.  Once you commit the crime of structuring to purchase like

here, structuring the purchase of the money orders, anything that's done with

those structured proceeds is subject to forfeiture." (*Id.* at 15.)  This argument

coincides with Fisher's concern that the Government has not offered an

explanation as to why the assets in question are subject to forfeiture.  (*See also*

*id.* at 18 ("There's no allegation in the superseding indictment, in the indictment

that those structured funds were the source of, you know, were in and of

themselves tainted, dirty, okay?").)

Finally, the Government continued to argue that *Monsanto* hearings are

inappropriate for anyone in Fisher's position because the same kind of hearing is

not available to other types of defendants.  In making this argument, the

Government insisted that "it's not just about this case.  It's a bigger picture.  What

5

a *Monsanto* hearing represents and the reason why we fought it so vehemently is because a *Monsanto* hearing is an opportunity for only a certain class of defendants to potentially, potentially if a hearing is allowed, delve into a grand jury's determination." (*Id.* at 19.)  The Government divided criminal defendants into three categories: those who can afford counsel, those who receive assigned counsel, and those who proceed *pro se.*  Of these three categories, only defendants in the first category ever would be in a position to request a *Monsanto* hearing, since only they would need access to assets to pay for counsel.  "This right doesn't—doesn't inure to the benefit of anybody other than defendants who can afford their own counsel.  Defendants who have assigned counsel, there is no *Monsanto* hearing because if there—if we seize all their assets, if we—if we have a forfeiture allegation taking everything that they own, they have no basis to come to this Court and say, Judge, we want a hearing on the nexus between the forfeiture and the crime charged.  It's fundamentally unfair . . . ." (*Id.* at 20.)  Fisher objected that the Government's argument would, on the pretense of fairness, wipe out the entire rationale of *Monsanto* and erode the Sixth Amendment right to choice of counsel.  "What they want is for—you should either get assigned counsel or proceed *pro se*, but because you have the ability to get assigned counsel, *Monsanto* should not apply to anyone across the country.  That's wrong.  I don't believe it's Department of Justice policy, and it

6

certainly violates the defendant's Sixth Amendment right to counsel of their choice." (*Id.* at 22.)

The parties maintained their positions in supplemental briefing that the Court permitted following the August 20, 2015 oral argument.  The Government asserted that "[u]nder structuring, the source of the funds, legitimate or otherwise, is not relevant.  Again, it is the act of structuring that renders the funds criminal proceeds.  Whatever is acquired, purchased or otherwise obtained or involved with these criminal proceeds is subject to forfeiture . . . . The government's position has always been that the property in question is subject to forfeiture because it was involved in and/or traceable to the structuring offenses charged in the indictment." (Dkt. No. 60 at 5.)  The Government later asserted that "because the grand jury in this case *did* make a probable cause finding relative to forfeiture, the defendant is not entitled to second-guess this finding under the guise of a *Monsanto* hearing" (emphasis in original).  (*Id.* at 7.)  The Government concluded its supplemental briefing as follows:

> The nexus between Theresa Lane and the structuring charge has been explained.  The grand jury has made a probable cause determination in that regard.  Allowing a *Monsanto* hearing under these circumstances would allow the defendant an unwarranted opportunity to second-guess the grand jury and to delve into the government's proof on this issue in a manner that is not available to defendants who cannot afford to hire their own counsel.

(*Id.* at 8.)  Meanwhile, Fisher reiterated her belief that the Government has no

7

credible theory connecting the asset in question to the offenses alleged:

> The application here is simple.  A house cannot facilitate the crime of causing a financial institution to fail to keep a record.  If the government charged money laundering or conspiracy to launder money, then an asset could be forfeitable if it facilitated the concealment of criminal proceeds.  The government never states here how the house helped cause a Western Union agent to fail to keep records of [a] purchased money order.

(Dkt. No. 61 at 5.)  Fisher again highlighted how the Government's interpretation of *Kaley* and *Cosme* would require eliminating *Monsanto* hearings altogether, so long as a grand jury makes a finding of probable cause on the underlying substantive offense.  Fisher then expressed disbelief at the Government's argument against Monsanto hearings in the name of fairness for all classes of defendants.  "[I]t is only those defendants who could afford counsel of choice but for unjust restraint of their assets who are at risk of having their Sixth Amendment rights violated.  According to the government, all defendants, rich or poor, should be treated equally—they should all be denied the right to a pre-trial hearing to free up assets unjustly restrained by the government.  This argument is perverse and has no foundation in the law." (*Id.* at 13.)

