United States District Court
Western District of New York

United States of America,

*Plaintiff*

*vs*

Georgina Fisher,

*Defendant*

**Memorandum of *Amicus Curiae***
**National Association of**
**Criminal Defense Lawyers**
15-CR-019-A

NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS

1660 L St. NW • 12th Floor
Washington, DC 20036
Tel: 202-872-8600

Richard D. Willstatter
GREEN & WILLSTATTER
200 Mamaroneck Avenue, Suite 605
White Plains, NY 10601
Tel: 914-948-5656
willstatter@msn.com  *NACDL Amicus Committee, Second Circuit Vice-Chair*

Steven L. Kessler
LAW OFFICES OF STEVEN L. KESSLER
100 Park Avenue
Thirty-Fourth Floor
New York, N.Y. 10017-5516
(212) 661-1500

Mark J. Mahoney
HARRINGTON & MAHONEY
70 Niagara Street, 3rd Floor
Buffalo, New York 14202-3407
Tel.: 716-853-3700
Facs.: 716-853-3710
mjm@harringtonmahoney.com
(*Counsel of Record*)

*Counsel for Amicus Curiae*

# Contents

Table of Authorities.................................................... iii

    Cases........................................................ iii

    Regulations................................................... v

    Articles...................................................... v

Interest of *Amicus Curiae*................................................ 1

Factual Background..................................................... 2

    A. The *lis pendens*. ...................................... 3

    B. *Monsanto* hearing ordered, but not held................. 3

    C. New order, inviting *amicus* appearances................. 3

    D. Withdrawal of *lis pendens*.............................. 5

Summary of the Argument ............................................... 7

Forfeiture based something other than the charged "structuring"................... 7

    A. Special Verdicts.......................................... 9

    B. Civil Forfeiture.......................................... 9

    C. Money Laundering........................................ 9

Forfeiture of structured, but otherwise untainted funds........................ 10

    A. By statute, structured funds are forfeitable. ................ 11

The government policy limiting the forfeiture of "lawful source" funds. ........... 12

    A. The IRS and DOJ policies against forfeiture of "legal source" funds ...... 14

    B. Holding the government to its own policies. ................ 17

Unauthorized "money judgment" forfeiture. ............................... 20

Conclusion............................................................ 27

i

ii

# Table of Authorities

### Cases

*American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532 (1970). . . . . . . . . . . 19

*Ex parte United States*, 242 U.S. 27 (1916).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Flores-Figueroa v. United States*, 556 U.S. 646, 129 S.Ct. 1886 (2009) U.S. 646, 129 S . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Garner v. Jones*, 529 U.S. 244 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Hickey-McAllister v. British Airways*, 978 F. Supp. 133 (E.D.N.Y. 1997). . . . . . . . . . . 18

*International House v. NLRB*, 676 F.2d 906 (2d Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . 18

*Mantilla v. United States*, 302 F.3d 182 (3d Cir. 2002).. . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Modern Plastics v. McCulloch*, 400 F.2d 14 (6th Cir. 1968).. . . . . . . . . . . . . . . . . . . . . 20

*Montilla v. I.N.S.*, 926 F.2d 162 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-19

*Morton v. Ruiz*, 415 U.S. 199 (1974).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*N.L.R.B. v. Campbell Prods. Dep't, Harry T. Campbell Sons., Co.*, 623 F.2d 876 (3d Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*NLRB v. Monsanto Chem. Co.*, 205 F.2d 763 (8th Cir. 1953). . . . . . . . . . . . . . . . . . . . . 20

*Regalado Cuellar v. United States*, 553 U.S. 550 (2008). . . . . . . . . . . . . . . . . . . . . . . . . 10

*Russello v. United States*, 464 U.S. 16 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Service v. Dulles*, 354 U.S. 363 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Singh v. U.S. Dept. of Justice*, 461 F.3d 290 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . 18

*United States  v. Charles D. Kaier Co.*, 61 F.2d 160 (3d Cir. 1932). . . . . . . . . . . . . . . . . 8

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). . . . . . . . . . . . . . . . 17

*United States v. $191,910.00 U.S. Currency*, 16 F.3d 1051 (9th Cir. 1994). . . . . . . . . . . 8

*United States v. All Assets of Statewide Auto Parts*, 971 F.2d 896 (2d Cir. 1992). . . . . . 12

*United States v. Awad*, 598 F.3d 76 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Bajakajian*, 524 U.S. 321 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12, 13

*United States v. Baker*, 227 F.3d 955 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Bermudez*, 413 F.3d 304 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Borromeo*, 945 F.2d 750 (4th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Caceres*, 440 U.S. 741 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Candelaria-Silva*, 166 F.3d 19 (1st Cir. 1999). . . . . . . . . . . . . . . . . . 25

*United States v. Capoccia*, 503 F.3d 103 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Casey*, 444 F.3d 1071 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Catherman*, 2007 WL 2790384 (S.D. Iowa 2007). . . . . . . . . . . . . . . . 2

*United States v. Croce*, 334 F.Supp.2d 781 (E.D.Pa. 2004). . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Dashney*, 937 F.2d 532 (10th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Davenport*, 929 F.2d 1169 (7th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Hall*, 434 F.3d 42 (1st Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Handakas,* 286 F.3d 92 (2d Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Heffner*, 420 F.2d 809 (4th Cir. 1969). . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993). . . . . . . . . . . . 12

*United States v. Koerber*, 966 F. Supp. 2d 1207 (D. Utah 2013). . . . . . . . . . . . . . . . . . 18

*United States v. Kushner,* 256 F.Supp.2d 109 (D. Mass. 2003). . . . . . . . . . . . . . . . . . . . 2

*United States v. Leahy*, 434 F.2d 7 (1st Cir. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Lockyer*, 448 F.2d 417 (10th Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. One 1973 Rolls Royce*, 43 F.3d 794 (3d Cir. 1994). . . . . . . . . . . . . . . . 8

*United States v. One Parcel of Real Property Known as 334-390 W. Broadway*, 964 F.2d 1244 (1st Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Presgraves*, 2011 WL 4716222 (N.D. WV Oct. 5, 2011). . . . . . . . . . . . 2

*United States v. Razmilovic*, 419 F.3d 134 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Real Property Located at 221 Dana Ave.*, 261 F.3d 65 (1st Cir. 2001). . 8

*United States v. Robilotto*, 828 F.2d 940 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . 21, 22

*United States v. Saccoccia*, 354 F.3d 9 (1st Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Sperrazza*, 804 F.3d 1113 (11th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Surgent*, 2009 WL 2525137 (E.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . 24

*United States v. Thompson*, 579 F.2d 1184 (10th Cir. 1978). . . . . . . . . . . . . . . . . . . . . 18

*United States v. Vampire Nation*, 451 F.3d 189 (3d Cir. 2006). . . . . . . . . . . . . . . . . . . . 24

*United States v. Ventura*, 2013 WL 2452723 (E.D. KY 2013). . . . . . . . . . . . . . . . . . . . 2

*United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Wommer*, 2011 WL 4500866 (D. Nev. 2011). . . . . . . . . . . . . . . . . . . . . 2

## Regulations

DOJ Policy Directive 15-3 (March 31, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Statement of Richard Weber, Chief of I.R.S. Criminal Investigation*, N.Y. Times, Oct. 25, 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## Articles

David B. Smith, "*A Comparison of Federal Civil and Criminal Forfeiture Procedures: Which Provides More Protections for Property Owners?*" Heritage Foundation, Legal Memorandum No. 158, July 30, 2015. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

L. Neyfakh, *Helicopters Don't Pay for Themselves*: *Why Eric Holder's Civil Forfeiture Decision Won't Stop Civil Forfeiture Abuse*, Slate, Jan. 16, 2015. . . . . . . . . . . . . . . . 14

