UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

United States of America

v.

Georgina Fisher, *also known as*
Georgina Baratta,

                              Defendant.

**REPORT AND
RECOMMENDATION**
15-CR-19A

## I.   INTRODUCTION

The Hon. Richard J. Arcara has referred this case to this Court under 28 U.S.C. § 636(b).

(Docket Entry Jan. 29, 2015).  Pending before the Court are four motions filed by either the

Government or defendant Georgina Fisher ("Fisher").  Fisher has filed a motion to strike the

forfeiture notice in the superseding indictment; this is the remaining active part of Docket No. 21.

The Government has a pending motion to set a scheduling order for omnibus pretrial motions.

(Dkt. No. 77.)  Fisher has a pending motion to compel certain discovery under Rule 16 of the

Federal Rules of Criminal Procedure and under *Brady v. Maryland*, 373 U.S. 83 (1963).  (Dkt. No.

79.)  Finally, Fisher has a pending motion to dismiss the indictment and to award costs and fees.

(Dkt. No. 80.)

After due consideration of the case docket and the papers filed for the pending motions,

the Court respectfully recommends granting Fisher's motion to dismiss in part and dismissing the

indictment without prejudice.  The Court recommends denying the motion to the extent that it

seeks any other relief.  In the alternative, the Court recommends granting Fisher's motion to strike

the forfeiture notice.  The Court further recommends denying the parties' remaining motions as

moot.

## II.   BACKGROUND

This case concerns allegations of "imperfect structuring," the Department of Justice's informal term for causing a financial institution to fail to file a report in violation of 31 U.S.C. § 5324(a)(1) (hereinafter "failure to file").  The Court will review the superseding indictment in more detail below; in short, the Government has accused Fisher of purchasing numerous money orders at times and in amounts that evaded financial regulations requiring the reporting of large financial transactions.  Three items or sets of items have been the subject of the Government's attention: a set of money orders, all purchased from Western Union, in a total amount of $74,000; a house that Fisher owned between 2007 and 2012, located at 3443 Ashwood Drive, North Tonawanda, New York (the "Ashwood home"); and a house that Fisher purchased in 2011, located at 4640 Theresa Lane, Niagara Falls, New York (the "Theresa Lane home").

What follows is a close look at how the Government presented this case to the grand jury. Examining the Government's presentation to the grand jury is important to understanding why Fisher seeks dismissal of the indictment.  Examining the presentation also puts the Court's concerns about the grand jury vote in context.

### A.  Proceedings before the Grand Jury

The Government convened a grand jury more than once for this case, as part of an investigation that dated back to 2010.  The first session occurred on January 21, 2015.  The Government introduced the case as a structuring case and introduced the relevant reporting requirement generally by stating that "if you are going to purchase money orders or things, MoneyGrams, money orders, you can't purchase more than $3000 without showing identification. Again, it's one of these things to keep track of the flow of money, so it's a $3000 requirement."

(Dkt. No. 106 at 4.)[1]  Immediately after this introduction, the Government told the grand jury about the relationship between this case and a prior case in this District, *U.S. v. Gregory Fisher*, Case No. 08-CR-315.  In the prior case, Fisher's then-husband Gregory Fisher ("Gregory") pled guilty to mail fraud and filing false tax returns.  For the sake of clarity, the Court will summarize the theory of events across both cases that the Government presented to the grand jury.  According to the Government, Gregory amassed several million dollars of proceeds from his fraud scheme, and about $500,000 of proceeds remained unaccounted for when that case ended.  Between the time of his sentence and his reporting to prison, Gregory gave some or all of the $500,000 of fraud proceeds to Fisher, who laundered it in the following alleged sequence.  Fisher bought large amounts of money orders in a short time and in amounts just under relevant reporting requirements.  Fisher used those money orders to pay off the mortgage that she had on the Ashwood home.  Fisher then obtained a line of credit against the equity in the Ashwood home, bought the Theresa Lane home, sold the Ashwood home, and paid off the line of credit.

The Government connected Gregory's case and this case by stating that "the background of this case is that Georgina Fisher was married to a guy who got in trouble for some criminality and was prosecuted.  She came into some cash—this is not part of this case, but it was probably the ill-gotten gains of the proceeds of her husband's criminal activity."  (*Id.* at 4–5.)  After summarizing how Fisher allegedly went to different institutions to buy money orders, the Government referred

---

[1] For the reasons stated before (Dkt. No. 64 at 15–19), and to alleviate the Government's concerns about selective quoting (*see* Dkt. No. 92 at 10 n.3), the full grand jury transcript has been docketed under seal with access restricted to the named parties and their counsel.  Where it has appeared in the record of voting, the foreperson's signature has been redacted.   The parties should contact the Clerk's Office if they have trouble accessing the sealed document.  The Court will address the Government's unilateral public disclosure of grand jury material separately below.

to Gregory again when summarizing Fisher's anticipated defense. "She wasn't attempting to evade the reporting requirements. She was just following her husband's instructions, who I believe at this time was in jail. The only relation to that is background and it goes to what her defense is. Listen, my husband told me to do this, I was just doing what he told me to do, I knew there was a requirement, but I never intended to evade any reporting requirement." (*Id.* at 6.) Introducing Gregory caused the grand jury to think about him; for example, a grand juror subsequently asked whether the Theresa Lane home had been "part of the assets purchased with the fraud proceeds." (*Id.* at 14.) A conversation about Gregory ensued (*see id.* at 15–20) that included statements that "he pled guilty to a lot of criminal activity" (*id.* at 16), that "there is reason to believe that the money used to pay off the mortgage was the proceeds of his criminal activity" (*id.* at 19), and that "[a]gain, let me just throw this out there and this is not for the record. I know you have to take it down, but so Greg Fisher is being investigated, so he's going to be the forefront, right? So law enforcement has limited resources *so they focus on the big fish and then they go down*." (*Id.* at 20 (emphasis added).)

Later on January 21, 2015, an agent with the Internal Revenue Service ("IRS") testified before the grand jury about an ongoing investigation of Fisher. The agent took the time to present details of how many money orders Fisher allegedly purchased, and at what locations, and over what period of time. Before long, though, the conversation returned to Gregory:

Q. Now, was there mention during the interview of her husband Greg Fisher?

A. Yes.

Q. And without getting into a lot of detail, is it fair to say that Greg Fisher had his own problems with the law?

A. Yes.

4

Q.  And specifically he had some fraud charges against him?

A.  He did.

Q.  And do you recall at the time that you interviewed Ms. Fisher whether or not Greg Fisher had pled guilty?

A.  Yes, he had.

Q.  What was the nature—again, generally what was the nature of his offense?

A.  He pled guilty to defrauding several banks, two or three, and West Herr Ford. He basically had a scheme.  He was telling them he was up-fitting cars for like a data emergency in case all the power goes down in your business, he would come to the rescue with his vehicle that was uploaded with electronic devices to save your electronic data is basically what he was selling to West Herr Ford, so West Herr Ford invested a lot of money with him and it turned out he was just stealing it and he also had some tax problems as well.

Q.  So Greg Fisher was defrauding West Herr and you indicated financial institutions?

A.  Correct.

Q.  What dollar amount are we talking about?

A.  I'm not 100 percent sure of the dollar amount, but at least a couple million dollars.

Q.  And was that an investigation that you were directly involved in?

A.  Yes.

Q.  Was another agency involved in that as well?

A.  Yes, the FBI.

Q.  As part of that investigation were you able to trace all of the several million dollars that Greg Fisher took?

A.  We were not able to trace all of it, no.

Q.  Were you able to trace some of it?

A.  Yes.

Q.  About what percentage?

A.  I want to say there was about $500,000 or so that we couldn't trace.

Q.  Could or could not?

A.  Could not trace.

Q.  Just in general why were you not able to trace that?

5

A.  Because he either—he had cash, he wrote checks out to cash to individuals, cashed the checks.  Once the instrument becomes cash it's hard to follow where the cash went.  He did purchase some significant assets with it that we were able to determine that's what he used the money for.

Q.  Right, and so that would be a traceable use of the funds and so arguably the government can then seek to forfeit those assets, correct, as purchased with criminally obtained money, correct?

A.  Correct.

Q.  But about $500,000 or so is your recollection of the dollar amount of the fraud that you could not trace to a specific asset?

A.  Correct.

(*Id.* at 48–50.)  The testimony then turned to an explanation of the difference between structuring and money laundering, with a suggestion that Fisher laundered Gregory's fraud proceeds and that the Government knew that but could not prove it beyond a reasonable doubt:

Q.  So structuring and money laundering can go together, but you can have either separately so you can have structuring where there is no laundering and laundering where there is no structuring; correct?

A.  Correct.

Q.  And in this case regarding Ms. Fisher, the investigation focused on structuring without the laundering and that has to do with the source of the funds and proof of the source of funds; correct?

A.  Right.  It would have to be the illegal proceeds in order to determine that she was laundering the money.

Q.  And that would have to be proven at trial beyond reasonable doubt; correct?

A.  Correct.

Q.  And so the reason for not focusing on money laundering with respect to this $300,000 that we've been talking about here was what?