Following the filing of supplemental briefing, the Court directed the Government to furnish, for *in camera* review, a complete and verbatim transcript of all grand jury proceedings.  (Dkt. No. 63.)  On September 29, 2015, the Government provided the requested transcript.  The Government also provided

the vote sheet for the original and the superseding indictment.  The Court will
preserve the confidentiality of the grand jury proceedings to the extent warranted,
but for the reasons explained below, the following points of information are
pertinent to the ongoing issues in the case and are hereby disclosed to defense
counsel:

- In *U.S. v. Gregory Fisher*, Case No. 08-CR-315, Fisher's ex-husband
  Gregory[1] pled guilty to mail fraud and filing false tax returns.  Gregory
  received a sentence that included a term of imprisonment and restitution in
  the amount of $969,647.09.  The Government had alleged over $2 million
  of fraud proceeds but was never able to trace about $500,000 of the
  alleged fraud proceeds to any specific asset.

- During introductory remarks prior to the first session for the original
  indictment, the Government told the grand jurors that "the background of
  this case is that Georgina Fisher was married to a guy who got in trouble
  for some criminality and was prosecuted.  She came into some cash—this
  is not part of this case, but it was probably the ill-gotten gains of the
  proceeds of her husband's criminal activity."  (Tr. Pt. I at 2–3.)[2]  (*See also*
  Dkt. No. 34 at 28 ("MAGISTRATE JUDGE SCOTT: Are you going to go
  after more than $74,000 if she's convicted?  MS. KRESSE: Yes.
  MAGISTRATE JUDGE SCOTT: By what course?  MS. KRESSE: Relevant
  conduct, Judge.  We would have a relevant conduct hearing showing that
  *this conduct began before what's set forth in the indictment*.  It was a
  pattern.  It was a scheme and, accordingly, that it involved $300,000,
  absolutely, Judge.") (emphasis added).)

- Responding to a question about the connection between Gregory's fraud
  and the Wells Fargo mortgage that was paid, the Government told the
  grand jurors that "I think the question is was the house somehow linked to
  his fraudulent conduct and I think the simple answer is no because if so

---

[1] Without knowing or needing to know details, the Court knows that Fisher and Gregory are no
longer married because of the motion to travel that it granted on March 19, 2015.  (Dkt. Nos. 9,
14.)
[2] To avoid disclosing dates of grand jury sessions or witnesses involved, the Court is referring to
"parts" of the transcript based on the tabs that the Government used to subdivide it.

she wouldn't have had to pay off the mortgage because it would have been seized." (*Id.* at 13.) "So what I'm saying, long way around, is because after his arrest and conviction I'm pretty sure she is still paying on the mortgage, that says to me that the house was not seized as part of the criminal investigation of the husband." (*Id.* at 14.)

- The grand jurors heard testimony that any funds in question would have to be proven as "illegal proceeds in order to determine that she [Fisher] was laundering the money." (Tr. Pt. II at 29.) The Government did not focus on money laundering charges because "[t]he source of the money we could never really say for sure because it's cash . . . . [W]e couldn't really say for sure it was illegal proceeds from her husband's fraud." (*Id.*)

- The grand jurors heard testimony intimating that the chronology of Gregory's sentencing and surrender is connected to the chronology of mortgage payments in Fisher's case. "The majority of it [i.e., mortgage payments for Ashwood Drive] came from—well, he didn't report to jail until September, so from April to September there was [sic] significant payments made and from September to February the rest of it was paid off." (*Id.* at 34.)

- Prior to another session of testimony for the original indictment, the Government told the grand jurors that they would hear testimony "about forfeiture because some of the questions were about the house and forfeitability of the house and it turns out after doing some research on it that because the money orders were obtained improperly by not buying them in a manner to provide ID and thus cause a report to be filed, that because she did that and then used that money to buy a house, that house is subject to forfeiture . . . . She sold that house and bought another house, so the forfeiture allegation is going to be seeking to forfeit the house that she has currently so that's something we added." (Tr. Pt. III at 8–9.)