Michael Sallah, Robert O'Harrow Jr., Steven Rich, Gabe Silverman, "*Stop and seize*," Washington Post, September 6 - November 15, 2014 (Six part series). . . . . . . . . . . . . 14

R. Emery, *Who's Policing the Prosecutors? Civil Forfeiture and Accountability*, N.Y. Times (Dec. 10, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Rep. Tim Walberg, "*Stopping the abuse of civil forfeiture*," Washington Post," September 4, 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

S. Dewan, *Law Lets I.R.S. Seize Accounts on Suspicion, No Crime Required*, N.Y. Times, Oct. 25, 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

S. Dewan, *Police Use Department Wish List When Deciding Which Assets to Seize*, N. Y. Times, Nov. 9, 2014.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Sarah Stillman, "*Taken*," New Yorker, August 12 & 19, 2013. . . . . . . . . . . . . . . . . . . . 14

"Arresting your property? – How civil a$$et forfeiture turns police into profiteers" (Heritage Foundation). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

"Civil Forfeiture and Deferred Prosecution Agreements," N.Y.S. Assembly Standing Committees on Codes and on the Judiciary, December 9, 2014. . . . . . . . . . . . . . . . . . . . 14

"IRS clarifies its position on civil forfeitures in uncharged structuring cases," Thompson Reuters Tax & Accounting News, October 29, 2014. . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# Interest of *Amicus Curiae*

*Amicus* represents practicing criminal defense lawyers from across the nation. The National Association of Criminal Defense Lawyers ("NACDL") is a nonprofit, voluntary, professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crime or misconduct. Founded in 1958, NACDL has a nationwide membership of 10,000 and an affiliate membership of almost 40,000, including private criminal defense lawyers, military defense counsel, public defenders, law professors, and judges. The National Association of Criminal Defense Lawyers is committed to preserving fairness in the state and federal criminal justice systems, and defending the rights of individuals guaranteed by the Constitution of the United States.

*Amicus* is concerned for how the government's forfeiture practices, if left alone, undermine the constitutional right provided to those accused of crimes to be represented in criminal proceedings by their counsel of choice, and the corresponding burden shifted to the Criminal Justice Act to provide a defense in complicated cases. In light of the Government's increasingly broad use of statutes permitting the restraint and forfeiture of assets unrelated to alleged criminal conduct, clients of *amicus*' members are often confronted with the issues raised in this case.

The National Association of Criminal Defense Lawyers has appeared as *Amicus* in important cases before the Supreme Court of the United States addressing the issue of forfeiture, including *Kaley v. United States* (№12-464), and *Luis v. United States*, (№ 14-419), in which it argued that the Government's asset forfeiture practices undermine the Fifth and Sixth Amendment rights of persons charged with crimes, including the critically important right to counsel of choice.

1

# Factual Background

In this structuring case, under 31 USC §5324(a)(1), the indictment contained a forfeiture allegation directed at property alleged to be "involved in" and "traceable to" the offense "including but not limited to" a residence at "4640 Theresa Lane, Niagara Falls, New York, titled in the name of Georgina Fisher," the defendant, and "$74,000 . . . to be evidenced by a monetary judgment." The indictment is silent on the connection between the house and the $74,000 alleged to be involved in the structured transactions, involving a number of $500 money orders purchased over a period of 8 days, reflected in 8 corresponding counts, each day involving around $9500.[1]

The National Association of Criminal Defense Lawyers is involved because the U.S. Magistrate Judge Scott initially requested *amici* to appear to address five questions that have arisen in this case. Intervening events have reduced the initial five questions to two. Those questions are:

- Can the Government use a forfeiture notice in a second criminal action to recover assets not traced after a prior criminal action?

- Can a structuring offense by itself make otherwise legitimate funds subject to forfeiture?

---

[1] The Second Circuit has held that charging structuring like this in multiple counts is multiplicitous. *United States v. Handakas,* 286 F.3d 92 (2d Cir. 2002) (Finding it *plain error* to have allowed the government to break up pattern of structuring over two years into two counts). Other circuits reach the same conclusion. *United States v. Davenport*, 929 F.2d 1169, 1171-73 (7th Cir. 1991); *United States v. Dashney*, 937 F.2d 532, 541 (10th Cir. 1991); *United States v. Sperrazza*, 804 F.3d 1113, 1125 (11th Cir. 2015). The law is apparently so settled that this issue has not even arisen in the Third and Fifth Circuits, and has been only addressed in trial level decisions in the First (*United States v. Kushner,* 256 F.Supp.2d 109, 113 (D. Mass. 2003)), Fourth (*United States v. Presgraves*, 2011 WL 4716222 *4 (N.D. WV Oct. 5, 2011)), Sixth (*United States v. Ventura*, 2013 WL 2452723 *3 (E.D. KY 2013) ), Eighth (*United States v. Catherman*, 2007 WL 2790384 *3 (S.D. Iowa 2007)), and Ninth (*United States v. Wommer*, 2011 WL 4500866 *3 (D. Nev. 2011)) Circuits, all following the *Davenport/Handakas* rule.

## A.  The *lis pendens*

The government had filed a *lis pendens* against the Theresa Lane property. The *lis pendens* prevented the defendant from borrowing funds needed in order to retain the counsel of her choice.  This prompted the defense to seek, *inter alia*: (1) a hearing pursuant to *United States v. Monsanto*, 924 F.2d 1186 (2d Cir. 1991); (2) removal of the *lis pendens*; and (3) striking of the forfeiture allegations. [Dkt# 21] The government initially opposed the hearing, asserting that the claimed inability to afford counsel was insufficiently established,  and that the approval by the grand jury of the forfeiture allegation in the indictment precluded a review of whether there was a nexus between the property and the structuring offense.

On June 9, 2015 the government orally stated that the forfeitability of the house arose from having been purchased with a home equity loan on another house, on Ashwood Avenue in Wheatfield, NY, whose mortgage has been paid down with the funds involved in the structured payments.

## B.  *Monsanto* hearing ordered, but not held.

Magistrate Judge Scott ordered a *Monsanto* hearing.  [Dkt# 37]. The Government appealed the decision to have a hearing. [Dkt# 41]. District Court Judge Arcara affirmed the order. [Dkt# 51]. The Monsanto hearing was scheduled for August 20, 2015, after the Court denied a Government motion for reconsideration. [Dkt. Nos. 55, 56, 57].

On August 20, 2015, the day scheduled for the *Monsanto* hearing, further claims made by the Government prompted the Magistrate Judge to permit the parties to exchange further memoranda on the issue.  After review of the supplemental briefings, the Magistrate Judge directed the Government to furnish the transcript of the grand jury proceedings for *in camera* review. [Dkt# 63].

## C.  New order, inviting *amicus* appearances

On October 6, 2015, the Magistrate Judge issued a new order.  Among other things, his review of the grand jury minutes revealed that the government made possibly contradictory statements to the grand jury about the basis for seeking forfeiture, and that the

forfeiture sought was based on the funds possibly being derived from Ms. Fisher's former husband's fraud, which was not identified in the forfeiture allegation in that otherwise unrelated prosecution:

> Simply put, the Government has no idea where the funds in question came from, but it has a hunch that the funds ultimately trace back to unaccounted fraud proceeds from Fisher's ex-husband Gregory. In that context, the Government seeks forfeiture because it has unfinished business with Gregory.