A.  The source of the money we could never really say for sure because it's cash.  I disapproved her claim that that was her life earnings, but we couldn't really say for sure it was illegal proceeds from her husband's fraud.

(*Id.* at 53.)  From here, the Government proceeded with a lengthy dialogue with the agent that reinforced for the grand jury that Gregory's untraced fraud proceeds wound up with Fisher and

6

that Fisher likely laundered the money:

> Q.  So circumstantially there might be evidence that there was about $500,000 per
> your testimony of the money from Greg Fisher that you couldn't trace.  She
> happened to have $300,000 worth of cash, but other than that *circumstantial
> logical argument*, proof beyond a reasonable doubt is another thing?
>
> A.  Correct.
>
> Q.  Now, I believe you testified that there were assets of Greg Fisher that were
> seized or forfeited?
>
> A.  Yes.
>
> Q.  Both seized and forfeited ultimately?
>
> A.  He surrendered it.
>
> Q.  So in other words, he didn't fight the seizure or the taking of the assets?
>
> A.  Right.  In his plea agreement he agreed to forfeit these things.  He had several
> store value cards like Wegmans and wherever.  Like he bought a bunch of store
> value cards.  He turned those in.  He had gold coins that were taken and sold
> and he did forfeit about $500,000 in cash as well.
>
> Q.  The house that this mortgage relates to?
>
> A.  Yes.
>
> Q.  Was there a reason why that was not pursued in terms of seizure?
>
> A.  *It's still possible that that could happen.*
>
> Q.  And what would—but it wasn't?
>
> A.  It wasn't.
>
> Q.  And the reason why it wasn't at that time—again, I'm asking you to go back on a
> different case, but generally if you know, or remember?
>
> A.  I don't recall specifically why we didn't make the decision to go after a seizure of
> the house.

(*Id.* at 54–55 (emphasis added).)  The Government then presented the grand jury with a window of

opportunity when Gregory would have transferred his fraud proceeds to Fisher for laundering:

> Q.  So I'm going to go through a timeline with you.  So it's by February 2010 the
> mortgage is paid off, correct?
>
> A.  Yes.
>
> Q.  Okay.  Greg Fisher is already serving his sentence at that point?

A.  My recollection is that in September 2009 is when Greg Fisher reported to federal prison.

Q.  And do you recall what his sentence was?

A.  Three years.  He spent almost three years.  I think he was released in January 2012.

Q.  Did you say September of `09?

A.  September of `09 is my recollection he reported and he was released to a halfway house in January of 2012.

Q.  Okay.  So in September, 2009 when he—by September, 2009 this is when he had to report to the Bureau of Prisons to begin serving his sentence; correct?

A.  Correct.

Q.  So he pled guilty some time prior to that?

A.  Yes.  Probably two years prior.

Q.  Two years prior?

A.  I want to say that it was—I wish I could pull these dates out of my head.  Maybe not quite as long.  It was at least a year prior.

Q.  And the conduct by Ms. Fisher begins in April 2009?

A.  Correct.

Q.  So after he's convicted.  Most likely after he pled guilty probably; correct?

A.  Yes.

Q.  But before he reports to jail?

A.  Correct.

Q.  Do you recall, did he have a voluntary surrender?

A.  Yes.

Q.  So in other words, he was given a date to show up at jail and—

A.  And he did.

Q.  Okay.  Is it fair to say going through this logically that as of the time that Greg Fisher was being investigated that there was no equity in the house?

A.  I believe she purchased the house in `07 I want to say, 2007, and made regular mortgage payments like people do.  She wrote a check once a month, January payment, February payment, one check for about two years and then in April is when the large principal payments started to be completed with the money orders.

8

(*Id.* at 55–57.)  The agent next gave a possible explanation for why the house in question between 2007 and 2009, the Ashwood home, was not forfeited in Gregory's case: Fisher bought it in her own name, she was not married to Gregory at the time of the purchase, and the Ashwood home had little equity in it.  The agent testified that the Ashwood home was sold in 2010[2] and that Fisher lived in the Theresa Lane home since then, which prompted this brief exchange regarding forfeiture:

> Q.  We're getting into all this forfeiture stuff, but if you could trace the proceeds from one house to the next house he could take the next in line house arguably; correct?
> A.  Correct.

(*Id.* at 59.)

The grand jury resumed proceedings on January 28, 2015.  Up to this point, the testimony that the grand jury received about Fisher's money orders concerned "perfect structuring" under 31 U.S.C. § 5324(a)(3).  The Government now announced that it was switching to failure to file under 31 U.S.C. § 5324(a)(1).  (*See id.* at 65 ("Apparently as that statute [5324(a)(3)] has been used and reviewed, the determination by the Department of Justice has been it's better to charge it under Subsection 1 of that statute, so let me read it to you.").)  After some discussion of Subsection 1, the IRS agent returned for additional testimony about money orders that Fisher allegedly purchased.  Gregory made a brief reappearance in the testimony when the agent reiterated that large principal payments on the Ashwood home began around April 2009 after Fisher married Gregory.  (*See id.* at 94.)  The agent also added more detail about how Gregory's fraud proceeds made their way through Fisher's two houses: She paid off a mortgage on the

---

[2] (*Id.* at 58.)  The Ashwood home actually was sold on October 19, 2012.  (Dkt. No. 35-1 at 28.)

Ashwood home; then obtained a line of credit for that house and used the money from the line of credit to buy the Theresa Lane home; and then paid off the line of credit.  (*See id.* at 95–96.)  At this point, a piece of dialogue occured that was somewhat confusing but is important to the Court's discussion of substitute assets below.  The charge now before the grand jury was causing a financial institution to fail to file a report, though the Government continued to use the word "structuring."  Either way, perfect structuring or failure to file a report would not in itself obtain or generate new funds.  The Government nonetheless blurred structuring/failure to file with Gregory's fraud proceeds and had this exchange with the agent:

> Q.  As a result of that [the transactions leading from the Ashwood home to the Theresa Lane home] for purposes of the forfeiture statute, is the property at Theresa Lane subject to forfeiture because it was ultimately purchased with funds obtained as a result of structuring activity?
>
> A.  Correct.  She paid off the Ashwood Lane with the structured funds, then obtained a loan from that house, the line of credit, secured it, bought another house, then sold the Ashwood house and paid off the line of credit, *so it was like a substitute asset.*
>
> * * *
>
> Q.  And that money is traceable to the structured purchases of money orders?
>
> A.  Yes because *Theresa Lane is a substitute asset* that as she went through the process of what she did, it ends up in Theresa Lane, mortgage free.

(*Id.* at 96–97 (emphasis added).)  By now, the extensive discussion of Gregory, of the ultimate fate of his fraud proceeds, and of substitute assets had its intended effect.  The grand jury entered a dialogue with the Government about the details of the transactions involving the Ashwood home and the Theresa Lane home.  (*See id.* at 109–10.)  The grand jury's concern about the fate of the fraud proceeds prompted the Government to try to pull back and to emphasize that "[e]ven though there is testimony about what happened with the money orders, it's not part of the actual

10

elements of the offense" (*id.* at 110), but even then the Government stated immediately thereafter that the fate of the fraud proceeds "comes in down the line when we talk about forfeiture because we have to trace the money" (*id.*).  After a read-through of a draft of the original indictment, the grand jury returned to the topic of the fraud proceeds by asking whether Fisher "is not being held accountable for the whole $302,000." (*Id.* at 115.)  The grand jury continued to think about how Gregory's proceeds wound their way through two houses when another dialogue began in response to the question, "So if you're not going after the $315,000, you're only going after the $74,500, why are you forfeiting the house that's worth $170,000?" (*Id.* at 116.)  During the dialogue, the Government hinted at Gregory and the substitute asset principle again when stating that "because we can show that that asset [*i.e.*, the Theresa Lane home] was purchased with $74,000 worth of money orders, we can forfeit it" (*id.* at 117) and "[t]he evidence that is forfeitable is the entire conduct on her part dating back to April 2010,[3] so it's broader than the nine counts that are specifically charged" (*id.* at 118).  Ultimately, a threshold number of grand jurors voted to issue the original indictment.

The grand jury convened again for Fisher's case several months later, on May 13, 2015, to consider a superseding indictment.  The Government reminded the grand jury of its previous vote to issue the original indictment.  The grand jury then heard additional testimony from the same IRS agent about the money orders that Fisher allegedly purchased.  The testimony contained no mention of Gregory, the fraud proceeds, or substitute assets.  Nonetheless, the grand jury remembered those topics from the proceedings for the original indictment and asked questions

---

[3] April 2009 likely was intended and understood by the grand jury, given the prior testimony that Fisher's alleged conduct began in April 2009.  (*See id.* at 56.)

about the two houses again. (*See id.* at 164–65.)  The grand jury subsequently voted to issue the

superseding indictment.

### B.  The Indictments

The original indictment (Dkt. No. 1) contained nine counts.  In each count, the

Government accused Fisher of violating 31 U.S.C. §§ 5324(a)(1) and 5324(d)(1).  Each count

corresponded to a date on which Fisher allegedly bought money orders; all of the money orders

purchased on a given date were grouped under the count assigned to that date.  The original

indictment also contained a forfeiture notice that mentioned the Theresa Lane home, a money

judgment for $74,000, and an intention to pursue substitute assets if necessary.