- During testimony for the original indictment, the Government asked, "as a result of that for purposes of the forfeiture statute, is the property at Theresa Lane subject to forfeiture because it was ultimately purchased with funds obtained as a result of structuring activity?" (Tr. Pt. IV at 23.) The answer provided was, "Correct. She paid off the Ashwood Lane [sic] with the structured funds, then obtained a loan from that house, the line of credit, secured it, bought another house, then sold the Ashwood house and paid off the line of credit, so it was like a substitute asset." (*Id.*)

10

- In its instructions to the grand jury before a vote on the original indictment, the Government read the forfeiture notice as it appeared in the draft indictment.  (Tr. Pt. V at 9.)  A question arose: "So if you're not going after the $315,000, you're only going after the $74,500, why are you forfeiting the house that's worth $170,000?"  (*Id.* at 11.)  The answer given was, "Because we can show—it's kind of complicated.  Even though she's charged with the specific counts, the rest of her conduct is relevant conduct for purposes of a prosecution, but you know what?  If you bear with me I can ask.  There's people in our office who do forfeiture and who know those questions better."  (*Id.* at 11–12.)  "I mean, what we can say is that the $74,000 charged in this indictment went to purchase that house, so we can take the house.  Now, does she have a claim to anything above $74,000?  Probably.  That's a forfeiture thing that—that's why I can't answer that because I'm not sure about all the rules and regulations, but she would certainly be able to make a claim that you only have $74,000, so if you take my house and it's worth $174,000, then you have to give me $100,000 or get a money judgment for $74,000 or whatever.  There's different things you can do, but yes, there are equitable issues there that would have to be resolved but because we can show that that asset was purchased with $74,000 worth of money orders, we can forfeit it."  (*Id.* at 12.)

- In response to further questioning about the actual dollar amount that could be subject to forfeiture, the Government responded as follows.  "For purposes of the forfeiture, the evidence would be that she paid off a mortgage—it would be as testified to; that she bought a home for about $300,000; that beginning in February of 2009[3] or April of 2009 she began buying money orders and using those money orders to pay off that mortgage.  She paid off the mortgage.  She then got a line of credit and bought another house.  Then she sold that house and paid off that line of credit.  All of that evidence would be part of the forfeiture, so it's not limited to $74,000.  Do you see what I'm saying?  If you think about what is the evidence that is forfeitable.  The evidence that is forfeitable is the entire conduct on her part dating back to April 2010, so it's broader than the nine counts that are specifically charged, but the reason it uses $74,000 is because if you're talking about a money judgment your money judgment is $74,000 because that's the total if you add up all the money orders in the indictment.  Does that make sense?  It's an issue of proof at trial and the

---

[3] The year 2000 appears here in the transcript, but 2009 likely was said or at least intended.

forfeiture is much broader than the specific counts with the money orders." (*Id.* at 13–14.)

- A threshold number of grand jurors subsequently "concurred in the Indictment in this case."  (Tr. Pt. VI at 1.)

- The grand jury convened again at a later time for proceedings that led to the superseding indictment.  The grand jury heard testimony about the basis for the changes in the substantive counts from the original to the superseding indictment.  The grand jury heard no additional testimony regarding forfeiture.  (*See generally* Tr. Pts. VII, VIII.)

- In its instructions to the grand jury prior to deliberations on the superseding indictment, the Government read the forfeiture notice in the draft superseding indictment, "which is the same as in the indictment."  (Tr. Pt. IX at 4.)  A question then was asked: "Is—the forfeiture, are they going to like try to get some of that money back from what she sold the house for or no?"  (*Id.* at 5.)  The Government answered as follows: "The forfeiture is only for what's specifically listed.  So it's for the house that she currently lives in and the total number—money—a money judgment or money totaling $74,000, which is the total of the money orders charged in the superseding indictment.  In terms of, you're saying if there was extra money, we're limited by what's alleged in the indictment or the superseding indictment in terms of what we forfeit . . . .  And again, we have to—well, in order to forfeit we have to be able to trace the money, and so—and I think you're referencing the fact that the first house she had on Ashwood was $300,000 and eventually she sold that . . . .  But if we can—like we could trace the purchase of Theresa Lane, and that's why we're seeking to forfeit that, okay?"  (*Id.* at 5–6.)