[Dkt# 64, p. 20]. The Court expressed concern about using forfeiture "to recover fraud proceeds from another case" and whether "structuring by itself can make otherwise legitimate funds subject to forfeiture?" Noting the conceded national significance of these and several other issues, the Magistrate Judge invited "*amici curiae* to appear in this case and to provide briefing on the arguments that the Government has raised."[2]

The National Association of Criminal Defense Lawyers  agreed to appear as *amicus*

---

[2] Originally, the questions the Magistrate Judge wanted *amici* to address were the following:

> 1) The grand jurors here received a draft indictment and superseding indictment that contained a proposed forfeiture notice. They cast a vote that they "concurred in the Indictment in this case" or "concurred in the Superseding Indictment in this case" without separating the substantive offense from the forfeiture notice. Under the facts presented here, can that vote mean anything other than a grand jury vote on the substantive offense? Alternatively, can a grand jury finding of probable cause on a substantive offense double as a finding of a factual nexus, so as to defeat a request for a *Monsanto* hearing?
> 2) The Government has argued that granting *Monsanto* hearings to defendants who can afford counsel is unfair to *pro se* defendants and to defendants with assigned counsel. Is this true?
> 3) Can the Government use a forfeiture notice in a second criminal action to recover assets not traced after a prior criminal action?
> 4) Can a structuring offense by itself make otherwise legitimate funds subject to forfeiture?
> 5) Do courts have discretion to require that *Monsanto* hearings proceed in adversarial fashion and not by proffer?

4

as did Americans for Forfeiture Reform,[3] and the Institute for Justice.[4]

## D.  Withdrawal of *lis pendens*

The government requested the court to rescind its order, based upon the government's consent to the *Monsanto* hearing. [Dkt# 65]. Before the defense had the opportunity to respond to this motion, the government released its *lis pendens* [Dkt# 76] and moved for the setting of a scheduling order for motions, claiming that the issues on which *amici* appearances were sought had now become moot, along with the need for a *Monsanto* hearing. [Dkt# 77]. This motion was denied by the Magistrate Judge. [Dkt# 81]. However, the Magistrate Judge agreed that the withdrawal of the *lis pendens* had an effect on the request for *amici* input:

> The removal of the *lis pendens* arguably moots the Government's own consent to a *Monsanto* hearing. Those two events, in turn, would appear to moot the first two of the three items of relief that Fisher sought in her original May 14 motion; they also would appear to moot Questions One, Two, and Five of the Questions Presented. The Government's actions have no impact on the third item of relief that Fisher requested, the striking of the forfeiture notice from the Superseding Indictment. Since the Government still seeks forfeiture upon sentencing and has advanced various theories of forfeiture, **Questions Three and Four continue to address live issues in the case. Questions Three and Four remain important also because they are now implicated in Fisher's most recent motions**.

Concluding, the Magistrate Judge stated:

> On or before January 29, 2016, the *amici curiae* are respectfully requested to file briefing that addresses Questions Three and Four in any way that they would consider helpful to the Court. The substantive pages of each brief should not exceed 40 pages.

The government filed an appeal of this ruling. [Dkt# 83].  The Magistrate Judge has

---

[3]  Appearing by Mahesha P. Subbaraman, 222 S. 9th Street, Suite 1600, Minneapolis, MN 55402 Tel: 612-315-9210, mps@subblaw.com

[4]  Appearing by Darpana M. Sheth, 901 North Glebe Road, Suite 900, Arlington, VA, 22203, (703) 682-9320, dsheth@ij.org

denied a motion to stay the filing of *amicus* briefs pending that appeal. [Dkt# 86]. The defense, on January 12, filed its opposition to the appeal.  As of this writing, the appeal has not been resolved. See, Text Order, Dkt# 84.

# Summary of the Argument

In the context of the present case, the Court has raised the following questions: (1) whether the government can forfeit Ms. Fisher's real property based on allegations that the property was indirectly funded with proceeds of her ex-husband's criminal activity; (2) whether, assuming the government can prove that the property is traceable to the proceeds of structuring, the property is subject to forfeiture without any proof that the funds were derived from independent criminal activity or to be used for an illicit purpose, and as such, (3) whether the government is bound by its policies barring the forfeiture of structured funds that are unconnected to any independent criminal activity.

The National Association of Criminal Defense Lawyers submits that: (1) forfeiture is available to the government in a criminal case only when, and in the manner, statutorily authorized for the offense of conviction; (2) the "structuring" statute authorizes forfeiture of funds or property involved in or traceable to structured transactions, without regard to any independent criminal activity; though (3) where the government's announced policy regarding "legal source" funds involved in structuring would apply, the Court has the power to ensure that this policy is not withheld arbitrarily.  Additionally we submit, on a question not directly raised by the Court, that (4) no statute authorizes a court to enter a "money judgment" as a form of criminal forfeiture in a structuring case.

# Forfeiture based something other than the charged "structuring"

"Can the Government use a forfeiture notice in a second criminal action to recover assets not traced after a prior criminal action?"

Forfeiture, like all criminal sentencing, is entirely a creature of statute and is illegal unless Congressionally authorized. *See, Ex parte United States*, 242 U.S. 27, 42 (1916);

*United States v. Razmilovic*, 419 F.3d 134 (2d Cir. 2005); *Mantilla v. United States*, 302 F.3d 182 (3d Cir. 2002); *United States v. Charles D. Kaier Co.*, 61 F.2d 160, 162 (3d Cir. 1932). Moreover, because forfeitures are harsh and "not favored" by the law, all forfeiture statutes, even civil ones, are construed strictly against the government. *County of Suffolk, New York v. First American Real Estate Solutions*, 261 F.3d 179, 195 (2nd Cir. 2001), citing *United States v. One 1973 Rolls Royce*, 43 F.3d 794, 819 (3d Cir. 1994) (rule of lenity requires court to resolve any ambiguity regarding scope of forfeiture statute in favor of the claimant).[5]   Indeed, even civil forfeiture is considered punitive and is subject to analysis pursuant to the Excessive Fines Clause of the Eighth Amendment. *See United States v. Bajakajian*, 524 U.S. 321, 329 (1998).

To forfeit Ms. Fisher's property based on the theory presented that the funds in issue are traceable to uncharged criminal activity by her ex-husband, the government would have had to do one of three things: (1) request a special verdict on forfeiture allegations in the criminal case against her ex-husband; (2) commence a civil forfeiture proceeding against the property itself; or (3) assert a money laundering charge in the criminal proceeding against Ms. Fisher based on laundering of the proceeds of her husband's prior activity, assuming such forfeiture were itself demonstrably authorized.

As the government has done none of these things, it cannot forfeit Ms. Fisher's property based on any theory other than structuring.  A brief background on each follows.

---

[5]   Accord *United States v. Saccoccia*, 354 F.3d 9, 15 (1st Cir. 2003) ("the very potency of the forfeiture power demands that it be reasonably contained within ascertainable limits"); *United States v. Real Property Located at 221 Dana Ave.*, 261 F.3d 65 (1st Cir. 2001) (forfeiture statutes must be construed narrowly); *United States v. One Parcel of Real Property Known as 334-390 W. Broadway*, 964 F.2d 1244, 1248 (1st Cir. 1992) ("since forfeitures are strong medicine, disfavored in our jurisprudence, it seems fitting to condition the medicine's availability on a proper regard for the requirements of the law"); *United States v. Borromeo*, 945 F.2d 750, 753 (4th Cir. 1991) ("Forfeitures are not favored in the law; strict compliance with the letter of the law by those seeking forfeiture must be required"); *United States v. $191,910.00 U.S. Currency*, 16 F.3d 1051, 1069 (9th Cir. 1994) (forfeiture statutes strictly construed against the government, because it is a "'harsh and oppressive procedure' which is not favored by the courts").