The superseding indictment (Dkt. No. 20) was substantially similar to the original

indictment.  The superseding indictment contained eight counts of violations of 31 U.S.C.

§§ 5324(a)(1) and 5324(d)(1); again, money orders allegedly purchased on a certain date were

grouped together, and each date led to a separate count.  The superseding indictment added the

serial number for each money order in question.  The forfeiture notice in the superseding

indictment was identical to the one in the original indictment.

### C.  The Lis Pendens

Shortly after the filing of the original indictment, on February 12, 2015, the Government

filed a notice of *lis pendens* under N.Y. CPLR Article 65 with the Niagara County Clerk's Office.

(Dkt. No.  7.)  The notice of *lis pendens* listed the Theresa Lane home.  Around the same time,

Fisher sought to borrow money against the equity in the Theresa Lane home to fund legal

representation.  When she discovered the *lis pendens*, Fisher explained to the Government that "we

anticipate that potential lenders will require a statement from the government regarding the equity

available in the Theresa Lane home." (Dkt. No. 21-2 at 6.)  The Government denied the request

for the information, stating that "[t]he government's claim on the property is secured by a *lis*

*pendens*.  Accordingly, the government will oppose any attempt by your client to encumber the

property." (*Id.* at 8.)  The Government filed a release of the *lis pendens* on November 17, 2015.

(Dkt. No. 76.)  The release came after the Court's partial release of the grand jury transcript. (*See*

*generally* Dkt. No. 64.)

### D.  Pending Motions and Government Representations

  i.  *Motion for Monsanto hearing, lifting of lis pendens, and striking of forfeiture notice*
      *(Dkt. No. 21)*

Fisher filed her first substantive motion on May 14, 2015, the day after the filing of the

superseding indictment.  In the motion, Fisher requested "an Order: (1) granting a hearing

pursuant to *United States v. Monsanto*, 924 F.2d 1186 (2d Cir. 1991); (2) directing the United

States to remove any *lis pendens* or other restraints on Defendant's property; (3) striking certain

forfeiture allegations in the subject Indictment; and/or (4) granting any additional relief the Court

in its discretion deems appropriate." (Dkt. No. 21 at 1.)  In the motion, Fisher explained that she

needed the equity in the Theresa Lane home to fund her defense.  Citing *U.S. v. Gotti*, 155 F.3d

144 (2d Cir. 1998), Fisher gave her first notice "that the government cannot restrain certain assets

pretrial unless they are specifically identified as forfeitable in the indictment.  Substitute assets may

not be restrained pretrial." (*Id.* at 4.)  Fisher offered the following argument in support of

removing the forfeiture notice from the superseding indictment altogether:

> 31 U.S.C. § 5317(c) provides for forfeiture of all property involved in and
> traceable to an offense under 31 U.S.C. § 5324.  To establish probable cause that
> property is subject to forfeiture the government must have reasonable grounds that
> rise above "mere suspicion." *United States v. Banco Cafetero Panama*, 797 F.2d 1154,

13

1160 (2d Cir. 1986). Obviously, an after-acquired home could not be "involved in" the alleged crimes. The Second Circuit has applied a facilitation theory to expand the "involved in" notion, holding that facilitation occurs when the subject property makes the underlying criminal activity "less difficult or more or less free from hindrance." *United States v. All Funds on Deposit in Great E. Bank Account No.*, 804 F. Supp. 444, 446 (E.D.N.Y. Aug. 28, 1992). Here, under a facilitation theory, the government would have to show that Ms. Fisher's home—purchased more than a year after the indictment period—somehow made it "less difficult" for her to allegedly cause a financial institution to fail to keep records of the purchase of specific money orders. Likewise, Ms. Fisher's bank accounts and 401K are comprised substantially of her wages and other current funds. Such funds could not possibly have made it "less difficult" for her to allegedly cause a financial institution to fail to keep records of the purchase of specific money orders more than 5 years ago.

As to traceability, there are no allegations or facts in the indictment showing that the $74,000 involved in the underlying offense is directly traceable to Ms. Fisher's Theresa Lane home.

(Dkt. No. 21-1 at 7.)

Of the requests that Fisher made in this motion, including the request for a *Monsanto* hearing, the motion to strike the forfeiture notice remains pending. The Government opposed the motion by asserting that "[t]here is nothing complicated about what constitutes the 'property involved' in a currency reporting violation. If someone fails to report a currency transaction, or files a false or incomplete report regarding that transaction, the government is entitled to forfeit all of the unreported or falsely reported funds (or property traceable thereto). Likewise, in a structuring case, the government may forfeit the entire sum that was divided up into smaller parts to evade the reporting requirement (or property traceable thereto)." (Dkt. No. 29 at 7.) The Government has downplayed the impact of the information that it gave the grand jury about Gregory's fraud scheme and how Fisher effectively laundered fraud proceeds as part of that scheme.

14

ii.    *Motion to set scheduling order (Dkt. No. 77)*

On November 18, 2015, the Government filed a motion for an order setting a schedule for

pretrial motions.  The Government contended that the lifting of the *lis pendens* eliminated all

issues pertaining to Fisher's initial motion and allowed the case to proceed in the ordinary course.

Fisher filed a response on November 20, 2015 that officially opposed the motion.  (Dkt. No. 78.)

Fisher's opposition was not so much to the setting in itself of a schedule for omnibus pretrial

motions.  Rather, Fisher's opposition focused on what she saw as the consequences of the motions

and proceedings that had occurred up to that point:

> The government knew that the equity in Ms. Fisher's home was her primary source
> of funds to pay for her defense, and it knew that by aggressively opposing Ms.
> Fisher's right to a *Monsanto* Hearing it could drain her resources such that even if
> she overcame the obstacles it threw in her path, the subject home's equity would be
> consumed.  In this manner, the government created a lose-lose scenario for Ms.
> Fisher.
>
>      But that strategy has now been exposed.  So the government abandons its
> restraint of Ms. Fisher's home and asks, in exchange, that the Decision and Order
> [*i.e.*, Dkt. No. 64] be rescinded and withdrawn and that the Court limit the
> government's exposure to release of the *lis pendens*.  However, the government has,
> as a practical matter and for the time being, achieved its goal of denying Ms. Fisher
> her Sixth Amendment rights to counsel of her choice.  Ms. Fisher no longer needs
> her *Monsanto* Hearing because the government has abandoned its restraint of her
> property.  She now needs something else—relief from the Court for the
> government's misconduct.

(*Id.* at 4.)

iii.    *Motion to compel discovery (Dkt. No. 79)*

On November 20, 2015, Fisher filed this motion seeking discovery under Rule 16(a)(1) and

*Brady v. Maryland*, 373 U.S. 83 (1963).  Up to this point, Fisher already had served the

Government with requests for a variety of records, reports, and notes.  (*See* Dkt. No. 79 at 3–5.)

15

Through this motion, Fisher additionally sought, on a conditional basis, "(1) all Grand Jury transcripts and evidence relevant to the nature, scope and extent of the government's misconduct in this case; and (2) all relevant and responsive information contained in all related investigation files of the IRS, Department of Justice, and any other agency assisting in this matter." (*Id.* at 7.) The condition was that Fisher wanted the specified information "to preserve her rights to protect her defense of this matter in the event that the government's Motion to Rescind and Withdraw the Decision and Order is granted, in whole or in part, and the excerpts of the Grand Jury proceedings are removed from the record." (*Id.*)

The Government filed its response to Fisher's motion on January 29, 2016. (Dkt. No. 91.)[4]  In short, the Government contended that it already complied with the discovery requirements of Rule 16 and with its obligations under *Brady*. "The government has provided over 3,200 pages of documents including copies of the money orders charged in the Indictment; bank records showing the defendant's use of the money orders to pay off the mortgage on her residence on Ashwood Drive in Wheatfield, New York; defendant's statement to the IRS; bank records from M&T Bank; tax records; Social Security records; DMV records; and jail calls between the defendant and Greg Fisher." (*Id.* at 2.)  With respect to legal theories and trial strategy, "the defendant has concluded that the government's trial theory will involve evidence regarding the defendant's ex-husband, Gregory Fisher, and accordingly, that she is entitled to documents and information in government agents' files relating to Gregory Fisher.  Defendant's Motion to Compel, Docket No. 79, at 13.  Defendant's request for such information should be denied.  To

---

[4] As of this writing, the Government's response appears in the docket as a pending motion.  This docketing appears to be in error.  The Clerk of the Court is directed to correct the entry for Docket No. 91 to reclassify it as a response to Docket No. 79.

the extent the government intends to introduce evidence regarding Gregory Fisher at trial, such information would have been disclosed in discovery as required by Rule 16(a)(1)(E)(ii)." (*Id.* at 7.) With respect to information that might qualify as *Jencks* or *Giglio* material, the Government did not oppose production so long as production occurs closer to trial in the manner that the trial judge sees fit.