- A threshold number of grand jurors subsequently "concurred in the Superseding Indictment in this case."  (Tr. Pt. X at 1.)

- The Court does not intend the above bullet points to be an exhaustive survey of every appearance of the word "forfeiture" in the grand jury transcript.  The bullet points do, however, capture all the substance of the grand jury proceedings that pertained to the issues that have arisen with Fisher's pending motion.

## II.  DISCUSSION

The Court has some difficulty deciding what to address right now, or what issues are currently before it.  This Court and Judge Arcara together have ruled three times so far that a *Monsanto* hearing should occur.  (Dkt. Nos. 37, 51, 56.)  The *Monsanto* hearing should have occurred on August 20, 2015.  Whether a defendant should receive requested relief does not become a best-of-seven series just because the Government loses.  Since another writing has become necessary, however, the Court will take the time to address some issues that drew its attention after the last round of arguments and the last round of briefing.

### A. Disclosure of Grand Jury Materials

The first issue that the Court will address concerns disclosing enough information from the grand jury proceedings to clarify serious factual ambiguities that the Government has created through its own arguments.  The Government has argued adamantly that it does not have to explain the source of the funds that it wants to seize.  (*See* Dkt. No. 59 at 15, 18.)  At the same time, and equally adamantly, the Government has argued that the grand jury cast a vote specifically to find a factual nexus between the substantive offense alleged and the assets that would be seized.  (*Compare id.* at 12 ("[B]ut we never know what the grand jury votes on, right?  I mean, we instruct them on the law . . . . No, it's a notice—because the forfeiture is a notice provision.") *with id.* at 12–13 ("But that being said, Judge, if evidence is presented showing the nexus, if the grand jury

13

doesn't feel that there's a nexus between the property and the crime charged,

they can come back and say . . . . [T]here's no forfeiture.  We're not—we're not—

because when they sign that indictment, Judge, it reads—again, it's a notice

provision, but the indictment reads, and it's read verbatim to the grand jury,

the grand jury alleges that, and then it says for the forfeiture.  So if the grand jury

doesn't feel that there is a nexus for that forfeiture, it's not going to sign this

document.  Again, I can't say what they—how they deliberated or anything

else.").)  But if the grand jury were making a formal finding and accusation of a

factual nexus then wouldn't Fisher have the right to be put on notice of that

finding?  And in any event, why would a grand jury make a specific finding of a

factual nexus when forfeiture is part of a sentence, and a forfeiture provision in

an indictment is simply a notice of what might happen at sentencing upon

conviction?  *See Cosme*, 796 F.3d at 234–35 ("Here, however, as the

government concedes in its brief on appeal, the grand jury did not vote on the

forfeiture allegations, which were simply **notice provisions not subject to a**

**grand jury vote**.  Accordingly, *Kaley* does not apply, and the district court was

required to make its own probable cause finding **where none had yet been**

**made in the case**.  The government argues that this error is harmless, but we

disagree.  Although the substantive allegations in the indictment mention the

assets in connection with the criminal conduct, at no point in this case has the

14

government had to demonstrate that it had probable cause to restrain Cosme's assets as required by the Fourth Amendment.") (emphasis added) (citation omitted).  The lack of factual findings leading up to a forfeiture notice is exactly why "the forfeiture allegation need not specify precisely what interest the defendant has in the property . . . . [T]he extent of the defendant's interest in the property vis a vis that of third parties will be determined not in the criminal trial itself, but in the ancillary proceeding.  Thus, it is not necessary for the grand jury to concern itself with the extent of the defendant's interest in the property, or as one district court has now held, with whether the defendant had any interest in the property at all.  The inclusion of a forfeiture allegation in the indictment simply puts the defendant on notice that whatever interest he may have in the property will be forfeited if he is convicted of the underlying offense."  Stefan D. Cassella, *Criminal Forfeiture Procedure: An Analysis of Developments in the Law Regarding the Inclusion of a Forfeiture Judgment in the Sentence Imposed in a Criminal Case*, 32 Am. J. Crim. L. 55, 61 (2004).