## A. Special Verdicts

Under 21 U.S.C. § 853(c), the government may not forfeit property that has been transferred from the defendant (in this case, Gregory Fisher) to a third party (Georgina Fisher) unless it obtains "a special verdict of forfeiture," finding that the government has proven by a preponderance of the evidence that the property is traceable to the defendant's criminal activity.

This section ensures that a special and separate evidentiary showing is made with respect to any property in the hands of a third party that the government claims is traceable to the defendant's criminal activity. If the government obtains such a special verdict, the transferee of the property has the opportunity to challenge the forfeiture in an ancillary proceeding after the preliminary order of forfeiture is issued, but before a final order of forfeiture is entered. *See* 21 U.S.C. § 853(n)(6); Fed. R. Crim. P. 32.2 (c).

Here, the government did not request a special verdict against Ms. Fisher's property in the criminal proceeding against her ex-husband Gregory. Therefore, the government may not pursue forfeiture of her property in this new criminal case based on a claim that the property is traceable to Gregory's criminal activity.

## B. Civil Forfeiture

The obvious advantages to the government of proceeding against a property by civil forfeiture instead of criminal forfeiture are that: (a) unlike criminal forfeiture, no conviction is necessary to civilly forfeit property; and (b) in a civil proceeding, the property owner must affirmatively come forward and assert a claim to the property. However, the government has chosen not to commence a civil proceeding against Ms. Fisher's property.

## C. Money Laundering

To forfeit property belonging to Ms. Fisher in a criminal proceeding against *Ms. Fisher* under the theory that it is the proceeds of her ex-husband's criminal activity, the government would have to prove that property in her possession constitutes the proceeds of that money laundering. No money laundering charge, however, has been asserted in the

criminal proceeding against Ms. Fisher.  Therefore, this avenue is foreclosed.

Further, to make such a claim, the government would have to prove that Ms. Fisher engaged in the transactions involving the purchase of the real property "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i).  The government would also have to establish that "the purpose – not merely effect" of the transaction "was to conceal or disguise" a specific attribute of the funds identified by the statute.  *Regalado-Cuellar v. United States*, 553 U.S. 550, 567 (2008).

It appears from some of the comments by the prosecutor to the grand jury that the government deliberately forwent such an approach because it knew it did not have such evidence.[6]

Therefore, in a case charging only structuring offenses, property is not properly subject to forfeiture based on allegations that the funds in issue are traceable to or involved in criminal activity other than the alleged structuring.

# Forfeiture of structured, but otherwise untainted funds

Can a structuring offense by itself make otherwise legitimate funds subject to forfeiture?

---

[6]  The Decision and Order on October 6, 2015 recited the following: The grand jurors heard testimony that any funds in question would have to be proven as "illegal proceeds in order to determine that she [Fisher] was laundering the money." (Tr. Pt. II at 29.) The Government did not focus on money laundering charges because "[t]he source of the money we could never really say for sure because it's cash . . . . [W]e couldn't really say for sure it was illegal proceeds from her husband's fraud." (Id.)

The anti-structuring laws prohibit breaking up potential large cash deposits or withdrawals into multiple transactions involving sums of $10,000 or less "for the purpose of evading the reporting requirements."  31 U.S.C. § 5324(a).[7]  The laws were initially enacted to flag "large and unusual currency transactions" for the purpose of "ferreting out criminal activity," such as tax evasion and money laundering.  *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 38 (1974) (citing H.R. Rep. No. 91-975, at 11-12 (1970)).

Cash transactions involving sums in excess of $10,000 require the completion of a Currency Transaction Report (CTR).  31 U.S.C. § 5313; 31 C.F.R. § 103.22(b)(1).  A completed CTR includes personal information identifying the individual making the transaction. The forms are filed with the IRS.

## A.  By statute, structured funds are forfeitable

Every structured dollar is potentially subject to forfeiture, despite its lack of connection to any independent criminal activity besides the failure to report it.  *See* 31 U.S.C. § 5317(c)(2) ("Any property involved in a violation of section 5313, 5316, or 5324 . . . and any property traceable to any such violation . . . may be seized and forfeited to the United States . . . .").

This makes structuring-based forfeitures one of the easiest sources of ready cash for the federal government among its vast web of hundreds of forfeiture laws, almost all of which require a connection to criminal activity.  *See*, *e.g.*, 18 U.S.C. § 981 (limiting civil forfeiture to property that "constitutes", or is "involved in", "derived from" or "traceable to", violations of specific federal criminal statutes).  Thus, seeking forfeiture in structuring cases is a tempting source of income for the Department of Justice, with no victims looking to

---

[7]  31 U.S.C. § 5324(a) ("[n]o person shall, for the purpose of evading the reporting requirements of section 5313(a). . . structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions"); *see* 31 C.F.R. § 103.11(gg) (defining 'structuring' to include "the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions, including transactions at or below $10,000.  The transaction or transactions need not exceed the $10,000 reporting threshold at any single financial institution on any single day in order to constitute structuring . . . .").

share in the funds.  But it can also be directed at those with no other connection to criminality other than the structuring itself, and be grossly disproportionate to the harm contemplated by the statute.  For this reason, forfeiture of otherwise innocent structured funds are particularly likely to be vulnerable to Eighth Amendment objections. See *United States v. Bajakajian*, 524 U.S. 321, 329 (1998).

Because the IRS and Department of Justice responded to widespread criticism of its forfeiture practices with a policy directive limiting forfeiture of "legal source" funds in structuring cases, the National Association of Criminal Defense Lawyers believes that the Court's second question to *amici* begs a third question –  whether the government can be compelled to apply that policy in this case.

# The government policy limiting the forfeiture of "lawful source" funds.

Though speaking of civil forfeiture at the time, the Supreme Court noted that "forfeiture has long been recognized as subject to abuse, largely because the government has a 'direct pecuniary interest in the outcome of the proceeding.'" *United States v. James Daniel Good Real Property*, 510 U.S. 43, 56 (1993).[8]  With the enactment of the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), Congress sought to "to prevent abuse of the civil forfeiture process in part by encouraging the government to seek forfeiture through criminal proceedings, where it would have to link targeted property to a specific criminal conviction." *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007) (citing H.R. Rep. 106-192, at

---

[8]  *See, e.g.*, 21 U.S.C. § 881(e)(2)(A)-(B); 28 U.S.C. § 524(c) (authorizing payment of seizure and forfeiture proceeds to specified federal agencies under Department of Justice control); *see also United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96, 110 (2d Cir. 2000) (a "source of potential abuse is that forfeited funds are kept by the Department of Justice as a supplement to its budget"); *United States v. All Assets of Statewide Auto Parts*, 971 F.2d 896, 905 (2d Cir. 1992) ("we continue to be enormously troubled by the government's increasing and virtually unchecked use of the civil forfeiture statutes and the disregard for due process that is buried in those laws").

8 (1999); 146 Cong. Rec. S1753-02; CAFRA § 16, 114 Stat. at 221).

CAFRA has hardly applied the brakes to the unchecked use of federal forfeiture. In fact, the opposite seems to be true. "[T]he value of assets seized [federally] has ballooned to $4.3 billion in the 2012 fiscal year from $407 million in 2001." S. Dewan, *Police Use Department Wish List When Deciding Which Assets to Seize,* N. Y. Times, Nov. 9, 2014. There was an interesting report on John Oliver's show, Last Week Tonight, on October 5, 2014.[9]

Forfeiture based on alleged structuring is particularly vulnerable to continuing abuse because of the fundamental difference between this type of forfeiture provision and what was known at common law or on previous forfeiture statutes. That is, the forfeiture is not dependent on proof of any independent unlawful activity generating "proceeds," or any criminal activity being facilitated. Here, again, the Supreme Court has observed that, proceeds-based forfeitures are inherently proportional to the criminal activity because they are intended deprive the defendant of his ill-gotten gains, at least in cases where it is the defendant who received and retained or used those proceeds. However, the forfeiture of funds involved in a reporting violation "does not serve the remedial purpose of compensating the Government for a loss," as "a loss of information regarding the amount of currency" involved in an unreported transaction is "not remedied by the Government's confiscation" of the funds involved. *United States v. Bajakajian*, 524 U.S. 321, 329 (1998).