    iv.  *Motion to dismiss and for legal fees (Dkt. No. 80)*

  On November 20, 2015, the same day as her motion to compel discovery, Fisher filed a motion to dismiss the superseding indictment and to assess costs and fees against the Government. (Dkt. No. 80.)  The tainting of the entire grand jury process was the theme of Fisher's motion. Fisher accused the Government of misrepresenting to the Court that it gave specific instructions on forfeiture to the grand jury when it did not.  Fisher argued that the Government improperly presented the grand jury with the same kind of theory of relevant conduct that had been rejected in *United States v. Maye*, 2014 U.S. Dist. LEXIS 56455, at *11 (W.D.N.Y. April 23, 2014) and *United States v. Capoccia*, 503 F.3d 103 (2d Cir. 2007).  When the grand jury expressed skepticism about the scope of any possible forfeiture, according to Fisher, "[t]he AUSA falsely represented to the Grand Jury that Ms. Fisher could recoup the difference between the value of her home and the amounts charged when she knew that the Indictment forfeited *both* $74,000 *and* the home and that she would deny any such recoupment." (Dkt. No. 80 at 4.)  Fisher then cited the Government's linking of her case to Gregory's fraud scheme and its description before the grand jury of the Theresa Lane home as a substitute asset:

    The AUSA presented a witness (presumably a government Agent) who
    testified that the Theresa Lane property is "like a substitute asset."  Tr. Pt. IV at 23,

Doc. No. 64.  The AUSA never explained to the Grand Jury the significance of this statement and the important distinction between an asset directly subject to forfeiture and thereby subject to pre-trial restraint, and a mere substitute asset that is *not* subject to pre-trial restraint.  She did not explain that the government cannot forfeit *both* the $74,000 and a substitute asset.  And, most importantly, she did not explain that the language of the Indictment she presented to the Grand Jury did *not* treat the Theresa Lane home as a substitute asset but, rather, as property *involved in* or *traceable to* the crimes charged and thus directly subject to forfeiture and pre-trial restraint.  Docket No. 20 at 10.

(*Id.* at 5.)  As for other issues, Fisher argued that the Government filed seven motions and memoranda objecting to a *Monsanto* hearing and made numerous misrepresentations along the way.  Fisher also highlighted the Government's argument "that *Monsanto* was somehow unfair to indigent and *pro se* defendants."  (*Id.* at 8; *see also id.* at 15.)  Finally, Fisher asserted that the Government's conduct in this case contravened Department of Justice policy to avoid trying to seize structured funds unless the funds were generated from criminal activity.  (*Id.* at 17; Dkt. No. 105 at 9.)  Fisher concluded that dismissal of the superseding indictment would be the only appropriate remedy, and that reimbursement of costs and fees would be appropriate.  "The government's knowing interference with resources that should have been lawfully available to Ms. Fisher affected innumerable decisions with respect to her defense.  She may have made substantially different choices with respect to the defense of her case *but for* the government's actions.  To date, Ms. Fisher still does not have access to the equity in her home to fund her defense.  She has accumulated legal bills fighting for her right to these assets nearing or exceeding the value of the assets she was fighting for."  (Dkt. No. 80 at 22–23.)

The Government opposed Fisher's motion.  The Government described its opposition to a *Monsanto* hearing as zealous advocacy that properly interpreted relevant case law.  (*See* Dkt. No. 92

at 2–6.)  With respect to instructions before the grand jury, "[w]hen the Court inquired about how the grand jury had been instructed, the government replied that it always instructed the grand jury on the law, and that it would have instructed the jury on the law regarding forfeiture.  *Id.* at 14. Not having the transcripts of those portions of the grand jury proceedings, the government was not in a position to state what specific instructions had been given."  (*Id.* at 7.)  The Government then proceeded, *sua sponte*, to disclose portions of the grand jury proceedings that had not been disclosed up to that point and that had not been the subject of any requests under Rule 6(e)(3)(E)(i).  (*Id.* at 9–10, 18 n.5, 19–20.)  The proffered explanation for the *sua sponte* disclosure was that "the government has endeavored to clarify the record by providing the full line of questioning and context in order to avoid the injustice of taking the government's conduct before the grand jury out of context."  (*Id.* at 10 n.3.)  The Government defended its grand jury presentation as falling within the discretion accorded to it in *U.S. v. Williams*, 504 U.S. 36 (1992). The Government then offered the additional defense that, despite its position that a charge of failure to file does not require the funds in question to originate from criminal activity, "the grand jury had every reason to be interested in and seek explanation of the source of the funds that the defendant used to purchase the money orders that serve as the basis of the structuring offense." (*Id.* at 18.)

**III.     DISCUSSION**

The parties currently have four motions pending.  Of these four motions, Fisher's motion to dismiss, if granted, would render the others moot.  The Court accordingly will examine the motion to dismiss first, paying particular attention to Fisher's arguments about the grand jury presentation.  Fisher's arguments invoke the Sixth Amendment explicitly but also implicate the Fifth Amendment.  (*See, e.g.*, Dkt. No. 105 at 13 ("The government appears to forget that it just called any connection to Greg Fisher 'implausible,' that it conceded that the information is irrelevant to the crimes charged in this case (Response at 19), and that it acknowledged that the charges in the Superseding Indictment have nothing to do with Ms. Fisher's former husband. (Docket No. 34, June 9, 2015 Tr. at 9:14-21).  Yet, the government presented this information to the Grand Jury to improperly create an impression that Ms. Fisher was a 'bad person.'  In this manner, the government presented to the Grand Jury a 'probability' that it concedes it could not prove.").)

### A.  *Grand Jury Presentations Generally*

"The grand jury is an English institution, brought to this country by the early colonists and incorporated in the Constitution by the Founders . . . . Its adoption in our Constitution as the sole method for preferring charges in serious criminal cases shows the high place it held as an instrument of justice.  And in this country as in England of old the grand jury has convened as a body of laymen, free from technical rules, acting in secret, pledged to indict no one because of prejudice and to free no one because of special favor."  *Costello v. U.S.*, 350 U.S. 359, 362 (1956).  The freedom and independence of the grand jury has manifested itself in practical ways many times over the years.  "The grand jury may compel the production of evidence or the testimony of

witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials." *U.S. v. Calandra*, 414 U.S. 338, 343 (1974). Grand juries may consider hearsay evidence and generally will not face scrutiny of the adequacy of the evidence brought to them. *See Costello*, 350 U.S. at 363–64; *accord, e.g., U.S. v. Martinez*, No. 08-CR-69S-12, 2010 WL 56052, at *2 (W.D.N.Y. Jan. 3, 2010) (Skretny, C.J.). *But see U.S. v. Ruggiero*, 934 F.2d 440, 447 (2d Cir. 1991) ("However, the use of hearsay evidence before a grand jury may render an indictment invalid if (1) the government misleads the grand jury into thinking it is receiving firsthand testimony when it is in fact receiving hearsay or (2) if there is a high probability that the defendant would not have been indicted had only nonhearsay evidence been used. The first ground is designed to prevent prosecutorial impairment of the grand jury's independent role, and the second is intended to eliminate prejudice to the defendant.") (citation omitted). The exclusionary rule does not apply to grand jury proceedings. *See Calandra*, 414 U.S. at 348. Defendants have no right to require the Government to present their version of events to a grand jury or to have potentially exculpatory evidence brought to the grand jurors' attention, unless "such evidence is substantial and where it might reasonably be expected to lead the jury not to indict." *U.S. v. Casamento*, 887 F.2d 1141, 1183 (2d Cir. 1989) (citation omitted). Other principles exist; the ones cited above are enough to emphasize how unfettered grand juries usually are when they convene and do their work. The grand jury's independence has evolved into a presumption that grand jury proceedings occurred properly and without any irregularities. *See Hamling v. U.S.*, 418 U.S. 87, 139 n.23 (1974); *accord U.S. v. R. Enters., Inc.*, 498 U.S. 292, 300 (1991) ("We begin by reiterating that the law presumes, absent a

strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority.")
(other citations omitted).  Defense challenges to that presumption are difficult because "[a] grand
jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is
adjudicated.  Rather, it is an ex parte investigation to determine whether a crime has been
committed and whether criminal proceedings should be instituted against any person."  *Calandra*,
414 U.S. at 343–44.

As independent as the grand jury is supposed to be, however, it does not operate without
limits.  A grand jury of lay citizens usually does not enter a proceeding knowing the law applicable
to that proceeding; "it must lean heavily upon the United States Attorney as its investigator and
legal advisor to present to it such evidence as it needs for its performance of its function and to
furnish it with controlling legal principles."  *U.S. v. Ciambrone*, 601 F.2d 616, 622 (2d Cir. 1979);
*see also* Niki Kuckes, *The Useful, Dangerous Fiction of Grand Jury Independence*, 41 Am. Crim. L. Rev.
1, 26 (2004) ("The reality is that prosecutors, not grand jurors, conduct grand jury investigations.
The prosecutor directs and controls the investigation, determines the evidence actually heard by
the grand jurors, and decides on the charges, if any.").  The grand jury's reliance on the
Government for investigative material and for legal advice, while in secret and away from any
competing perspective, gives the Government a unique responsibility to guard the grand jury's
freedom and independence.  This responsibility leads to the one rule about grand jury proceedings
that supersedes any others: The grand jury's freedom and independence must not be
compromised.  The Fifth Amendment requires no less.  *See* U.S. Const. amend. V ("No person
shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or

indictment of a Grand Jury . . . .").  "This constitutional guarantee presupposes an investigative body acting independently of either prosecuting attorney or judge, whose mission is to clear the innocent, no less than to bring to trial those who may be guilty . . . . The grand jury may not always serve its historic role as a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor, but if it is even to approach the proper performance of its constitutional mission, it must be free to pursue its investigations unhindered by external influence or supervision so long as it does not trench upon the legitimate rights of any witness called before it." *U.S. v. Dionisio*, 410 U.S. 1, 16–18 (1973); *see also U.S. v. Leeper*, No. 06-CR-58A, 2006 WL 1455485, at *2 (W.D.N.Y. May 22, 2006) (Arcara, C.J.) ("If the Grand Jury Clause means anything, it means that a criminal indictment must actually issue from a grand jury, not some other source.  The fundamental concept underlying the Fifth Amendment guarantee is that in order for an indictment to be recognized as actually issuing from a grand jury, it must be the product of an investigative deliberation that is independent of both the prosecuting attorney and the court . . . . Without a guarantee of independence, the indictment would not be the genuine issue of a grand jury within the meaning of the Constitution.") (citation omitted).