The explanatory value of the grand jury materials prompts a review of the rules governing grand jury disclosure.  "The court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter . . . preliminarily to or in connection with a judicial proceeding."  FRCP 6(e)(3)(E)(i).  The Court also has an inherent authority to disclose grand jury

15

materials when appropriate because the tradition of grand jury secrecy is not absolute. *See In re Craig*, 131 F.3d 99, 103 (2d Cir. 1997); *see also In re Biaggi*, 478 F.2d 489, 493 (2d Cir. 1973). Although Fisher herself has not sought release of grand jury materials at this time, prudence warrants that the Court determine, as with a defense request, that any material disclosed "is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that [disclosure] is structured to cover only material so needed." *Douglas Oil Co. of California v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979).

The grand jury materials that the Court reviewed *in camera* go a long way toward explaining what actually happened before the grand jury regarding forfeiture. As seen from the bullet points that appear above, the Government proffered its theory of why the assets in question ultimately would be subject to forfeiture. The Government used conditional language when describing forfeiture, language such as "we have to be able to trace the money" and "if we could trace the purchase of Theresa Lane." (Tr. Pt. IX at 6.) Conditional language indicates that the necessary tracing did not happen during the grand jury proceedings. The Government did not separate the substantive offense from the forfeiture notice. The Government did not give instructions specifically about factual nexus. That is to say, at no time during the grand jury proceedings did

16

the Government tell the grand jurors that a general vote on the entire indictment would be construed as both probable cause for the underlying offense and probable cause for a factual nexus.  The Government did not tell the grand jurors to vote sequentially, i.e., to vote first on the underlying substantive offense and then to proceed to factual nexus if they found probable cause for the offense.  Inversely, the Government also did not tell the grand jurors that if they disagreed about factual nexus then they could express themselves that way, either by a specific finding to that effect or by voting down the draft indictments.  Instead, the Government placed before the grand jurors an indictment and superseding indictment that contained a general forfeiture notice.  The Government conceded at the last oral argument that it does not know what the grand jurors subsequently did.  The vote sheets do not provide any clarity.  The vote sheets say only that a threshold number of grand jurors "concurred in the Indictment in this case" or "concurred in the Superseding Indictment in this case" without separating the substantive offense from the forfeiture notice.  That the grand jurors saw a superseding indictment with a forfeiture notice but voted only on the substantive offense makes sense, given that, "grand juries do not, in fact, make reliable findings regarding the source of allegedly forfeitable assets.  The decisions of other courts reflect this same lack of confidence that grand juries give serious consideration to the forfeitability of assets . . . . Neither the DOJ nor

17

any federal appellate decision (other than Bissell)[4] maintains that an indictment with a forfeiture claim represents anything more than the government's allegation that certain assets are forfeitable.  If it is true that an indictment does not constitute a probable cause determination as to forfeitability of assets, then the Fourth Amendment stands in the way of any pretrial restraint on property." Ricardo J. Bascuas, *Of Defense Lawyers and Pornographers: Pretrial Asset Seizures and the Fourth Amendment*, 62 U. Miami L. Rev. 1159, 1174 (2008).

Clarifying what the grand jury actually did in this case justifies disclosing to defense counsel the information contained in the bullet points above.  Neither Fisher nor this Court have ever disagreed with the Government that Fisher cannot use a *Monsanto* hearing to revisit the grand jury's finding of probable cause for the underlying substantive offense of structuring.  Theoretically, if the grand jury had held an additional specific vote on factual nexus then the Court likely would have to deny the request for a *Monsanto* hearing altogether.  That specific vote on factual nexus never happened, though, and to deny Fisher a hearing and her choice of counsel based on a vote that never happened would constitute the kind of injustice that the Court is allowed to correct through limited disclosure.  In making disclosures, the Court has taken care not to disclose more

---

[4] *U.S. v. Bissell*, 866 F.2d 1343 (11th Cir. 1989), *disagreed with by Monsanto.*

18

than necessary to resolve the ambiguities that the Government has introduced in this case.