These concerns expressed in *Bajakajian* become amplified in cases where the mere reporting violation is not aggravated by any evident and chargeable criminal activity which generated the funds involved. The eventual proliferation of such 'legal source' seizures and civil and criminal forfeiture proceedings alleging structuring violations suggests that the government caught on to this potential profit center. But the disproportionality of these results did not escape attention.

Substantial negative publicity regarding this expansion of structuring-based forfeitures

---

[9] https://www.youtube.com/watch?v=3kEpZWGgJks

appeared in the press. *See*, *e.g.*, S. Dewan, *Law Lets I.R.S. Seize Accounts on Suspicion, No Crime Required*, N.Y. Times, Oct. 25, 2014; Sarah Stillman, "*Taken*," New Yorker, August 12 & 19, 2013;  Michael Sallah, Robert O'Harrow Jr., Steven Rich, Gabe Silverman, "Stop and seize," Washington Post, September 6 - November 15, 2014 (Six part series); Rep. Tim Walberg, "*Stopping the abuse of civil forfeiture*," Washington Post," September 4, 2014; L. Neyfakh, *Helicopters Don't Pay for Themselves*: *Why Eric Holder's Civil Forfeiture Decision Won't Stop Civil Forfeiture Abuse*, Slate, Jan. 16, 2015; R. Emery, *Who's Policing the Prosecutors? Civil Forfeiture and Accountability*, N.Y. Times (Dec. 10, 2014)  As was noted for the Court in Fisher's June 14, 2015 filing [Dkt# 31, at n.2] and in Fisher's more recent motion [Dkt# 80 at p.16], there was a Congressional inquiry into the practice of forfeitures of "legal source" funds in structuring cases, and calls for reform, in a report issued by the House Ways and Means Subcommittee on Oversight. In addition, similar legislative hearings have been conducted on the state level. *See, e.g.,* "Civil Forfeiture and Deferred Prosecution Agreements," N.Y.S. Assembly Standing Committees on Codes and on the Judiciary, December 9, 2014. See, "Arresting your property? – How civil a$$et forfeiture turns police into profiteers"   (Heritage Foundation).[10]

## A.  The IRS and DOJ policies against forfeiture of "legal source" funds

As the Court is aware, on October 25, 2014, the Chief of Criminal Investigation for the IRS issued the following statement regarding the agency's change in policy with respect to structuring-based civil forfeiture cases:

> After a thorough review of our structuring cases over the last year and in order to provide consistency throughout the country (between our field offices and the U.S. attorney offices) regarding our policies, I.R.S.– C.I. will no longer pursue the seizure and forfeiture of funds associated solely with 'legal source' structuring cases unless there are exceptional circumstances justifying the seizure and forfeiture and the case has been approved at the direct of field operations (D.F.O.) level. While the act of structuring – whether the funds are from a legal or

---

[10]  To view the booklet online go to: www.heritage.org/ForfeitureReform  and to view more examples of the abuse of forfeiture laws visit: www.heritage.org/ForfeitureAbuse

illegal source – is against the law, I.R.S.- C.I. special agents will use this act as an indicator that further illegal activity may be occurring. This policy update will ensure that C.I. continues to focus our limited investigative resources on identifying and investigating violations within our jurisdiction that closely align with C.I.'s mission and key priorities. The policy involving seizure and forfeiture in 'illegal source' structuring cases will remain the same.

*Statement of Richard Weber, Chief of I.R.S. Criminal Investigation*, N.Y. Times, Oct. 25, 2014.[11]

This IRS announcement was followed a few months later by the adoption of the equivalent policy by the DOJ Criminal Division's Asset Forfeiture and Money Laundering Section, rejecting the practice of seizure and forfeiture "legal source" funds in pure structuring civil and criminal matters. According to the Attorney General's introductory memorandum, "the directive will focus the use of our asset forfeiture authorities against actors that structure financial transactions to hide significant criminal activity, and will further other compelling law enforcement interests."

This DOJ policy "applies to all federal seizures for civil or criminal forfeiture based on a violation of the structuring statute," DOJ Policy Directive 15-3, at p. 1 (March 31, 2015).[12] Thus, it should apply here unless the government can demonstrate why it should not

---

[11]  See also, "IRS clarifies its position on civil forfeitures in uncharged structuring cases," Thompson Reuters Tax & Accounting News, October 29, 2014, available at http://tinyurl.com/IRSpolicy2014

[12]  This statement in the policy adds "except those occurring after an indictment or other criminal charging instrument has been filed." And it also states "[i]f no criminal charge has been filed." It is not clear what the intent or rationale might be of this language, for it conflicts with the stated purpose of the policy, which is to prohibit *any* proceedings involving forfeiture based on "legal source" structuring violations unless the purpose of the structuring was "to hide significant criminal activity." Holder Memorandum, March 31, 2015, accompanying DOJ Policy Directive 15-3. There is no judicial comment on this language and no other explanatory material published by DOJ to specify any other intended meaning. We note that the predecessor IRS directive, which this policy purports to emulate, apparently contained no such exceptions. While there is no publicly stated interpretation of the DOJ policy, its purpose appears to be to give the DOJ room to seek indictments on whatever basis it deems appropriate. Regardless, if the indictment is based solely on a legal source structuring allegation, then, under both the IRS and

apply, or secures the appropriate internal authorizations which actually comport to "a compelling law enforcement reason" to pursue the forfeiture of "legal source" funds.

The thrust of the policy is that the government will seek forfeiture of structured funds only when the structuring is a "gateway" crime to other criminal activity, not to structuring itself.

Although the DOJ policy directive seems oriented towards seizures of bank accounts, not restraints on real property, the policy is not against mere seizures or other restraints on "legal source" funds prefatory to a conviction.  It is against forfeiture of any "legal source" funds *at all*.

In this case, the parties have not fully addressed the question of whether the IRS and Criminal Division policies are implicated in the contemplated forfeiture.  The government stated that it had not sought any authorization because it was not needed, though its

---

DOJ policies, there should be no forfeiture component.
　　We also note that the language in question is susceptible to an interpretation consistent with the Attorney General's stated purpose of the directive. Here is the operant sentence:
　　　　"The guidance applies to all federal seizures for civil or criminal forfeiture based
　　　　on a violation of the structuring statute, except those occurring after an indictment
　　　　or other criminal charging instrument has been filed."
In this sentence, what does "those" refer to?  To say it refers to any seizures for criminal forfeiture does not make sense, because the policy applies not just to seizures pre-conviction but to "asset forfeiture authorities" in general, including seeking forfeiture upon conviction.  And the entire purpose of the directive, as stated by the Attorney General, would be eviscerated if merely incorporating "legal source" assets forfeiture in an indictment created an exception to the policy.  There is no pertinent difference between  "legal source" forfeiture sought before, or without, criminal charge and the same forfeiture sought in connection with a criminal charge.  Rather, the sentence only makes sense if the exception refers to any  "*violation of the structuring statute*" which occurs after criminal charges of any sort have been filed, such as to hide proceeds or facilitate ongoing criminal activities by the person charged. That is, while the policy is laudable where there is no case to be made that the source of structured funds was illegitimate, *after a charge* has been brought of some wrongdoing, the assumption is fair that any structuring is related to the protection of ill gotten gains, to conceal assets from the sentencing court, or to facilitate ongoing unlawful activities.