A violation of the Grand Jury Clause of the Fifth Amendment is grounds for dismissal of an indictment.  *See Leeper*, 2006 WL 1455485, at *4 ("Whether derived from the constitution or from its supervisory authority, it is clear that this Court has authority to dismiss an indictment where it was issued in violation of the Fifth Amendment's guarantee of an unbiased and independent grand jury.").  Any finding that a defendant faced public accusation of a crime from a compromised grand jury cannot be rescued through harmless error analysis or claims of

23

prosecutorial discretion, because of the way that a grand jury indictment can frame all subsequent proceedings:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a noncapital offense—all on the basis of the same facts. Moreover, the grand jury is not bound to indict in every case where a conviction can be obtained. Thus, even if a grand jury's determination of probable cause is confirmed in hindsight by a conviction on the indicted offense, that confirmation in no way suggests that the discrimination did not impermissibly infect the framing of the indictment and, consequently, the nature or very existence of the proceedings to come. When constitutional error calls into question the objectivity of those charged with bringing a defendant to judgment, a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm.

*Vasquez v. Hillery*, 474 U.S. 254, 263 (1986) (internal quotation and editorial marks and citation omitted), *quoted in U.S. v. Koschtschuk*, No. 09-CR-96S, 2011 WL 3295817, at *4 (W.D.N.Y. Aug. 1, 2011) (McCarthy, M.J.). A violation of a nonconstitutional rule pertaining to prosecutorial conduct or grand jury proceedings also can lead to dismissal of an indictment, but not for the violation *per se*. "[D]ismissal of the indictment [for a nonconstitutional violation] is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. U.S.*, 487 U.S. 250, 256 (1988) (citing *U.S. v. Mechanik*, 475 U.S. 66, 78 (1986) (O'Connor, J., concurring); other citations and internal quotation marks omitted). Tethering any nonconstitutional violations to the grand jury's freedom and independence preserves a defendant's Fifth Amendment rights without burdening the grand jury

24

with procedural rules and court precedents that would pull it improperly within the orbit of a specific branch of government.

The relationship between *Nova Scotia* and a major case cited by the Government supports the long line of authority that grounds all grand jury challenges in the grand jury's freedom and independence. In *U.S. v. Williams*, 504 U.S. 36 (1992), the defendant was indicted for overstating the value of certain assets and interest income to influence some banks' actions on his loan requests. After having a chance to review portions of grand jury transcripts, the defendant moved to dismiss the indictment on the basis that the prosecutors did not present the grand jury with exculpatory evidence, a violation of Tenth Circuit precedent that extended *Brady* obligations to grand jury proceedings. The Tenth Circuit affirmed; before the Supreme Court, the defendant argued that the dismissal of the indictment was consistent with judicial supervisory power over the grand jury. The Supreme Court reversed, drawing a distinction between the use of supervisory power "as a means of enforcing or vindicating legally compelled standards of prosecutorial conduct before the grand jury," *Williams*, 504 U.S. at 46–47, and its use "as a means of *prescribing* those standards of prosecutorial conduct in the first instance—just as it may be used as a means of establishing standards of prosecutorial conduct before the courts themselves. It is this latter exercise that respondent demands." *Id.* at 47. By "prescribing" standards, the Supreme Court meant the practice in lower courts of creating grand jury procedural rules independent of the Grand Jury Clause of the Fifth Amendment, or some similar constitutional or statutory mandate; and then dismissing indictments for violations of those rules in themselves. *See id.* at 50 ("[A]ny power federal courts may have to fashion, *on their own initiative*, rules of grand jury procedure is a

25

very limited one, not remotely comparable to the power they maintain over their own proceedings.") (emphasis added).  The Supreme Court gave examples, such as prior attempts by lower courts to impose the exclusionary rule and the hearsay rule on grand jury proceedings.  *Id.* The Supreme Court gave the additional example of past attempts to impose rules concerning the sufficiency of evidence presented to the grand jury.  *Id.* at 54.  In a similar way, the Supreme Court rejected the defendant's request to impose the *Brady* rule on grand juries, precisely because "[t]he rule would neither preserve nor enhance the traditional functioning of the institution that the Fifth Amendment demands."  *Id.* at 51.  The Government in Fisher's case here seems to be implying that *Williams* changed Supreme Court precedent to make the grand jury impenetrable to most, if not all, judicial inquiry.  (*See* Dkt. No. 92 at 17.)  *Williams* instead prohibits lower courts from letting trial and pretrial rules leak into grand jury proceedings and then punishing prosecutors for failing to abide by those rules when before the grand jury.  *Williams* left intact—as it would have had to do if the issue had been presented, given the constitutional magnitude—the ability of courts to enforce the Grand Jury Clause of the Fifth Amendment and to protect defendants from grand juries whose freedom and independence had been compromised.  *Williams* also preserved the ability of courts to enforce grand jury rules of nonconstitutional magnitude, such as Rule 6 of the Federal Rules of Criminal Procedure, 504 U.S. at 46 n.6,[5] so long as those rules "were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions."  *Id.* at 46.

---

[5] Footnote 6 in *Williams* further cited to "[a]dditional standards of behavior for prosecutors (and others) [that] are set forth in the United States Code."  *Id.*

### B.  *Grand Jury's Independence Compromised Here*

In the context of the principles discussed above, the Court now turns to a review of the grand jury proceedings in this case.  Almost immediately after the grand jury proceedings began, the Government framed its presentation in the context of Gregory's "criminality" and "ill-gotten gains." (Dkt. No. 106 at 2–3, 16.)  The grand jury heard extensive detail about how Gregory defrauded West Herr Ford—a very large local car dealership to which some grand jurors may have had employment, family, or other personal connections; the Court will never know—through the sale of fictitious car data kits, and how he had "some tax problems as well." (*Id.* at 49.)  The grand jury heard that Gregory's proceeds from the fraud scheme ran into the millions of dollars, and that about $500,000 of those cash proceeds were never accounted for.  (*See id.* at 49–50.)  The Government filled that gap by telling the grand jury that Gregory had a window of a few months between his sentencing and his voluntary surrender to prison during which he could have transferred the unaccounted cash to Fisher.  (*See id.* at 55–57.)  *Cf. U.S. v. Hill*, No. S 88 CR. 154 (MJL), 1989 WL 47288, at *6 (S.D.N.Y. Mar. 22, 1989) (dismissing parts of an indictment where the prosecutor "chose to allow fleeting and irrelevant references to the defendant's prior or ongoing criminal activity, the nature of which the grand jurors were left to speculate and the effect of which was no doubt inflammatory").  The Government then suggested that the transfer in fact happened, and that Fisher used Gregory's proceeds to purchase money orders that funded a chain of financial transactions involving two houses.  The Government effectively labeled Fisher a money launderer and told the grand jury that, while it was not confident that it had proof beyond a

reasonable doubt, it had "circumstantial evidence"[6] and a "circumstantial logical argument" that

she wound up with Gregory's fraud proceeds.  (*Id.* at 54.)  *Cf. U.S. v. Hogan*, 712 F.2d 757, 761 (2d

Cir. 1983) (reversing and remanding with instructions to dismiss the indictment, where the

prosecutor told the grand jury that the defendant was a "real hoodlum" who should be indicted as

a matter of equity and that the defendant was suspected of other uncharged crimes; "[t]hese

government accusations and others appear to have been made, not to support additional charges,

but in order to depict appellants as bad persons and thereby obtain an indictment for independent

crimes.  This tactic is fundamentally unfair.") (internal quotation marks and citation omitted).