One more problem remains.  The grand jurors cast only one general vote for the underlying substantive offense.  The Government never instructed the grand jurors to vote specifically on factual nexus, and the materials that the Court has reviewed give no indication of such a consideration apart from the main vote on the substantive offense.  Why, then, has the Government doubled down on its insistence otherwise?  (*See* Dkt. No. 60 at 3, 7, 8.)  The charitable answer is that the Government sincerely believes that if it places a draft indictment with a forfeiture notice in front of a grand jury, and that grand jury casts a general vote for "probable cause," then the same vote covers both the substantive offense and a finding of factual nexus.  Nothing in *Kaley* or *Cosme*, the cases that the Government has cited repeatedly, supports such a specific legal theory.  The need to address the implications of that legal theory will be discussed further below.  The possibility of an alternative answer prompted the Court to disclose limited grand jury information about the source of the funds in question.  So far, and particularly because Fisher has not filed standard pretrial motions yet, the Court has not paid much attention to the substantive offense alleged.  Without prejudice to any future arguments from Fisher, the Court views the alleged substantive offense as its own issue.  Either Fisher structured or did not, and if a

jury at trial believes beyond a reasonable doubt that she did then she will face appropriate consequences.  The forfeiture notice is a whole other matter, and the grand jury materials finally make clear why the Government has been so passionate about the grand jury vote and about refusing to explain the origin of the funds that it wants to seize.  Simply put, the Government has no idea where the funds in question came from, but it has a hunch that the funds ultimately trace back to unaccounted fraud proceeds from Fisher's ex-husband Gregory.  In that context, the Government seeks forfeiture because it has unfinished business with Gregory.  The Court has decided that defense counsel needs to know that to prepare a fair defense, and the use of one criminal case to address unaccounted funds from another has potential implications that will be addressed below.

### B. Invitation to Appear as Amici Curiae

The second issue that the Court will address in this Decision and Order concerns the implications of some of the arguments that the Government has made to avoid a *Monsanto* hearing.  The Government has argued that a grand jury vote of probable cause for a substantive offense doubles as a vote of probable cause for a factual nexus that would set up forfeiture.  That argument, if correct, would eliminate *Monsanto* hearings categorically, so long as the Government put a draft forfeiture notice in front of the grand jurors.  The Government always would be able to argue that a single grand jury vote must

have encompassed all aspects of the draft indictment.  The issue of a factual

nexus thus always would fall within the presumption of grand jury regularity.  The

Government has argued that defendants with retained counsel should not

receive *Monsanto* hearings, as a matter of equality, because *pro se* defendants

and defendants with assigned counsel are never in a position to request them.

That argument, if correct, also would eliminate *Monsanto* hearings categorically

because it would lump together defendants in categorically different situations.

For defendants who have no attorneys and defendants with assigned attorneys,

any talk of infringement on the right to choose counsel has no meaning.  Both

society and constitutional principles focus only on making sure that *pro se*

defendants are capable of representing themselves and that poor defendants

have constitutionally adequate representation.  *See U.S. v. Kopp*, No. 00-CR-

189A, 2007 WL 1747165, at *2 (W.D.N.Y. June 18, 2007) (Arcara, *C.J.*)

("[D]efendants who do not have the means to hire their own lawyers have no

cognizable complaint so long as they are adequately represented by attorneys

appointed by the courts.") (citations omitted).  Defendants with enough financial

means, in contrast, find themselves seeking *Monsanto* hearings because society

expects them to use their own resources for representation and not to draw on

limited public resources.  *Cf. U.S. v. Stevenson*, No. CRIM. 10-120, 2012 WL

1038832, at *4 (W.D. Pa. Mar. 28, 2012) ("In conclusion, to conserve the limited

resources of the public defender for those truly unable to afford qualified counsel, federal judicial officers must carefully review the financial data of each defendant to determine those defendants who can afford to pay for counsel.").  Ironically, if defendants with financial means were denied counsel of their choice through forfeiture, and their financial status continued to disqualify them for assigned counsel, then their level of representation would fall below that of defendants receiving assigned counsel.  These defendants then would be left representing themselves or trawling for attorneys who would take their cases *pro bono*.  As for other issues, the grand jury materials here reveal that the Government's primary motive for forfeiture is to recover fraud proceeds from another case that it cannot otherwise prove as belonging to that other case.  What is the limiting principle behind the strategic use of forfeiture notices across cases?  The Government also has argued that structuring by itself can make otherwise legitimate funds subject to forfeiture.  Again, does this argument have any limiting principles?  Finally, in the event that a *Monsanto* hearing eventually occurs in this case, the Government has asserted that it could proceed by proffer.  But what if proceeding by proffer prevents defendants from probing the extent of a factual nexus?