16

explanation for this was never fully given.[13]  Of course the systemic problem is that the Department of Justice can on the one hand use public policy pronouncements purporting to restrict forfeitures, as a way to deflect pressure from Congress and the public on the other hand, while in court – the only place where it really matters – the government makes the argument that "we're not bound" by these policies.

Under these circumstances, NACDL as *amicus* will not venture to speculate whether the policies would serve to preclude the forfeiture sought here. However, as explained in the next section, we do maintain that the Court has the power to require the government to abide by its policy, if it is found to apply in this case.

## B.  Holding the government to its own policies

The Department of Justice generally maintains that it policies, such as those expressed in the U.S. Attorney's Manual, do not create rights for accused persons. It is not so simple a thing, however, for the government to reserve for itself the ability to arbitrarily choose when to conform to its own guidelines.  While the government's initial decision to adopt a policy may be voluntary, once the policy is adopted, the government is required to comply with it.  Known as the *Accardi* doctrine, this has been the law for at least sixty years.  *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954) (government agency's failure to follow its own policies held to violate due process); *see also Service v. Dulles*, 354 U.S. 363, 388 (1957) (rejecting agency's argument that it was not required to establish more rigorous procedures than required by law; having adopted them, the agency "could not . . . proceed without regard to them").

The *Accardi* doctrine has been repeatedly applied by the Courts, including in this Circuit.  *E.g.*, *Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991) (the *Accardi* "doctrine has continued vitality, particularly where a petitioner's rights are 'affected'") (citing *Morton v.*

---

[13]  At oral argument on June 9, 2015, the defense raised the question of approval required under the IRS and DOJ policies. [p.31] AUSA Kane indicated: "It's my position that IRS approval for this indictment was never needed because it's charging her with – well – . . ." but she was interrupted by defense counsel and her colleague, AUSA Kresse, before completing her answer.

*Ruiz*, 415 U.S. 199, 235 (1974)); *Singh v. U.S. Dept. of Justice*, 461 F.3d 290, 296 (2d Cir. 2006) ("In *Montilla* . . . we expressly adopted the *Accardi* doctrine, interpreting it to hold that, '[t]he failure of the [BIA] and of the Department of Justice to follow their own established procedures [constituted] reversible error'") (quoting *Montilla*, 926 F.2d at 167); *Hickey-McAllister v. British Airways*, 978 F. Supp. 133, 140 (E.D.N.Y. 1997) (holding that petitioner's claim against Customs is "sufficient to state a claim under the *Accardi* doctrine).

As the Second Circuit has held, because the *Accardi* doctrine "is premised on fundamental notions of fair play underlying the concept of due process . . . [i]ts ambit is not limited to rules attaining the status of formal regulations, "'even where the internal procedures are possibly more rigorous than otherwise would be required,' and even though the procedural requirement has not yet been published in the federal register." *Montilla*, 926 F.2d at 167 (quoting *Morton*, 415 U.S. at 325); *see International House v. NLRB*, 676 F.2d 906, 912 (2d Cir. 1982).

Thus, the *Accardi* doctrine applies regardless of whether the agency labels its procedure a regulation, a policy, or something else, and whether the original intent of the policy was to protect individual rights:

> From the variety of situations in which the courts have held that agencies must follow their statements of policy and directives, it is apparent that if the statements are applicable, are made known, and are of guidance for the execution of the agency policies, it makes no difference what they are called nor how they are adopted. The public has a right to rely on them as against some inconsistent case by case subjective determination by a public official. The cases further demonstrate that it makes no difference whether the agency has express statutory authority to adopt the policy. The agency has to run its business, it has to function. This is done by regulations and policy statements, and it makes no difference whether Congress has expressly directed them or not if they are within the general objectives of the agency, and especially if they represent some self-restraint on its authority or discretion as in the case before us.

*United States v. Koerber*, 966 F. Supp. 2d 1207, 1235 (D. Utah 2013) (quoting *United States v. Thompson*, 579 F.2d 1184, 1191 (10th Cir. 1978) (Seth, C.J., McKay & Logan, JJ.,

18

dissenting on other grounds));[14] *see Garner v. Jones*, 529 U.S. 244, 257 (2000) (Court of Appeals erred in disregarding agency's policy statement which was "a formal published statement as to how the Board intends to enforce its rule").  *Accord N.L.R.B. v. Campbell Prods. Dep't, Harry T. Campbell Sons., Co.*, 623 F.2d 876, 881 (3d Cir. 1980) ("Once the Board adopts a particular policy . . . its original discretion is displaced.  It is bound to adhere to the policy it announces, until such time as the policy is modified or abandoned"); *United States v. Leahy*, 434 F.2d 7, 11 (1st Cir. 1970) (holding that "the agency had a duty to conform to its procedure, that citizens have a right to rely on conformance, and that the courts must enforce both the right and the duty"); *United States v. Heffner*, 420 F.2d 809, 812 (4th Cir. 1969) (cases applying the *Accardi* Doctrine to various agency policies, directives and rules "are consistent with the doctrine's policy to prevent the arbitrariness which is inherently characteristic of an agency's violation of its own procedures").

As noted at the outset of this point, the government puts disclaimers in its Manual and in individual policy statements, asserting that such policy statements do not give rise to rights or claims that are enforceable by the accused.  When offering support for this position, the government typically refers to *United States v. Caceres*, 440 U.S. 741, 752-55 (1979).  The Second Circuit in *Montilla, supra* p. 17, specifically addressed the *Caceres* line of cases, and explained the divergence between those cases and those applying the *Accardi* Doctrine:

> To be sure, the cases are not uniform in requiring that every time an agency ignores its own regulation its acts must subsequently be set aside.  Nonetheless, decisions contrary to the views expressed in *Accardi* may generally be distinguished from the instant case because in most of those cases the agency regulation that was departed from governed internal agency procedures rather than, as here, the *rights or interests* of the objecting party.

*Montilla*, 926 F.2d at 167 (emphasis added) (citing *Caceres*, 440 U.S. at 752-55; *American*

---

[14]  The *Thompson* case involved the D.O.J.'s "Petite Policy," which relates to a policy of avoiding multiple successive prosecutions arising from the same conduct.  The Petite Policy, which has been held not to be binding on the agency for purposes of the *Accardi* Doctrine, is not applicable here.

*Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 538-39 (1970); *United States v. Lockyer*, 448 F.2d 417, 420-21 (10th Cir. 1971); *Modern Plastics v. McCulloch*, 400 F.2d 14, 19 (6th Cir. 1968);  *NLRB v. Monsanto Chem. Co.*, 205 F.2d 763, 764-65 (8th Cir. 1953)).

Here, the nationally announced DOJ and IRS policies of not seeking criminal penalties or forfeiture for garden-variety structuring that is not associated with any independent criminal activity, certainly affects the "rights or interests" of those whom the policy change would benefit.  Of course, this is especially so in cases where there are criminal charges and defense counsel is needed, and the restraints imposed by the government in anticipation of a forfeiture verdict impair the ability of the person to defend against the charges and the forfeiture.

# Unauthorized "money judgment" forfeiture

Having made the point that forfeiture is entirely a creature of statue, *supra* p. 7, and in the context of the Court's evident concern for the proper role of forfeiture tools in the investigation, at the grand jury, in effecting a pretrial restraint, and as a punishment, we take the liberty to point out another aspect of the prospective forfeiture in this case which is of concern to this *Amicus*.