The Government's equating Fisher to a money launderer in Gregory's scheme is consistent with its

description, desired to be off the record, of Gregory as the "big fish" (*id.* at 20) who needed to be

taken down first, with Fisher coming next as the Government worked its way down the hierarchy

of the fraud scheme.  *Cf. U.S. v. Serubo*, 604 F.2d 807, 818 (3d Cir. 1979) (vacating sentences

where the prosecution's suggestion to the grand jury that the defendants had Cosa Nostra ties "was

a blatant invitation to associate the defendants with a disfavored criminal class, and was

inconsistent with the American Bar Association Standards Relating to the Prosecution Function");

*U.S. v. Vetere*, 663 F. Supp. 381, 387 (S.D.N.Y. 1987) (dismissing an indictment for kidnapping

charges where a grand jury presentation about the defendant's drug history helped "push a

wavering grand jury over the edge" with a "bad-guy" theory).  With respect to the takedown of

Gregory's fraud scheme, the grand jury heard that Gregory faced formal fraud charges, with the

implication that another grand jury already made a probable-cause determination in the same

---

[6] "Indeed, the law recognizes that a guilty verdict can be based entirely on circumstantial evidence, and that
elements going to the operation of a defendant's mind, such as willfulness, can often be proved only
through circumstantial evidence."  *U.S. v. Cassese*, 428 F.3d 92, 104 (2d Cir. 2005) (citations omitted).

scheme that Fisher allegedly was assisting. *Cf. U.S. v. Acquest Dev., LLC*, 932 F. Supp. 2d 453, 461 (W.D.N.Y. 2013) (McCarthy, M.J.) (report and recommendation) (recommending dismissal of an indictment where "[t]he grand jury did not need to hear that Judge Arcara had found probable cause [supporting a crime-fraud exception to an assertion of privilege against a grand jury subpoena] 'so that they could appropriately weigh [a witness's] testimony and understand why he was now electing to provide testimony'—it would have been sufficient merely to tell them that he had been ordered to testify"), *adopted*, Case No. 11-CR-347, Dkt. No. 59 (W.D.N.Y. Mar. 26, 2013) (Skretny, C.J.) (text order); *Leeper*, 2006 WL 1455485, at *3 ("Had the prosecutor really intended for the May 16th grand jury to reach its own independent determination without influence as to what another grand jury had done, there would have been no need to even mention the existence of an earlier indictment or the fact that the trial had started and that a petit jury had been empaneled."). The grand jury heard that Gregory took a guilty plea (*id.* at 24), which would be legally equivalent to a conviction at trial beyond a reasonable doubt. Though the Government later tried to correct itself, the grand jury heard that a forfeiture of Fisher's house, by way of Gregory's conduct, "still could happen" (*id.* at 55) and that the Theresa Lane home was a substitute asset (*id.* at 96–97). Telling the grand jury that the Theresa Lane home was a substitute asset is significant because it exposed the grand jurors to the implied question of what the substitution was. If the substitution meant, as the Government now is trying to argue, replacing the original money orders with real estate involved in or traceable to them then the Government erred by placing a sentencing issue before the grand jury. *Cf. U.S. v. Peralta*, 763 F. Supp. 14, 20 (S.D.N.Y. 1991) (dismissing an indictment where, *inter alia*, the prosecution's legal errors misled

29

the grand jury and prejudiced the defendant).  If, as is more likely here, the substitution meant the conversion of Gregory's fraud proceeds into the Theresa Lane home then the Government again made the grand jury think about this case in terms of the uncharged fraud and money laundering scheme between Gregory and Fisher.  The Government also would have created confusion in the grand jurors' minds about whether the Theresa Lane home had been connected to the discrete act of purchasing money orders or to the broader scheme with Gregory.  *See U.S. v. Capoccia*, 503 F.3d 103, 110 (2d Cir. 2007) ("[W]here the government has alleged discrete violations of a statute that does not criminalize a scheme, conspiracy, or enterprise, the government is not entitled to forfeiture of proceeds from uncharged violations regardless of whether they and the charged violations are part of a common scheme."); *accord U.S. v. Maye*, No. 08-CR-194S, 2014 WL 1671506, at *4 (W.D.N.Y. Apr. 23, 2014) (Skretny, C.J.); *see also* Brief for Nat'l Assn. of Crim. Def. Lawyers, Dkt. No. 96, at 15 ("To forfeit Ms. Fisher's property based on the theory presented that the funds in issue are traceable to uncharged criminal activity by her ex-husband, the government would have had to do one of three things: (1) request a special verdict on forfeiture allegations in the criminal case against her ex-husband; (2) commence a civil forfeiture proceeding against the property itself; or (3) assert a money laundering charge in the criminal proceeding against Ms. Fisher based on laundering of the proceeds of her husband's prior activity, assuming such forfeiture were itself demonstrably authorized.").  The continual reinforcement of Gregory's role in Fisher's uncharged money laundering was the likely reason why the grand jury wrestled with the exact course that the money laundering took.  (*See, e.g., id.* at 115–16.)

The shadow that Gregory cast over the entirety of the grand jury proceedings caused irreparable damage to the grand jury's independence.  After hearing details of a multimillion dollar fraud scheme between Gregory and Fisher that led to prior determinations of probable cause and guilt, the grand jury would have felt pressure to view Fisher as the last piece of Gregory's puzzle.  The grand jury would have felt pressure to indict Fisher as a means to the end of accounting for all of Gregory's fraud proceeds.  The grand jury confirmed how much Gregory was weighing on its mind toward the end of the proceedings for the superseding indictment.  The proceedings for the superseding indictment came about four months after the proceedings for the original indictment and did not mention Gregory during any testimony.  Nonetheless, the grand jury remembered the extensive presentation about Gregory from four months earlier and ended the proceedings with questions about the tracing of the fraud proceeds.  (*See id.* at 164–65.) Additionally, the grand jury asked questions throughout the proceedings about the Ashwood home, which Fisher sold in 2012.  (*See, e.g., id.* at 109–10.)  Even under the broadest possible interpretation of "all property traceable to such property," the language from the forfeiture notice in the superseding indictment, the Government simply could have told the grand jury that funds from the money orders found their way to the Theresa Lane home, a property that Fisher currently owns.  Discussing the Ashwood home served no purpose except to strengthen the ties between Gregory and Fisher and to show the grand jury the imperative to capture the remnant of Gregory's fraud proceeds.  Under these circumstances, the Court has grave doubts that an independent grand jury indicted Fisher free of the pressure to conform to the probable-cause and reasonable-doubt findings that occurred with the "big fish."  Deciding against an indictment here would have

31

required the grand jury to contravene a prior indictment in the same scheme, a prior guilty plea

and sentence, and a "circumstantial logical argument" that known fraud proceeds were there for

the taking and that indicting Fisher was the way to take them.  The Government's implicit denial

"that the government's trial theory will involve evidence regarding the defendant's ex-husband,

Gregory Fisher" (Dkt. No. 91 at 7) makes the situation worse; it suggests that a trial jury would be

free to infer that probable cause rested only on a failure to file when that was not true.

Fisher's Fifth Amendment rights were violated here, and "it is impossible to restore [her] to

the position that [s]he would have occupied vis-a-vis the prosecutor." *U.S. v. Fields*, 592 F.2d 638,

648 (2d Cir. 1978).  At a minimum, the forfeiture notice must be stricken as the part of the

indictment most severely tainted, but dismissal of the entire indictment is appropriate.

### C.  *Other Government Conduct that Prejudiced Fisher*

As noted above, the violation of the Grand Jury Clause of the Fifth Amendment that

occurred in this case alone justifies dismissal of the indictment.  "Dismissing an indictment to

punish the government for its misconduct, however, entails no implicit second-guessing of the

grand jury and thus steers clear of the prohibition of *Williams*." *U.S. v. Strouse*, 286 F.3d 767, 773

(5th Cir. 2002); *see also Ciambrone*, 601 F.2d at 623 ("[T]he prosecutor's right to exercise some

discretion and selectivity in the presentation of evidence to a grand jury does not entitle him to

mislead it or to engage in fundamentally unfair tactics before it.").  To that end, some of the

Government's conduct in this case has been troubling.  As quoted previously, the Government

pushed the grand jury to link the Theresa Lane home to Gregory's frauds proceeds and explicitly

told the grand jury that "that money is traceable to the structured purchases of money orders . . . .

because *Theresa Lane is a substitute asset* that as she went through the process of what she did, it

ends up in Theresa Lane, mortgage free." (Dkt. No. 106 at 96–97 (emphasis added).)  The grand jury made its decisions with that characterization, and its link to Gregory, in mind.  Yet in its first appeal to Judge Arcara—and at a time when Fisher and the Court did not yet know what transpired before the grand jury—the Government asserted that "[t]he Theresa Lane property is not a 'substitute asset' as that term is defined in Title 18, United States Code, Section 853(p)."  (Dkt. No. 46 at 2.)  In its first opposition to a *Monsanto* hearing—again when Fisher and the Court did not yet know otherwise—the Government omitted the presentation of Gregory's fraud to the grand jury and wrote that "defendant complains that the Indictment fails to explain why Theresa Lane is subject to forfeiture.  This complaint ignores a plain reading of the Forfeiture Allegation which alleges the statutory basis that subjects the property to forfeiture."  (Dkt.  No. 29 at 5.)  On February 13, 2015, Fisher sent a letter to the Government disclosing that she wanted to borrow money against the Theresa Lane home.  In the letter, Fisher asked the government to "advise as to your position on this issue in light of the fact that *the Indictment identifies* Ms. Fisher's home as an asset subject to forfeiture."  (Dkt. No. 21-2 at 6 (emphasis added).)  The Government's response changed Fisher's phrasing and stated that "your client's residence is, *as you acknowledge*, subject to criminal forfeiture."  (*Id.* at 8 (emphasis added).)