The Government is at least partially aware of how broad its arguments have been, because it has stated explicitly that "it's not just about this case.  It's a

bigger picture." (Dkt. No. 59 at 19.)  The Government effectively has admitted

that defense counsel around the country could be affected by the rulings that the

Court makes here.  If the Government insists on national implications then the

Court will insist on national input.  The Court hereby invites *amici curiae* to

appear in this case and to provide briefing on the arguments that the

Government has raised.  *Cf. In re Indu Craft Inc.*, 580 F. App'x 33, 34 (2d Cir.

2014) (granting *amicus curiae* status *sua sponte*); *Empire Rayon Yarn Co. v. Am.*

*Viscose Corp.*, 364 F.2d 491, 492 (2d Cir. 1965) (requesting *amicus curiae*

briefing *sua sponte* "[b]ecause of the importance of the issue involved"); *U.S. v.*

*Heleniak*, No. 14-CR-42A, 2015 WL 4208622, at *4 (W.D.N.Y. July 10, 2015)

(Scott, *M.J.*) ("Granting leave [to appear as *amicus curiae*] should occur where

the movant has an interest in the issues that extend beyond the particular case.")

(citations omitted).  In extending this invitation, the Court intends no slight to

defense counsel, who has provided zealous and professional representation at

all times.  The Court simply wants a broader range of input before giving serious

consideration to arguments with potentially enormous implications.

Specifically, the Court invites *amicus curiae* briefing for the following five

questions:

1) The grand jurors here received a draft indictment and superseding
indictment that contained a proposed forfeiture notice.  They
cast a vote that they "concurred in the Indictment in this case"
or "concurred in the Superseding Indictment in this case"

without separating the substantive offense from the forfeiture notice.  Under the facts presented here, can that vote mean anything other than a grand jury vote on the substantive offense?  Alternatively, can a grand jury finding of probable cause on a substantive offense double as a finding of a factual nexus, so as to defeat a request for a *Monsanto* hearing?

2) The Government has argued that granting *Monsanto* hearings to defendants who can afford counsel is unfair to *pro se* defendants and to defendants with assigned counsel.  Is this true?

3) Can the Government use a forfeiture notice in a second criminal action to recover assets not traced after a prior criminal action?

4) Can a structuring offense by itself make otherwise legitimate funds subject to forfeiture?

5) Do courts have discretion to require that *Monsanto* hearings proceed in adversarial fashion and not by proffer?

The only question remaining is whom to invite to intervene, and the Court seems to have a fairly simple answer available.  In *Kaley*, the Supreme Court allowed *amicus* briefing from the following national organizations: the American Bar Association, the Cato Institute, the Institute for Justice, and the National Association of Criminal Defense Lawyers.  These organizations are granted leave to intervene here and are respectfully invited to submit *amicus* briefing on any or all of the above five questions, as they may see fit.  On the date attached to this Decision and Order, the Court will serve each organization with a hard copy of this document by first-class mail at the addresses listed below; the Court also will send a Notice of Electronic Filing to the email addresses listed below.

24

Any organization that wishes to accept the Court's invitation is respectfully requested to file a notice of appearance within 30 days to confirm its intentions.

Based on a cross-check of the addresses from the *Kaley* briefs with what appears to be each organization's website, the Court will use the following addresses:

American Bar Association
321 North Clark Street
Chicago, IL 60610
abapresident@americanbar.org

Cato Institute
1000 Massachusetts Ave, NW
Washington, DC 20001-5403
ishapiro@cato.org

Institute for Justice
901 N. Glebe Rd, Suite 900
Arlington, VA 22203
general@ij.org

National Association of Criminal Defense Lawyers
1660 L St. NW, 12th Floor
Washington, DC 20036
vantoun@nacdl.org

### III. CONCLUSION

For all of the foregoing reasons, the Court issues invitations to appear as

*amici curiae* as explained above.  Speedy-trial time remains excluded because

Fisher's motion to lift the restraints on her assets (Dkt. No. 21) remains pending.

SO ORDERED.

_____/s/ Hugh B. Scott_____

HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: October 6, 2015

26