The forfeiture notice refers to

> property involved in the offense of Title 31, United States Code, Section 5324, and all property traceable to such property, including but not limited to:
>
> *   *   *
>
> Money Judgment:
> A sum of money equal to $74,000.00 United States currency, which is the total amount of the property involved in the offenses of conviction. Said amount is to be evidenced by a monetary judgment.

It is not clear on this record whether the government seeks this *in lieu of* or *in addition to* the forfeiture of the house.  Here the money allegedly involved in the structuring went to

20

Wells Fargo Bank, but the government is not seeking it from Wells Fargo.[15]  Instead it hypothesizes the existence of a "money judgment" which "evidences" the same "amount" and is apparently considered a proxy for the actual funds.

The use of the "money judgment forfeiture" has proliferated, largely unnoticed by the courts and defense counsel.  This is probably by virtue of the numbing effect of the bewildering number of forfeiture authorities that Congress has enacted in recent years, and the superior bargaining power of prosecutors in the plea process which usually results in the accused being left unable to challenge forfeitures.  Forfeiture may seem of less consequence to defense counsel than jail time that is saved in the "bargain."  The general approach in such cases is for the government to identify any dollar value it wants to associate as "proceeds" of an offense and then assume that a "money judgment" can be authorized in that amount against any convicted defendant, obviating concerns for traceability, nexus, etc.

The general antecedent for a so-called "money judgment" forfeitures derives from case law under the RICO statute. That precedent, of which *United States v. Robilotto*, 828 F.2d 940, 948-49 (2d Cir. 1987) is the original case in this circuit, is simply inapplicable to later-enacted statutes, such as 31 USC §5317(c), which read quite differently and more narrowly. RICO contained the first 20th century provision for criminal forfeiture. Codified in 18 U.S.C. § 1963(a)(1), it provided for forfeiture, upon conviction, of "any interest [the defendant] has acquired ... in violation of" RICO's substantive prohibition. The Supreme Court construed "interest" broadly to include the proceeds of racketeering. *Russello v. United States*, 464 U.S. 16, 22 (1983). In *Robilotto* the Second Circuit ruled, "Because the forfeiture imposed upon [the appellant raising the challenge] is *in personam*, the government need not trace the proceeds of [defendant-appellant's] racketeering activities to identifiable assets."

---

[15]  Ordinarily, we would expect that a bank which was a recipient of funds derived from structured transactions would have a *bona fide* claim to the funds, and be able to avoid having to satisfy a forfeiture order.  One might question here, however, whether Wells Fargo Bank, which received numerous money orders, purchased on the same day, presumably by the same person, in $500 amounts totaling $10,000 or less on any given day, would be on notice that the funds were the product of structuring.

828 F.2d at 949. The Court therefore ruled the forfeiture "valid," *id*., rejecting the argument that the statute required tracing of the original proceeds to property in the defendant's possession, at that time.

In contrast with RICO's focus on "interest[s] ... acquired," §5317(c), like most other forfeiture provisions, refers to forfeiture only of property "involved in" or "traceable to" the antecedent offense.  Nothing else is made forfeitable by that provision

When Congress enacted § 5317(c) in October 2001 as § 372 of the USA PATRIOT Act,[16] it expressly rejected the *Robilotto* approach, which in the absence of statutory compulsion had rejected a demand for tracing.  Congress instead adopted a tracing requirement. What is criminally forfeitable upon conviction is plainly stated: property that was "involved in the offense" and "any property traceable thereto."  Forfeiture of property of equal value, such as money, is nowhere mentioned as a third option.

Although the Judicial Conference (by close vote) inserted an unfortunate reference to the notion of "personal money judgments" into the revised Fed.R.Crim.P. 32.2(b)(1), in language which attempts to defeat any claim to a jury trial, the Advisory Committee Note carefully reminds the reader that the Conference has taken no position on substantive validity of the "money judgment" concept, thus avoiding a substantial question under the Rules Enabling Act, 28 U.S.C. § 2072(b).  Careful consideration of the language, structure, history and purpose of the post-1984 criminal forfeiture statutes demonstrates that such personal money judgments are not authorized. See *United States v. Croce*, 334 F.Supp.2d 781 (E.D.Pa. 2004), adhered to on reconsideration, 345 F. Supp.2d 492 (E.D.Pa. 2004), reversed on a different issue, 209 Fed. Appx. 208 (3d Cir. 2006) (not precedential). Judge Dalzell's opinion for the district court in *Croce* is actually the first analysis of the issue to examine pertinent statutory text and principles, and which does not simply cite earlier case law.

The dubious nature of the court-created "money judgment" concept is highlighted by

---

[16]  See USA PATRIOT Act, § 372, Pub.L. 107-56, Oct. 26, 2001. In the same section, Congress struck a prior criminal forfeiture provision applicable to cases under § 5324 from the general forfeiture provision for financial crimes, 18 U.S.C. § 981.

the Supreme Court's decision in *Flores-Figueroa v. United States*, 556 U.S. 646, 129 S.Ct. 1886, 1893 (2009). In that case the Court was confronted with a claim that it would enhance the purpose of the identity theft statute to interpret it to allow conviction without proving that the accused knew that the ID refers to a real person. Rejecting judicial lawmaking of this type, the Supreme Court's largely unanimous opinion states: "[C]oncerns about practical enforceability are insufficient to outweigh the clarity of the text. . . . [W]e cannot find indications in statements of its purpose or in the practical problems of enforcement sufficient to overcome the ordinary meaning, in English or through ordinary interpretive practice, of the words that [Congress] wrote." Neither of the separate concurrences disagreed.

The author of the highly authoritative two-volume treatise, "Prosecution and Defense of Forfeiture Cases," (Mathew Bender), David Smith, has written the following:

> The concept of a personal money judgment, which looks and acts like a criminal fine, departs from the basic nature of a forfeiture, whether civil or criminal. It is deemed a "forfeiture" of sorts, but no specific property is forfeited. More important, this judicial lawmaking violates the principle of separation of powers as well as an important rule of statutory construction. As discussed below, money judgments allow the government to avoid the need to trace. They provide a way for the government to exaggerate the amount of proceeds generated by the offense of conviction through erroneous extrapolations. They allow for joint and several liability among co-defendants through an additional judicial invention. They produce forfeiture judgments that hang over a defendant for the rest of his life, regardless of his ability to pay, thus interfering with his rehabilitation.

(Footnotes omitted) David B. Smith, "A Comparison of Federal Civil and Criminal Forfeiture Procedures: Which Provides More Protections for Property Owners?" Heritage Foundation, Legal Memorandum No. 158, July 30, 2015.[17]

In 2009, Judge John Gleeson addressed this issue in his usual thoughtful manner:

> Other statutes demonstrate that when Congress intends to authorize personal money judgments, it does so explicitly. In the USA PATRIOT Act of 2001, Congress created the new federal crime of

---

[17] This paper, in its entirety, can be found at http://report.heritage.org/lm158

23

"bulk cash smuggling." Like § 982, 31 U.S.C. § 5332(b)(2) provides that "the court, in imposing sentence ..., shall order that the defendant forfeit to the United States, any property, real or personal, involved in the offense, and any property traceable to such property." However, the relevant section also provides that "[i]f the property subject to forfeiture under [ (b)(2) ] is unavailable, and the defendant has insufficient substitute property that may be forfeited pursuant to [21 U.S.C. § 853(p) ], the court shall enter a personal money judgment against the defendant for the amount that would be subject to forfeiture." 31 U.S.C. § 5332(b) (4). This language authorizes the entry of a personal money judgment, but does so only when an individual is convicted of bulk cash smuggling and has insufficient substitute property. Because Congress knows how to explicitly authorize and require the imposition of a personal money judgment in a forfeiture proceeding, I view its failure to do so in § 982 and § 853 as intentional rather than inadvertent. *Cf. Chapman v. United States*, 500 U.S. 453, 459, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) ("Congress knew how to indicate that the weight of the pure drug was to be used to determine the sentence, and did not make that distinction with respect to LSD.").