Twice during an early oral argument, the Government told the Court that the grand jury made a specific finding of a factual nexus between the Theresa Lane home and the offenses charged.  (*See* Dkt. No. 34 at 3, 5.)  Resolving the presence or absence of a factual nexus is one issue that *Monsanto* hearings address.  The Government's motive for asserting a specific finding by the grand jury was to squeeze the issue of a factual nexus under the general rule that *Monsanto*

hearings cannot revisit grand jury findings of probable cause.  *See generally Kaley v. U.S.*, ___ U.S. ___, 134 S. Ct. 1090 (2014).  Despite the Government's assertions, however, no specific grand jury finding of nexus occurred:

> The Government used conditional language when describing forfeiture, language such as "we have to be able to trace the money" and "if we could trace the purchase of Theresa Lane." (Tr. Pt. IX at 6.)[7]  Conditional language indicates that the necessary tracing did not happen during the grand jury proceedings.  The Government did not separate the substantive offense from the forfeiture notice.  The Government did not give instructions specifically about factual nexus.  That is to say, at no time during the grand jury proceedings did the Government tell the grand jurors that a general vote on the entire indictment would be construed as both probable cause for the underlying offense and probable cause for a factual nexus.  The Government did not tell the grand jurors to vote sequentially, i.e., to vote first on the underlying substantive offense and then to proceed to factual nexus if they found probable cause for the offense.  Inversely, the Government also did not tell the grand jurors that if they disagreed about factual nexus then they could express themselves that way, either by a specific finding to that effect or by voting down the draft indictments.  Instead, the Government placed before the grand jurors an indictment and superseding indictment that contained a general forfeiture notice.  The Government conceded at the last oral argument that it does not know what the grand jurors subsequently did.  The vote sheets do not provide any clarity.  The vote sheets say only that a threshold number of grand jurors "concurred in the Indictment in this case" or "concurred in the Superseding Indictment in this case" without separating the substantive offense from the forfeiture notice.  That the grand jurors saw a superseding indictment with a forfeiture notice but voted only on the substantive offense makes sense, given that, "grand juries do not, in fact, make reliable findings regarding the source of allegedly forfeitable assets.  The decisions of other courts reflect this same lack of confidence that grand juries give serious consideration to the forfeitability of assets . . . . Neither the DOJ nor any federal appellate decision (other than Bissell) maintains that an indictment with a forfeiture claim represents anything more than the government's allegation that certain assets are forfeitable.  If it is true that an indictment does not constitute a probable cause determination as to forfeitability of assets, then the Fourth Amendment stands in the way of any pretrial restraint on property."  Ricardo J. Bascuas, *Of Defense Lawyers and Pornographers: Pretrial Asset Seizures and the Fourth Amendment*, 62 U. Miami L. Rev. 1159, 1174 (2008).

(Dkt. No. 64 at 16–18; *see also id.* at 19 (asking whether "the Government sincerely believes that if

---

[7] Now Dkt. No. 106 at 165.

it places a draft indictment with a forfeiture notice in front of a grand jury, and that grand jury casts a general vote for "probable cause," then the same vote covers both the substantive offense and a finding of factual nexus.").)  The Government nonetheless repeated this assertion on August 18, 2015 when it wrote that "the grand jury *did* vote on the forfeiture allegation."  (Dkt. No. 54 at 4.)  The Government repeated the assertion a second time the same day when it wrote that "[i]n voting on the indictment in the instant case, the grand jury also voted on the forfeiture allegations."  (Dkt. No. 55 at 3.)  The Government repeated the assertion at the next court appearance:

> MAGISTRATE JUDGE SCOTT: Let me cut through this because I have a concern, I'm not sure what to do with this.  You have to help here.  Is it your position that the grand jury was actually presented the question whether there was probable cause, there was a nexus between the activity and the assets?
>
> MS. KRESSE: Right.

(Dkt. No. 59 at 5.)  The Government repeated the assertion another time when it wrote that "the grand jury in this case *did* make a probable cause finding relative to forfeiture."  (Dkt. No. 60 at 7.) These repetitions all occurred before the Court had the grand jury transcript.  "The government cannot properly, either explicitly or implicitly, mischaracterize the substance of grand jury testimony."  *U.S. v. Valentine*, 820 F.2d 565, 570 (2d Cir. 1987).

There are other examples of Government conduct that prejudiced Fisher during the course of this case.  During the proceeding of August 20, 2015, the Government told the Court, before the Court had the grand jury transcript, that "[t]here's no allegation in the superseding indictment, in the indictment that those structured funds were the source of, you know, were in and of themselves tainted, dirty, okay?"  (Dkt. No. 59 at 18.)  The Government did not tell the Court how much of the first presentation to the grand jury rested on the discussion of Gregory and the

assertion that the funds were in fact tainted.  At the same proceeding, the Government debuted its

"bigger picture" argument that "[d]efendants who have assigned counsel, there is no *Monsanto*

hearing because if there—if we seize all their assets, if we—if we have a forfeiture allegation taking

everything that they own, they have no basis to come to this Court and say, Judge, we want a

hearing on the nexus between the forfeiture and the crime charged.  It's fundamentally unfair."

(*Id.* at 20.)  The Government later repeated its argument that the Sixth Amendment right to choice

of counsel must yield when "not available to defendants who cannot afford to hire their own

counsel" (Dkt. No. 60 at 8), even though the Theresa Lane home contained at least some equity

that was innocent of all charged and uncharged allegations.  (*See* Dkt. No. 106 at 117.)  Fisher's

response to this breathtaking aggression against the Sixth Amendment will suffice: "This argument

is perverse and has no foundation in the law."  (Dkt. No. 61 at 13.)  The Supreme Court recently

agreed, addressing the problem of "criminal forfeitures, which can include innocent—not just

tainted—assets, a point of critical importance here."  *Luis v. U.S.*, ___ U.S. ___, 136 S. Ct. 1083,

1088 (Mar. 30, 2016) (plurality opinion).

> How are defendants whose innocent assets are frozen in cases like these supposed
> to pay for a lawyer—particularly if they lack "tainted assets" because they are
> innocent, a class of defendants whom the right to counsel certainly seeks to protect?
> These defendants, rendered indigent, would fall back upon publicly paid counsel,
> including overworked and underpaid public defenders.  As the Department of
> Justice explains, only 27 percent of county-based public defender offices have
> sufficient attorneys to meet nationally recommended caseload standards.  Dept. of
> Justice, Bureau of Justice Statistics, D. Farole & L. Langton, Census of Public
> Defender Offices, 2007: County-based and Local Public Defender Offices, 2007, p.
> 10 (Sept. 2010).  And as one *amicus* points out, "[m]any federal public defender
> organizations and lawyers appointed under the Criminal Justice Act serve
> numerous clients and have only limited resources."  Brief for New York Council of
> Defense Lawyers 11.  The upshot is a substantial risk that accepting the

Government's views would—by increasing the government-paid-defender workload—
render less effective the basic right the Sixth Amendment seeks to protect.

*Id.* at 1095; *see also Luis v. U.S.*, Brief for Am. Bar Ass'n, 2015 WL 5169101, at *6 (Aug. 25, 2015)

("Moreover, if the defendant is found not guilty, or the government is otherwise found not

entitled to untainted assets that were needed for payment of counsel of choice, the defendant's

deprivation of counsel of choice is a structural error that cannot be cured.") (citation omitted);

*U.S. v. Stein*, 541 F.3d 130, 157 (2d Cir. 2008) ("A defendant who is deprived of counsel of choice

(without justification) need not show how his or her defense was impacted; such errors are

structural and are not subject to harmless-error review.") (citation omitted).  When the Court

decided that it needed to review the grand jury transcript to untangle the emerging issues in the

case, it had to issue two orders before receiving the full transcript.  (Dkt. Nos. 62, 63.)  With

respect to the grand jury transcript and what the Government told the grand jury about forfeiture,

the same prosecutor who conducted all grand jury proceedings has taken the position that without

"the transcripts of those portions of the grand jury proceedings, the government was not in a

position to state what specific instructions had been given."  (Dkt. No. 92 at 7.)  The conduct

described above, which constantly prejudiced Fisher by preventing her from finding out the full

extent of grand jury irregularities and hampering choice of counsel and a fair defense, looked as if

the Government wanted to keep testing the limits of what it could get away with.  This conduct

ultimately infringed on the Sixth Amendment as well.  "In a nutshell, the Sixth Amendment

protects against unjustified governmental interference with the right to defend oneself using

whatever assets one has or might reasonably and lawfully obtain."  *Stein*, 541 F.3d at 156.