*United States v. Surgent*, 2009 WL 2525137 at *6 (E.D.N.Y. 2009). While it is true that, in *United States v. Awad*, 598 F.3d 76, 79 n.5 (2d Cir. 2010), in a footnote to a *per curiam* decision, the panel dismissed the ruling in *Surgent* as "unpersuasive." The primary point raised by the Appellants in *Awad* was that they did not have funds to pay. The issue of the validity of a money judgment *at all* was not raised by the Appellants in their briefs, nor was it argued. Rather, the question was only addressed in Rule 28(j) submissions invited by the panel, which appears to have belatedly stumbled on the question. Thus, the *per curiam* ruling does not have building blocks of a broad precedential pronouncement on the subject.

The *Awad* decision relied heavily on the Third Circuit decision in *United States v. Vampire Nation*, 451 F.3d 189, 201-03 (3d Cir. 2006), and assumed that *Vampire Nation* contradicted the holding in *Surgent*. While upholding the concept of entering an *in personam* money judgment in a criminal mail fraud forfeiture under 28 U.S.C. § 2461(c), the Third Circuit actually ruled that:

"the *in personam* forfeiture judgment [is not] a general judgment *in personam*. The judgment *in personam* here is one in forfeiture and is

limited by the provisions of 21 U.S.C. § 853(a) . . . ."

*Id*. at 202. Thus, the personal judgment applies only to property described in the applicable substantive forfeiture provision (there, stated as § 853(a)[18]) or other property actually traceable to such forfeitable property, and if tracing fails, then to substitute assets as defined and limited by § 853(p).[19]

---

[18]  The Third Circuit's reference to § 853(a) may have been an inadvertent error by the panel. As stated earlier in the *Vampire Nation* opinion, 451 F.3d at 200, the substantive civil forfeiture provision applicable there (on account of the defendant's mail fraud violation), rendered criminal by § 2461(c), was not 21 U.S.C. § 853(a), but rather 18 U.S.C. § 981. Even if the reference to § 853(a) is a mistake, however, it makes no difference to the analysis in the opinion, as applied to criminal forfeiture of a defendant's interest in the proceeds (or property derived from proceeds) of an offense.

[19]  The *per curiam* decision by the panel in *Awad* also referred to *United States v. Casey*, 444 F.3d 1071 (9th Cir. 2006); *United States v. Hall*, 434 F.3d 42 (1st Cir. 2006); and, *United States v. Baker*, 227 F.3d 955 (7th Cir. 2000).  In *Casey*, the Ninth Circuit admitted that the statute does not "explicitly authorize money judgments, which could be satisfied out of the defendant's future assets."  44 F.3d at 1073.  The court believed that "imposition of a money judgment on a defendant who currently possesses no assets furthers the remedial purpose of the forfeiture statute by ensuring that all eligible criminal defendants receive the mandatory forfeiture sanction Congress intended."  Id. at 1074.  But the court failed to address the fact that Congress had explicitly authorized money judgments only in the case of bulk cash transfers, and overlooked the availability, under Rule 32.2(e), of an amendment "at any time" of an existing order of forfeiture to include property that "is substitute property that qualifies for forfeiture under the statute."  The Ninth Circuit simply, and unnecessarily, rewrote the statute.

    *Baker* and *Hall* suffer from the same shortcomings.  Both courts claim to rely on the intent of § 853, but engage in no meaningful examination of the language.  *Baker* also cites *United States v. Candelaria-Silva*, 166 F.3d 19 (1st Cir. 1999) and *United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996).  *Candelaria-Silva*  cited no authority or rationale its conclusion that "the government is entitled to an in personam judgment against the defendant" in a proceeding under § 853.  *Voigt* does not appear to address the issue: Voigt was required to forfeit substitute property. (The Third Circuit in *Vampire Nation* did not even mention *Voigt*.)

    *Hall* merely gives reasons why the court thought money judgments made sense as part of criminal forfeiture orders, but did not endeavor to show that forfeiture money judgments are authorized by § 853.  It offers no answer to the fact that Congress has explicitly authorized forfeiture money judgments in other contexts but chose not to do so in § 853.

    *Awad* also refers to *United States v. Bermudez*, 413 F.3d 304 (2d Cir. 2005)(*per curium*), but there the defendant did not challenge the authority to issue the forfeiture money judgment, nor did the Second Circuit substantively address the issue.  As admitted by the government in the *Surgent* case, *Bermudez* is a case where "the Second Circuit affirmed forfeiture orders awarding

The *Awad* decision also was based on a different statute. The underlying offense was money laundering, and the decision placed heavy reliance on the fact that the statute – contrary to the general convention noted above at p. 7 – should be construed "liberally." 21 U.S.C. § 853(o). Here we have the entirely different policies and potential harms relating to structuring of transactions, where *any forfeiture* may be disproportionate to the harm in failing to report, as suggested above at pp. 12, 13. And, in the area of avoiding currency transaction reporting, as the excerpt from Judge Gleeson's decision notes, there is an express adoption of "money judgement" forfeiture in this very Chapter involving "Monetary Transactions" – but only in the case of "bulk cash smuggling." 31 U.S.C. § 5332(b)(2). For that, "a personal money judgment against the defendant for the amount that would be subject to forfeiture" is expressly allowed. 31 U.S.C. § 5332(b)(4). Congress' clear choice *not* to make such forfeiture available elsewhere in the same Chapter, precludes its use in garden variety structuring cases. So, *Awad*, whatever weight it might otherwise be given, certainly cannot be taken as a bar to a determination, in the case of mere structured transactions, to disallow any claim for so-called "money judgment forfeiture" in derogation of the "involved in" or "traceable to" dictates of the statute.

---

money judgments without discussion or analysis." *Surgent*, 2009 U.S. Dist. LEXIS 72563, at *20.

# Conclusion

While the immediate answers to the questions posed by the Court for *amici* are relatively simple, the Court's questions aptly point to more complex problems in the use of forfeiture vehicles in structuring-only cases.  This is amplified by the considerable confusion in this case surrounding the actual role of the grand jury and the meaning and applicability of the government's own reform-oriented forfeiture policies.  The National Association of Criminal Defense Lawyers submits that this is a case which warrants further examination of these practices and policies with an eye toward the power of the Court to make the government adhere to its own policies which affect the substantial rights of individuals.

Moreover, this is an apt case to curb the swell of the government's unauthorized use of "money judgment" forfeiture to evade Congress' limitation of forfeiture to property "involved in" or "traceable to" the offense of conviction.

Dated:  March 22, 2016

Respectfully submitted,
/s/ Mark J. Mahoney

Richard D. Willstatter
GREEN & WILLSTATTER
200 Mamaroneck Avenue, Suite 605
White Plains, NY 10601
Tel: 914-948-5656
willstatter@msn.com
*NACDL Amicus Committee, Second*
*Circuit Vice-Chair*

Mark J. Mahoney
HARRINGTON & MAHONEY
70 Niagara Street, 3rd Floor
Buffalo, NY  14202-3093
(716) 853-3700
mjm@harringtonmahoney.com

Steven L. Kessler, Esq.
LAW OFFICES OF STEVEN L. KESSLER
100 Park Avenue
Thirty-Fourth Floor
New York, N.Y. 10017-5516
(212) 661-1500