Two lesser statutory or rule violations are worth noting for the record.  As the Court noted previously, the Government unilaterally disclosed portions of the grand jury transcripts that had not been disclosed previously.  "Unless these rules provide otherwise, the following persons must not disclose a matter occurring before the grand jury: . . . an attorney for the government . . . ."  Fed. R. Crim. P. 6(e)(2)(B)(vi).  "A knowing violation of Rule 6, or of any guidelines jointly issued by the Attorney General and the Director of National Intelligence under Rule 6, may be punished as a contempt of court."  Fed. R. Crim. P. 6(e)(7).  The violation here was knowing and willful because the Government made the disclosures to oppose Fisher's motions; "the government has endeavored to clarify the record by providing the full line of questioning and context in order to avoid the injustice of taking the government's conduct before the grand jury out of context."  (Dkt. No. 92 at 10 n.3.).  This violation by itself would not lead to dismissal, but "a knowing violation of Rule 6 may be punished as a contempt of court.  In addition, the court may direct a prosecutor to show cause why he should not be disciplined and request the bar or the Department of Justice to initiate disciplinary proceedings against him.  The court may also chastise the prosecutor in a published opinion."  *Nova Scotia*, 487 U.S. at 263.  The Court believes that this public chastisement suffices as a punishment and will defer to Judge Arcara as to whether any additional punishment may be necessary.  As for the other violation, the Government applied a *lis pendens* to a property that it told the grand jury was a substitute asset.  "[P]re-conviction restraint of substitute assets is impermissible."  *U.S. v. Perkins*, 994 F. Supp. 2d 272, 275 (E.D.N.Y. 2014) (citations omitted).  The prohibition on these restraints extends to notices of *lis pendens*.  "[T]he Government has no colorable interest in substitute assets until it obtains a conviction.  Even then, since the

38

substitute assets are not 'tainted assets,' they only come into play when needed to satisfy a shortfall. Under the current statutory scheme, then, substitute assets are used only to satisfy what is a money judgment. All of this brings the Government to its final roadblock: *lis pendens* is unavailable in New York where the subject claim is 'in essence only a money claim.'" *U.S. v. Kramer*, No. 1:06CR200-ENV-CLP, 2006 WL 3545026, at *10 (E.D.N.Y. Dec. 8, 2006) (citations omitted).

Finally, Fisher's argument about Department of Justice policy (Dkt. No. 80 at 16–18) merits a brief comment. On March 31, 2015–before the superseding indictment in this case–U.S. Attorney General Eric Holder issued a memorandum to all U.S. Attorneys concerning the use of forfeiture in structuring cases. *See* Eric Holder, Mem. for Heads of Dep't Components and U.S. Attys, *available at* http://www.justice.gov/ sites/default/files/opa/press-releases/attachments/2015/03/31/ag-memo-structuring-policy-directive.pdf (last viewed May 13, 2016). "I directed a review of the use of asset forfeiture authorities to ensure that the Department is allocating its resources to address the most serious structuring offenses. The attached policy directive is the result of that review. In order to maximize the effectiveness of our efforts, the directive will focus the use of our asset forfeiture authorities against actors that structure financial transactions to hide significant criminal activity, and will further other compelling law enforcement interests." *Id.* at 1. The accompanying Policy Directive 15-3 applied to "all structuring activity whether it constitutes 'imperfect structuring' chargeable under 31 U.S.C. § 5324(a)(1) or 'perfect structuring' chargeable under 31 U.S.C. § 5324(a)(3)." *Id.* at 2. Within the Policy Directive, the provision that comes closest to Fisher's situation is the provision that says that "[i]f no criminal charge has been filed and a prosecutor has not obtained the approval

identified below, a prosecutor shall not move to seize structured funds unless there is probable cause that the structured funds were generated by unlawful activity or that the structured funds were intended for use in, or to conceal or promote, ongoing or anticipated unlawful activity." *Id.* at 3. The approval in question would come from the U.S. Attorney for the respective district.

Of course, the Court does not have and would not want any role in deciding what Department of Justice policy should be. The Court also does not have enough facts to decide whether an actual policy violation occurred that would warrant consideration of the *Accardi* doctrine. *See generally U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954); *see also Montilla v. I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991) ("To be sure, the cases are not uniform in requiring that every time an agency ignores its own regulation its acts must subsequently be set aside. Nonetheless, decisions contrary to the views expressed in *Accardi* may generally be distinguished from the instant case because in most of those cases the agency regulation that was departed from governed internal agency procedures rather than, as here, the rights or interests of the objecting party.") (citations omitted). In the context of every other problem that arose in this case, however, the Government's moving against the general trend in its own agency's policy is important to note. The Policy Directive shows that the Department of Justice wants to move away from forfeitures of structured funds where the funds are not tainted by any activity other than the structuring itself— the situation in which this case would fall had the grand jury not been tainted with all of the information about Gregory. Yet something about this case drove the Government to try to seize the funds and the Theresa Lane home at all costs, even in the face of Department of Justice policy. Given how heavily the Government relied on Gregory's fraud scheme before the grand jury, the

Court cannot escape the conclusion that the "something" in question was the opportunity to use Fisher as a means to an end. The Government had one last piece of Gregory's fraud scheme outstanding, the final portion of fraud proceeds that went unaccounted for. The Government would have had to leave that part of Gregory's case unresolved indefinitely, but then Fisher's alleged money order purchases presented a new opportunity. The opportunity, however, came with a dilemma. If the Government had kept its real motive for the prosecution to itself and presented the grand jury with a clean-cut case about failure to file then it likely would have avoided violating the Fifth Amendment. That clean-cut presentation, however, would have come at the cost of a presentation that, on its face, went against Department of Justice policy trends because the funds in question would have appeared innocent of all criminal activity. In contrast, the Government could have tried adhering to Department of Justice policy trends by charging Fisher explicitly with the continuation of Gregory's fraud scheme, knowing that its evidence was weak. In the end, the Government tried to finesse both sides of this dilemma and failed, tainting the grand jury presentation and tacking into the direction of its agency policy in the process.

All of the above instances of Government conduct provide additional support to the dismissal of the indictment on Fifth and Sixth Amendment grounds. Through these acts, the Government demonstrated a desire to win at all costs and a repeated prejudice to Fisher's ability to receive an impartial grand jury vote, to examine a compromised vote, and to prepare a fair defense with her choice of counsel. Especially in the context of the compromise of the grand jury's freedom and independence, the Government's conduct here cannot stand.

### D.  Remedy

The only question left is the extent of the relief that Fisher should receive on her motion

to dismiss.  As noted above, the Court recommends granting the motion to dismiss the indictment

or, in the alternative, granting the motion to strike the forfeiture notice.  The Court recommends

that the dismissal officially be without prejudice.  *See Acquest*, 932 F. Supp. 2d at 462 ("[D]ismissal

without prejudice is ordinarily the appropriate remedy for prejudicial prosecutorial misconduct

during grand jury proceedings.") (internal quotation marks and citation omitted).  Whether the

timing of the Government's grand jury presentation effectively makes the dismissal with prejudice

is not the Court's concern; the Court cannot overlook the Fifth and Sixth Amendment violations

here simply because "[t]his has been open since 2010 in my office because I gave you a 2010

number.  I inherited this case in 2013.  So somebody else had it, so cases get bounced around."

(Dkt. No. 106 at 20.)  The Court recommends denying any award of costs and fees for two

practical reasons.  Even if litigating the case up to this point has proven expensive for Fisher,

dismissing the case now spares her the expense of filing additional omnibus pretrial motions,

engaging in oral arguments, conducting possible evidentiary hearings, and preparing for trial.  At

the same time, "we think that the prospect of cases lost because of attorney misconduct is likely to

produce a sharp improvement in the procedures adopted by United States Attorneys to control

attorney conduct before the grand jury."  *Serubo*, 604 F.2d at 818; *see also U.S. v. Estepa*, 471 F.2d

1132, 1137 (2d Cir. 1972) ("We cannot, with proper respect for the discharge of our duties,

content ourselves with yet another admonition; a reversal with instructions to dismiss the

indictment may help to translate the assurances of the United States Attorneys into consistent

performance by their assistances.").

### E.  Other Motions

The Court's recommendation to dismiss the indictment has a practical effect on the other pending motions.  Fisher's motion to strike the forfeiture notice becomes moot unless, as noted above, it is granted as an alternative to outright dismissal.  The Government's motion for a scheduling order becomes unnecessary and also as moot.  Fisher's motion for discovery has become moot for several reasons.  The Government has asserted that it has provided over 3,200 pages of documents and that it already has made efforts to preserve agent notes and reports.  The Government already committed to providing *Brady/Jencks/Giglio* at the appropriate time, if necessary.  Putting aside the grand jury presentation about Gregory, the Government has confirmed that this case has no co-conspirators as understood under Federal Rule of Evidence 801(d)(2)(e).  The Government has confirmed additionally that this case involved no searches, informants, or cooperating witnesses.  Finally, Fisher's motion for discovery focused heavily on access to the grand jury transcript.  Fisher now has access to that transcript, and the information in it provides enough information about Government theories or tactics that further disclosure through an instrument like a bill of particulars would not be needed.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting Fisher's motion to dismiss (Dkt. No. 80) in part and dismissing the indictment without prejudice.  The Court recommends denying the motion to the extent that it seeks any other relief.  In the alternative, the Court recommends granting Fisher's motion to strike the forfeiture notice (Dkt. No. 21).  The Court further recommends denying the parties' remaining motions (Dkt. Nos. 77, 79) as moot.

## V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).


SO ORDERED.

___/s Hugh B. Scott_____
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: May 13, 2016