**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

UNITED STATES OF AMERICA,

          v.
                                            15-CR-19-A
                                          **DECISION AND ORDER**

GEORGINA FISHER,

             Defendant.
_____

This case is before the Court on the Government's objections to Magistrate Judge Scott's Report and Recommendation (Docket No. 107, *United States v. Fisher*, 2016 WL 2779018 (W.D.N.Y. May 13, 2016)), which recommends dismissing the superseding indictment without prejudice. In the alternative, Judge Scott recommends striking the superseding indictment's forfeiture notice. Judge Scott makes these recommendations because, during grand jury proceedings in this case, the Assistant United States Attorney (AUSA) made several references to the Defendant's ex-husband's criminal conduct. Judge Scott also recommends dismissal because, in response to grand juror questions, the AUSA and the IRS Special Agent who testified before the grand jury discussed whether and how Fisher's home could be forfeited in the event of a conviction.

The Court reviews Judge Scott's recommendations *de novo*. *See* 28 U.S.C. § 636(b)(1). The Court has carefully reviewed the record, the parties' extensive briefing, and, in particular, the transcripts of grand jury proceedings in this case. *See* Docket No. 118. After *de novo* review, and for the reasons stated below, the Court does not adopt the Report and Recommendation. The Court therefore denies Fisher's motion to

1

dismiss the superseding indictment for alleged grand jury misconduct.  *See* Docket No. 80.

## BACKGROUND

### A.  Procedural history

The Court assumes familiarity with this case's lengthy procedural history.  Thus, the Court recites only those facts relevant to Fisher's motion to dismiss.

The superseding indictment charges Fisher with eight counts of structuring. Fisher's ex-husband, Gregory Fisher, is not charged in the superseding indictment, nor was he a target of the grand jury investigation in this case.[1]  Gregory's criminal history, however, is central to Georgina's arguments for dismissal.  In 2008, Gregory pled guilty to a two-count information charging mail fraud and filing false tax returns.  *See United States v. Gregory Fisher*, No. 08-cr-00315-WMS, Docket Nos. 5 & 10.  And in 2009, Judge William M. Skretny sentenced Gregory to 36 months' imprisonment and three years' supervised release.  *See id.* Docket No. 27.  Judge Skretny also ordered Gregory to pay $969,647.09 in restitution.  *Id.*

Just over five years later, the AUSA[2] assigned to this matter presented a grand jury with a case involving Georgina's purchases of over $300,000 in money orders. After the AUSA made a second presentation a week later, the grand jury voted to indict Fisher.  The indictment charged nine counts of causing a financial institution to fail to file a transaction report—i.e., structuring—in violation of 31 U.S.C. § 5325(a)(2).  The indictment also contained a forfeiture allegation stating that, in the event of a conviction,

---

[1]  "Fisher" refers to the Defendant, Georgina Fisher.  When necessary, the Court refers to Fisher by her first name (Georgina) to distinguish her from her ex-husband, Gregory Fisher.

[2]  The AUSA who presented Georgina's case to the grand jury was not the AUSA who prosecuted Gregory.

the Government would seek to forfeit "all right, title, and interest in any and all money and other property involved in the offense[s] [charged] and all property traceable to such property, including but not limited to" (1) real property located on Theresa Lane in Niagara Falls, New York, which is titled in Fisher's name; (2) $74,000, "which is the total amount of the property involved in the offenses [charged]"; or, (3) if the Theresa Lane home or $74,000 cash is unavailable, "any other property of [Fisher's] up to the value of the forfeitable property described above."   Docket No. 1 at 7-8.   Two weeks later, the Government filed a notice *lis pendens* against Fisher's Theresa Lane home.   And several months later, the grand jury handed up a superseding indictment.   The superseding indictment rearranged the money orders at issue into eight counts of structuring (rather than nine counts), but it contained the same forfeiture allegation as the original indictment.  *See* Docket No. 20.

### B.  The grand jury proceedings

Fisher's motion to dismiss is based on the AUSA's conduct before the grand jury. She argues that dismissal is warranted for two reasons.   First, Fisher notes that the AUSA referred to Gregory's criminal conviction several times during grand jury proceedings.   According to Fisher, these references improperly suggested that Fisher conspired with Gregory or was somehow involved in his crimes.   Second, Fisher claims that the AUSA incorrectly explained to the grand jury whether and how the Government could seize Fisher's home in the event of a conviction.

The first reference to Gregory before the grand jury came in the AUSA's opening statement.[3]   After she introduced herself and, briefly, the structuring statute, the AUSA

---

[3]   The Court's summary of grand jury proceedings in this case is based on transcripts the Government has filed under seal.  *See* Docket No. 118.  Fisher has moved to unseal those transcripts, as well as the

told the grand jury that "the background of this case is that Georgina Fisher was married to a guy who got in trouble for some criminality and was prosecuted.  She came into some cash—this is not part of this case, but it was probably the ill-gotten gains of the proceeds of her husband's criminal activity."  A3:21 - A4:1.  The AUSA then gave a short summary of the evidence against Fisher, as well as another summary of the structuring statute.  The AUSA continued by describing Fisher's interview with the IRS Special Agent who investigated the case.  According to the AUSA, Fisher told the Special Agent that "[s]he wasn't attempting to evade the reporting requirements [in the structuring statute].  She was just following her husband's instructions, who I believe at this time was in jail.  The only relation to that is background and it goes to what her defense is.  Listen, my husband told me to do this, I was just doing what he told me to do, I knew there was a requirement, but I never intended to evade any reporting requirement."  A-5:2-8.  The AUSA once again described the structuring statute, and

parties' redacted briefing in support of, and in opposition to, her motion to dismiss.  *See* Docket No. 127.  That motion remains pending, and the Court will resolve it in due course.  At present, however, the transcripts remain under seal.  This Decision and Order's summary of the sealed grand jury transcripts is authorized by Federal Rule of Criminal Procedure 6(e)(3)(E)(i), which allows the Court to lift the seal on grand jury secrecy "in a manner, and subject to any other conditions that it directs" when doing so is necessary "in connection with a judicial proceeding."  The Court does not make this decision lightly.  Indeed, "the discretion of a trial court in deciding whether to make public the ordinarily secret proceedings of a grand jury investigation is one of the broadest and most sensitive exercises of careful judgment that a trial judge can make."  *In re Petition of Craig*, 131 F.3d 99, 104 (2d Cir. 1997).  The Court finds that unsealing the portions of the grand jury transcripts that are quoted and summarized in this Decision and Order is warranted for two reasons.  First, because the parties' arguments focus so heavily on the grand jury proceedings, as well as serious accusations of grand jury misconduct, filing an un-redacted Decision and Order is the only way to ensure that the reasons for the Court's decision—and, more particularly, the Court's reasons for not adopting the Report and Recommendation—are accessible to both the bar and the public.  Second, and relatedly, the Report and Recommendation, which has been publicly available for several months, *see* 2016 WL 2779018, quotes heavily from the grand jury transcripts.  As a result, there is little basis for redacting the Court's Decision and Order.  *See Craig*, 131 F.3d at 107 ("[T]he extent to which the grand jury material in a particular case has been made public is clearly relevant because even partial previous disclosure often undercuts many of the reasons for secrecy.")

The Court's summary of the grand jury proceedings in this case condenses over 160 pages of grand jury transcripts.  The Court's summary is, therefore, necessarily selective; the Court has neither quoted nor summarized every question and answer.  The Court has nonetheless endeavored to provide a balanced summary and has, to the extent possible, identified in this Decision and Order each of the issues Fisher points to as a basis for dismissal.

she responded to a number of grand juror questions about how the statute operates and what conduct it prohibits.

The Special Agent then began her testimony.  She first described how the IRS became aware of Fisher's conduct; Gregory was not mentioned.  The Special Agent next explained the structuring statute and Fisher's conduct.  The Special Agent told the grand jury, for instance, that over a ten-month period Fisher had purchased more than $300,000 in money orders at a number of stores, but that Fisher made her purchases in increments of less than $3,000 per store.  The Special Agent testified that Fisher used those money orders to pay off her mortgage.  And the Special Agent testified in detail as to when and where Fisher purchased many of the money orders.

Following that, the Special Agent told the grand jury about her interview with Fisher.  The Special Agent first told the grand jury that Fisher had claimed that the allegedly structured cash was her life savings.  But, the Special Agent continued, she disproved Fisher's claim by examining the Form W-2s from Fisher's entire employment history.  It was during this discussion that Gregory was mentioned for the second time in the proceedings.  Specifically, the AUSA asked, and the Special Agent confirmed, that there was "mention during the interview of [Fisher's] husband Greg Fisher." A-37:12-13. The AUSA then asked the Special Agent to tell the grand jury—"without getting into a lot of detail"—whether Gregory "had some fraud charges against him"; she asked the Special Agent to describe "generally . . . the nature of his offense"; she asked the Special Agent to tell the grand jury about the size of Gregory's fraud; and she asked the Special Agent whether, "[a]s part of that investigation [the Special Agent was] able to trace all of the several million dollars that Greg Fisher took."  A-37:12 - A-38:22.  The

Special Agent confirmed that, while "some" of Gregory's fraud proceeds could be traced, approximately $500,000 could not, either because Gregory "had cash" or because he "wrote checks out to cash to individuals," thus making the proceeds "hard to follow." A-38:21 - A-39:11. Finally, the Special Agent testified, Fisher stated during her interview that "you don't have to show ID if it's less than $3,000." A-40:1-2. The Special Agent then stepped out of the grand jury room.

The grand jurors had a number of questions for the AUSA. One of the first questions concerned the difference between structuring and money laundering. Another grand juror asked whether the mortgage Fisher paid off was "part of the assets purchased with the fraud proceeds." A-43:20-24. The AUSA responded: "So you're talking about the connection with Greg Fisher. I think the question is was the house somehow linked to his fraudulent conduct and I think the simple answer is no because if so she wouldn't have had to pay off the mortgage because it would have been seized." A-43:25 - A-44:4. The AUSA then briefly explained that the Government can "try to seize and ultimately forfeit, take, any assets that we can trace to the fraudulent conduct," and she described the manner in which the Government can seek pre-trial restraint of those assets. A-44:19-24. The AUSA concluded by stating, "long way around," that "because after [Gregory's] arrest and conviction I'm pretty sure she is still paying on the mortgage, that says to me that the house was not seized as part of the criminal investigation of the husband." A-45:2-6. A grand juror then asked whether the house could "be seized now." A-45:10. The AUSA responded that she did not know whether structuring is a crime for which forfeiture is an available penalty.

The grand jury's questioning continued.  One grand juror asked whether "there [is] a conspiracy charge" involving Gregory Fisher.  The AUSA responded, "[n]o.  And the question of whether it could be a conspiracy charge?  Maybe.  But he pled guilty to a lot of criminal activity.  The bottom line is that these are the decisions that we have to make in terms of charging."  A-45:20-23.  The AUSA then told the grand jury why, in the Government's opinion, there was insufficient evidence of an agreement between Gregory and Georgina to sustain a conspiracy charge.  A-45:23 - A-46:10.  The grand jurors followed up with a variety of other questions: for instance, one grand juror asked a question about federal jurisdiction over the proposed charges; another grand juror inquired whether "the target ever volunteer[ed] to the agent why she was reluctant to show ID"; and another questioned whether "a structural [sic] charge [is] harsher than a money laundering charge."  A-46:11 - A-47:19.  Yet another grand juror asked whether the grand jury could indict Fisher for both money laundering and structuring.  The AUSA reminded the grand jury—as she had already instructed them—that, "for money laundering you have to be able to prove that the funds were illegally obtained or the proceeds of illegal conduct.  Here you heard the testimony that there's reason to believe based on the fact that Ms. Fisher never made $300,000, based on the fact that Mr. Fisher stole or defrauded quite a bit of money, $500,000 at least of which was never able to be traced, so there's reason to believe that the money used to pay off the mortgage was the proceeds of his criminal activity."  A-47:23 - A-48:6.  "[B]ut," the AUSA concluded, "it comes down to is there enough proof to prove that beyond a reasonable doubt . . . .  Like here it's probable cause, right?  51 percent, but at trial, it's beyond a reasonable doubt."  A-48:6-16.  Finally, one grand juror asked whether Fisher

was listed on the home's mortgage, while another asked why it had taken nearly five years to present Fisher's case to the grand jury.

After the AUSA answered those questions, the Special Agent returned to the grand jury room.  The AUSA then asked the Special Agent to explain the difference between structuring and money laundering.  After the Special Agent gave an extended response, the AUSA asked for "the reason for not focusing on money laundering."  A-54:17-18.  The Special Agent responded that she "couldn't really say for sure [that the allegedly structured funds] w[ere] illegal proceeds from her husband's fraud.  We did know, and sometimes you take the charges that's easiest to prove, and we did know that she did the structuring by way of the purchase of the money orders, so that was— we focused on that.  It was a more readily provable crime."  A-54:20 - A-55:2.  The AUSA then asked why "[t]he house that this mortgage relates to" was not seized after Gregory's conviction; the Special Agent could not recall.  A-55:22 - A-56:8.  The AUSA asked the Special Agent to go through "a timeline" of when Gregory reported to prison, when Fisher's alleged structuring began, and when Fisher made her mortgage payments.  The AUSA concluded by asking: "So . . . at the time that the FBI and IRS are investigating Greg Fisher and determining what assets to seize, that's not a particularly good asset because there's no equity in in; correct?"  A-58:20-23.  The Special Agent responded: "Also, she was not married to Greg at the time.  When she purchased the house she was not married to him."  A-58:24-25.

The Special Agent then told the grand jury that the home whose mortgage Fisher had paid off with the allegedly structured money orders was no longer the home in which she lived.  The AUSA responded: "We're getting into all this forfeiture stuff, but if

you could trace the proceeds from one house to the next house he [sic] could take the next in line house arguably; correct?"  The Special Agent confirmed the AUSA's statement.  A-60:2-5.  The AUSA then asked the Special Agent several brief questions about Fisher's interview and store policies for money orders.

The Special Agent stepped out of the grand jury room again.  After a grand juror asked a question about the number of counts in a possible indictment, grand jury proceedings concluded for the day.

One week later, the AUSA returned to the grand jury to present a draft indictment.  The AUSA explained the structuring statute at length, and she explained the way in which the proposed charges were organized.  The AUSA also noted that "some of the questions" at the previous session "were about the house and forfeitability of the house," and "it turn[ed] out after doing some research" that, because Fisher used the allegedly structured money orders "to buy a house, that house is subject to forfeiture."  A-73:15-24.

The Special Agent then returned to the grand jury room, where she was presented with a spreadsheet summarizing the money orders Fisher purchased and later used to pay off her mortgage.  A-77:2 - A-78:4-5.  The Special Agent testified in exhaustive detail about the dates and times when, and locations where, Fisher purchased certain money orders listed in the draft indictment.  Following that, the Special Agent testified that Fisher used the allegedly structured money orders to pay off the mortgage for her home on Ashwood Drive.  Then, according to the Special Agent, Fisher took out a line of credit on the Ashwood Drive home, which she used to purchase

a home on Theresa Lane. Finally, the Special Agent told the grand jury that Fisher sold the Ashwood Drive home and paid off her line of credit.

The Special Agent's testimony continued with another description of her interview of Fisher; a description of Western Union's policies for money order purchases; and the Special Agent's investigation into Fisher's claim that the allegedly structured funds represented her life savings. The Special Agent then stepped out of the grand jury room. The only mention of Gregory during the second grand jury presentation referred to the fact that Georgina changed her last name when she married Gregory.

The AUSA answered several more grand juror questions about how the IRS became involved in the investigation, as well as the mechanics of Fisher's line of credit. The AUSA then read a draft indictment, including a forfeiture allegation, to the grand jury. A grand juror asked a question (discussed more fully below at note 9) about the amount of forfeiture sought compared to the amount of structuring charged in the draft indictment. After the AUSA answered those questions and left the grand jury room, the grand jury voted to indict Fisher.

Several months later, the AUSA returned to the same grand jury to present a superseding indictment. The Special Agent's testimony during the superseding presentation focused largely on clarifying the purchase dates for several money orders so that the counts in the indictment could be reordered to conform to those corrected dates. Gregory Fisher was not mentioned during the superseding presentation. After the AUSA read the draft superseding indictment, a grand juror asked another question about the difference between the amount of funds allegedly structured and the value of

the Theresa Lane home.  The AUSA answered that question (*see* note 9 *infra*) and left

the grand jury room.  The grand jury then voted to supersede the indictment.

**DISCUSSION**

**1.  The structuring statute charged in the superseding indictment**

Understanding the parties' arguments for and against dismissal requires

understanding what conduct is prohibited by the structuring statute charged in the

superseding indictment.  The superseding indictment alleges that Fisher structured

$74,000 in money order purchases with the intent of evading reporting requirements.

As is relevant here, a "financial institution" must obtain identification from any person

who purchases $3,000 or more worth of money orders in "a transaction or group of . . .

contemporaneous transactions."  31 U.S.C. § 5325(a).  The superseding indictment

alleges that Fisher "cause[d] or attempted to cause" the stores from which she

purchased her money orders "to fail to file" reports of money order purchases of $3,000

or more.  31 U.S.C. § 5324(a)(1).  Put differently, the superseding indictment alleges

that, by purchasing less than $3,000 in money orders at each of the stores from which

she made her purchases, Fisher avoided having to show identification for her

purchases, thereby "caus[ing]" the stores to fail to file reports of her purchases.  *Id.*

The structuring statute charged in the superseding indictment does *not* require

the Government to show that the allegedly structured funds were proceeds of a crime or

otherwise tainted.  In contrast, the federal money laundering statute—which is not

charged in the superseding indictment—*does* require the Government to show that the

funds at issue were ill-gotten.  *See* 18 U.S.C. § 1956.  Thus, to obtain an indictment in

this case, the Government did not need to introduce evidence concerning the source of the structured funds.

### 2. Fisher's motion to dismiss for alleged misconduct before the grand jury

Fisher moves for dismissal because of the AUSA's conduct before the grand jury. In particular, she argues that the AUSA's references to Gregory, as well as the AUSA's discussion of forfeiture, warrant dismissal. The record, however, does not support Fisher's claims that the AUSA's conduct strongarmed the grand jury into indicting Fisher or listing her home as a forfeitable asset. To the contrary, the record shows that the AUSA's discussion of both Gregory and forfeiture came largely *in response* to grand juror questions.

But more fundamentally, the grand jury's receipt of evidence about Gregory was fully consistent with the grand jury's far-reaching investigative powers. And to the extent the grand jury plays any role in forfeiture, Fisher has not shown that the AUSA's discussion of forfeiture before the grand jury was improper.

### a. The Court's limited authority to regulate grand jury proceedings

The Fifth Amendment provides in relevant part that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury." This guarantee preserves the grand jury's two historical duties. The grand jury's first duty is to determine "whether there is probable cause to believe a crime has been committed." *United States v. Calandra*, 414 U.S. 338, 343 (1974). And the grand jury's second duty is no less important: to "protect[] . . . citizens against unfounded criminal prosecutions." *Id.* Because the grand jury is charged with such enormous responsibilities, it is entrusted with a number of powers and

characteristics that are unique in federal criminal law. *See Whitehouse v. U.S. Dist. Court for Dist. of Rhode Island*, 53 F.3d 1349, 1357 (1st Cir. 1995). These powers and characteristics inform the Court's conclusion that the grand jury presentations in this case do not warrant dismissal. The Court therefore discusses them briefly.

First, unlike a petit jury, which may consider only what evidence the parties introduce and the Rules of Evidence allow, the grand jury "is not confined to a passive role." *United States v. Nunan*, 236 F.2d 576, 593 (2d Cir. 1956). Instead, a grand jury "may and often does proceed on its own initiative." *Id.* The grand jury may, for instance, initiate an investigation based on "tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors." *Calandra*, 414 U.S. at 344. It may be "induced . . . by newspaper reports." *Nunan*, 236 F.2d at 593. And it may "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950). The grand jury, in other words, has historically been "free to make [its] presentments or indictments on such information as [the grand jurors] deemed satisfactory." *Costello v. United States*, 350 U.S. 359, 362 (1956). The grand jury is entrusted with this nearly boundless investigative authority because it "sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge." *United States v. Williams*, 504 U.S. 36, 51 (1992). If this "public responsibility is adequately to be discharged," then the grand jury's "investigative power must be broad." *Calandra*, 414 U.S. at 344.

Second, and relatedly, the grand jury's broad investigative power means that a grand jury investigation necessarily "paints with a broad brush." *United States v. R.*

*Enterprises, Inc.*, 498 U.S. 292, 297 (1991).   *See also Calandra*, 414 U.S. at 343-44 (noting that, given "its special role in insuring fair and effective law enforcement," the grand jury has "broad" investigative powers).   Not only may it proceed on its own initiative and for its own reasons, but in conducting an investigation the grand jury's "sources of information are widely drawn." *Id.* at 344.  Of course, the grand jury "may compel the production of documentary evidence or the testimony of witnesses, as it deems necessary." *United States v. Davis*, 702 F.2d 418, 422 (2d Cir. 1983).   But the true breadth of the grand jury's investigative power is evident from the grand jury's ability to consider evidence that would typically be inadmissible at trial: a grand jury may, for instance, hear (and base an indictment on) hearsay, *Costello*, 350 U.S. at 361-64; evidence obtained in violation of the Fourth Amendment, *Calandra*, 414 U.S. at 349-52; evidence subject to a civil protective order, *Davis*, 702 F.2d at 421-22; and, possibly, "evidence previously obtained in violation of the privilege against self-incrimination." *Williams*, 504 U.S. at 49 (citing *Calandra*, 414 U.S. at 346).   *See also id.* at 50 (noting that the Supreme Court "ha[s] received many requests to exercise supervision over the grand jury's evidence-taking process, but . . . ha[s] refused them all").  The Government, of course, may choose to not introduce evidence before the grand jury that would be inadmissible at trial.   But the point is that, if the grand jury would like to consider such evidence, it may do so without affecting the validity of the indictment.   In short, the grand jury "may compel the production of evidence or the testimony of witnesses as *it considers appropriate*, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials." *Calandra*, 414 U.S. at 343 (emphasis added).

Third and finally, although the grand jury "belongs to no branch of the institutional Government," *Williams*, 504 U.S. at 47, it does not operate entirely separate and apart from the other branches.   The judiciary's relationship with the grand jury "has traditionally been, so to speak, at arm's length."   *Id.*   More relevant here, the grand jury and the United States Attorney have a unique relationship.   The grand jury "serv[es] as a kind of buffer or referee between the Government" and those whom the Government suspects of committing crimes.   *Id.*   But at the same time, the grand jury cannot function without the U.S. Attorney, who serves both as the grand jury's legal advisor and as the conduit through which the grand jury obtains evidence.   *See United States v. Hogan*, 712 F.2d 757, 759 (2d Cir. 1983) ("[I]t is the prosecutor who draws up the indictment, calls and examines the grand jury witnesses, advises the grand jury as to the law, and is in constant attendance during its proceedings."); Hon. Irving R. Kaufman, *The Grand Jury—Its Role and Its Powers*, 17 F.R.D. 331, 336 ("[The grand jury] is vested with the critically important power of subpoenaing witnesses . . . .   The United States Attorney utilizes [the grand jury's] subpoena power to bring witnesses and documents before [the grand jury].")   As a practical matter, then, the U.S. Attorney helps shape the grand jury's investigation. That is why the Court instructs every grand jury it empanels—including the one whose indictment Fisher now challenges—that, because the U.S. Attorney "has the duty of prosecuting . . . federal crimes, the U[.] S[.] Attorney . . . present[s] the matters . . . the government wants [the grand jury] to consider." Tr. of Nov. 2014 Grand Jury Empanelment 6:1-5.[4]   In other words, while the grand jury is not an arm of the U.S. Attorney (nor is the U.S. Attorney an agent of the grand jury), "[t]he authority of the

---

[4]   Contemporaneous with the filing of this Decision and Order, the Court has filed a transcript of the instructions it gave the grand jury that indicted Fisher.   "[J]uries are presumed to follow their instructions," *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), and the Court assumes the grand jury did so in this case.

prosecutor to seek an indictment has long been understood to be coterminous with the authority of the grand jury to entertain the prosecutor's charges." *Williams*, 504 U.S. at 53 (quotations omitted).

Taken together, these principles illustrate the grand jury's investigative and institutional freedom. Two basic rules follow.

The first is the well-settled rule that "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." *Calandra*, 414 U.S. at 345. The Supreme Court has repeatedly rejected arguments that an indictment may be dismissed because of the source or the quality of evidence presented to the grand jury. *See, e.g.*, *Bank of Nova Scotia v. United States*, 487 U.S. 250, 261 (1988) ("[T]he mere fact that evidence . . . is unreliable is not sufficient to require a dismissal of the indictment."); *Costello*, 350 U.S. at 362-63 ("'No case has been cited, nor have we been able to find any, furnishing an authority for looking into and revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon sufficient proof.'") (quoting *United States v. Reed*, 27 F. Cas. 727, 738 (Cir. Ct. N.D.N.Y. 1852) (No. 16,134) (Nelson, Circuit Justice)). Allowing dismissal of a facially-valid indictment because the grand jury was presented with insufficient or improper evidence "would run counter to the whole history of the grand jury institution, in which laymen conducted their inquiries unfettered by technical rules." *Costello*, 350 U.S. at 364. And entertaining such challenges would not only undermine the historic independence of the grand jury's evidence-gathering and deliberative functions, but it would also (as this case demonstrates) result in delay, as a court, before conducting a trial on the merits,

conducted "a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment." *Id.* at 363.

Second, the principles discussed above show that, if the grand jury is to effectively discharge its duties, federal courts must have relatively limited authority to intrude on a grand jury investigation. This is the foundation of the Supreme Court's decision in *United States v. Williams*. In *Williams*, the Supreme Court rejected the argument that a prosecutor has a constitutional obligation to present a grand jury with exculpatory evidence. 504 U.S. at 52. Specifically, the Court rejected the argument that a federal court may impose such an obligation as part of its supervisory authority over the grand jury. *Id.* Giving courts such power would, the Court observed, be inconsistent with "the grand jury's operational separateness from its constituting court." *Id.* at 49. This was why "it should come as no surprise that [the Supreme Court] ha[s] been reluctant to invoke the judicial supervisory power as a basis for prescribing modes of grand jury procedure." *Id.* at 49-50. Whatever limited supervisory authority a federal court might have over the grand jury, "[i]t certainly would not permit judicial reshaping of the grand jury institution, substantially altering the traditional relationships between the prosecutor, the constituting court, and the grand jury itself." *Id.* at 50. Put differently, a court may not, under the guise of imposing a procedural rule, invoke its supervisory authority to limit the type of evidence the grand jury has historically been permitted to consider, nor may a court regulate the way in which the grand jury receives that evidence. Relatedly, *Williams* held, requiring a prosecutor to present the grand jury with exculpatory evidence "would alter the grand jury's historical role, transforming it from an

accusatory to an adjudicatory body." *Id.* at 51.  And, moreover, requiring the presentation of exculpatory evidence would force courts to consider exactly the sort of argument that has long been rejected as inconsistent with the grand jury's investigative function: a challenge "based upon the sufficiency of the evidence relied upon by the grand jury." *Id.* at 53.

*Williams*' holding is simple: a federal court may use its "supervisory power . . . to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those few, clear rules which were carefully drafted and approved by [the Supreme Court] and by Congress to ensure the integrity of the grand jury's functions." *Id.* at 46 (quotations omitted).[5]  A federal court may therefore use its supervisory authority over the grand jury only to "enforce[e] or vindicat[e] legally compelled standards"—not "as a means of *prescribing* those standards of prosecutorial conduct in the first instance." *Id.* at 46-47 (emphasis in original).  *Williams*, in short, makes clear that "nothing short of a violation of laws or procedural rules regulating grand jury matters will permit a court to exercise its supervisory authority in the grand jury arena." *United States v. Gillespie*, 974 F.2d 796, 801 (7th Cir. 1992).

Fisher argues that the AUSA's grand jury presentations violate *Williams*' rule in two ways.  First, Fisher argues that the AUSA "used false and inflammatory statements to cause the Grand Jury to believe that Ms. Fisher conspired with her ex-husband to launder fraud proceeds through the purchase of the money orders referenced in the

---

[5]  *Williams* left open the possibility that federal courts "may" have the authority to "fashion, on their own initiative, rules of grand jury procedure." *Id.* at 50.  The Court suggested, though, that any such power "is a very limited one, not remotely comparable to the power [courts] maintain over their own proceedings." *Id.*  Fisher does not pursue this argument, nor, given the nature of the conduct in this case, would it likely affect the Court's conclusion that dismissal is unwarranted.

Superseding Indictment."  Docket No. 146 at 7.  Second, Fisher claims that the AUSA "presented false theories of forfeiture" and "gave [the grand jury] false assurances on Ms. Fisher's remedies regarding the forfeiture of her home."  *Id.*  The Court addresses each argument in turn.

### b. The AUSA's references to Gregory Fisher were not improper, nor do they provide a basis for dismissing the superseding indictment.

The record does not show that the AUSA used "false and inflammatory language" regarding Gregory Fisher.  Docket No. 146 at 7.  Likewise, the record does not support Fisher's claim that references to Gregory were meant "to cause the Grand Jury to believe that Ms. Fisher conspired with her ex-husband to launder fraud proceeds through the purchase of the money orders."  In any event, such conduct, if true, would not permit dismissal under *Williams.*  And, finally, none of the conduct Fisher points to impaired the grand jury's independence.

### i. The AUSA's references to Gregory Fisher provided the grand jury with legitimate background information, often in response to grand juror questions.

An AUSA does not violate a rule regulating grand jury proceedings by informing the grand jury that the target's spouse was previously convicted of committing several crimes, when, as here, those crimes might be relevant to charges that could conceivably be brought against the target.  In other words, the grand jury in this case properly heard evidence of Gregory's fraud conviction, not to show that Georgina was guilty by association but, instead, to give the grand jury a complete picture of Georgina's conduct.  That evidence was particularly important to explaining why certain charges— most notably, money laundering—would be inappropriate.  Rather than violating a rule

regulating grand jury proceedings, the grand jury's receipt of this evidence was consistent with the grand jury's far-reaching investigative powers.

"[T]he nature of the crime and the identity of the accused are decisions made by the grand jury at the conclusion of its inquiry, not at the beginning." *Davis*, 702 F.2d at 422. The grand jury, then, cannot be limited to hearing evidence that is strictly related to charges the Government considers bringing against a target at the start of its investigation. To the contrary, the Government may properly provide the grand jury with evidence that bears on the target's *possible* criminal conduct, even if that evidence is not strictly relevant to the Government's proposed charges, and even if that evidence might cast the target in a less-than-favorable light.

In this case, Fisher's conduct, combined with the Government's proposed charges, led some grand jurors to ask legitimate questions to help them understand the full extent of Fisher's conduct and whether that conduct might be illegal. For instance, several of the grand jurors' questions show that the purpose of the structuring statute is not intuitive. Other questions show that it was not apparent to some grand jurors that structuring and money laundering are separate crimes. For example, after the Special Agent finished her testimony, one of the first questions asked by a grand juror was what the grand juror qualified as "a question of ignorance": "Is structuring the same thing as money laundering?" A-42:19-20. Similarly, another grand jury stated: "I'm getting a little confused because if you're taking cash and getting a money order that's pretty much money laundering, too. Could you not file for both?" A-47:20-22. It would have been nearly impossible for the AUSA (and, later, the Special Agent) to not answer these legitimate questions as she did: by referencing the suspected source of the cash Fisher

allegedly structured.[6]   A money laundering charge would require the Government to present the grand jury with evidence that the cash Fisher allegedly structured was "the proceeds of . . . unlawful activity" and that Fisher knew that fact.  18 U.S.C. §1956(a)(1).  Thus, to answer the grand jury's questions about whether a money laundering charge would be appropriate, the Government would *need* to inform the grand jury of the Government's suspicions regarding the origins of Fisher's cash.

Identifying Gregory's fraud proceeds as a potential source of Georgina's allegedly structured cash was, therefore, little more than an example of a grand jury investigation "paint[ing] with a broad brush," *R. Enterprises, Inc.*, 498 U.S. at 298, so that the grand jurors understood all the relevant facts.  Relatedly, references to Gregory were also an example of the Government carrying out its obligation to "furnish [the

---

[6]  *See, e.g.*, A-54:8 – A-55:9:

Q: And in this case regarding Ms. Fisher, the investigation focused on structuring without the laundering and that has to do with the source of the funds and proof of the source of funds; correct?

A: Right.  It would have to be the illegal proceeds in order to determine that she was laundering the money.

Q: And that would have to be proven at trial beyond a reasonable doubt; correct?

A: Correct.

Q: And so the reasons for not focusing on money laundering with respect to this $300,000 that we've been talking about here was what?

A: The source of the money we could never really say for sure because it's cash.  I disproved her claim that that was her life earnings, but we couldn't really say for sure it was illegal proceeds from her husband's fraud.  We did know, and sometimes you take the charges that's easiest to prove, and we did know that she did the structuring by way of the purchase of the money orders, so that was—we focused on that.  It was a more readily provable crime.

Q: So circumstantially there might be evidence that there was about $500,000 per your testimony of the money from Greg Fisher that you couldn't trace.  She happened to have $300,000 worth of cash, but other than that circumstantial logical argument, proof beyond a reasonable doubt is another thing?

A: Correct.

grand jury] with controlling legal principles," *United States v. Ciambrone*, 601 F.2d 616, 622 (2d Cir. 1979)—that is, the difference between structuring and money laundering, and why the evidence supported one charge but not the other.  The record, therefore, does not support Fisher's claim that the AUSA's references to Gregory were intended to "inflam[e]" the grand jurors by "caus[ing] the[m] . . . to believe that Ms. Fisher conspired with her ex-husband to launder fraud proceeds through the purchase of the money orders."  Docket No. 146 at 7.

But even if certain references to Gregory were, as Fisher argues, meant to provoke the grand jurors into indicting Fisher, that claim is not a basis for dismissal under *Williams*.  *Williams* emphasized that courts must carefully identify the nature of alleged grand jury misconduct, because "a complaint about the quality or adequacy of the evidence can always be recast as a complaint that the prosecutor's presentation was 'incomplete' or 'misleading.'"  *Williams*, 504 U.S. at 54-55.  The former challenge, of course, "'would run counter to the whole history of the grand jury institution.'"  *Id.* at 55 (quoting *Costello*, 350 U.S. at 364).  *See also United States v. Jones*, 165 F.3d 620, at *2 (2d Cir. 1998) (Table Decision) ("[A] defendant's complaint that a government agent gave the grand jury misleading testimony—including an inaccurate summary of evidence—is in essence a challenge to the reliability or competence of the evidence and, absent other prosecutorial misconduct, will not support dismissal of an indictment.")  Thus, even if certain of the AUSA's references to Gregory may, in hindsight, have been ill-advised—in particular, her opening comment that Fisher "was married to a guy who got in trouble"—a complaint about those references amounts only to a complaint about the manner in which the AUSA *introduced* evidence.  As discussed

above, the grand jury was well within its right to hear evidence of Gregory's conduct, given the potential relevance of that evidence to charges against Georgina.  Fisher's complaint, then, is really that the AUSA mentioned Gregory in such a way as to persuade the grand jurors into thinking that Georgina's conduct was worth investigating and, ultimately, indicting.  But even if that is true (and the record does not support such a claim), that is exactly the type of complaint that *Williams* says courts have no authority to remedy: courts may use supervisory authority to enforce already-prescribed rules and standards of conduct, but courts may not use supervisory authority to "*prescrib*[*e*] . . . standards of prosecutorial conduct."  *Williams*, 504 U.S. at 46-47 (emphasis in original).  By seeking dismissal, that is what Fisher asks the Court to do: she asks the Court to conclude that the *way in which* the AUSA put legitimate evidence before the grand jury was improper.

Thus, while some of the AUSA's references to Gregory might appear to have been unnecessary, none of those references (nor the way in which the AUSA put them before the grand jury) "amounts to a violation of one of those few, clear rules which were carefully drafted and approved by [the Supreme Court] and by Congress to ensure the integrity of the grand jury's functions."  *Williams*, 504 U.S. at 46.

In response, Fisher relies heavily on two decisions that predate *Williams*: the Second Circuit's decision in *United States v. Hogan*, 712 F.2d 757 (2d Cir. 1983), and the Third Circuit's decision in *United States v. Serubo*, 604 F.2d 807 (3d Cir. 1979).  Both cases are factually distinguishable.  And, in light of *Williams*, both cases are likely legally distinguishable as well.

In *Hogan*, the Second Circuit reversed a district court decision denying a motion to dismiss the indictment for prosecutorial misconduct before the grand jury. The AUSA in *Hogan* had engaged in what the Second Circuit called "flagrant and unconscionable" (712 F.2d at 762) conduct: when asked by a grand juror whether the case was worth indicting given that the target may have backed out of a drug deal, the AUSA responded that, "[i]f the deal would have gone forward we would have a real hoodlum trying to sell heroin" and that the grand jury should indict as "a matter of equity," *id.* at 760; the AUSA then introduced testimony that the target "was a 'suspect' in the apparently unrelated murders" of a drug dealer and a police officer, *id.*; the AUSA made "himself an unsworn witness" by suggesting that the target "was guilty of misconduct while he was a police officer," and by stating that the AUSA "had read various articles in [the] newspaper which accused a 'high ranking officer' of receiving bribes from gamblers," *id.*; and, most egregiously, when the AUSA wanted to show the grand jurors that the target had a "predisposition to possess heroin," the AUSA introduced the false testimony of two DEA Agents. *Id.* at 760-61.

In *Serubo*, the Third Circuit also reversed a district court decision denying a motion to dismiss the indictment for prosecutorial misconduct before the grand jury. The AUSA in that case engaged in "extreme" misconduct before the grand jury by eliciting "graphic and misleading reference[s] to Cosa Nostra hatchet men" that the Third Circuit believed was a "blatant invitation to associate the defendants with a disfavored criminal class." 604 F.2d at 818.

As an initial matter, it should be obvious that the conduct in this case is different, both in degree and in kind, from the conduct in *Hogan* and *Serubo*. In this case, the

AUSA largely responded to grand juror questions about whether a money laundering charge would be appropriate by telling the grand jurors that the source of Fisher's funds, though suspicious, likely could not be proven beyond a reasonable doubt.   In other words, the AUSA's references to Gregory were made for a proper purpose, and they were focused: they did not suggest to the grand jurors that Fisher should be indicted merely because her ex-husband had been convicted of fraud.   And the AUSA's references to Gregory did not, as in *Hogan* and *Serubo*, include conduct, such as attacks on the target's character, whose only purpose could have been to pressure the grand jury into indicting Fisher.   To the extent the grand jurors in this case may have felt such pressure, that is an inevitable consequence of the grand jury's duty to "run down" "every available clue" and to ensure that "all witnesses [have been] examined in every proper way to find if a crime has been committed."   *Calandra*, 414 U.S. at 344 (quotation marks omitted).

Further, as the Court's discussion of the grand jury should make clear, some of the misconduct at issue in *Hogan* and *Serubo* is, after *Williams*, likely not the type of misconduct that can lead to dismissal.   To be sure, some of the misconduct in *Hogan* and *Serubo* clearly survives *Williams*.   For instance, an AUSA's knowing and intentional introduction of perjured testimony (as in *Hogan*) would likely constitute subornation of perjury, in violation of 18 U.S.C. § 1622.   It would therefore be a violation of "one of those few, clear rules which were carefully drafted and approved by [the Supreme Court] and by Congress to ensure the integrity of the grand jury's functions."   *Williams*, 504 U.S. at 46.   *See also id.* at 46 n.6 (identifying § 1622 as a rule that could result in dismissal).   And an AUSA's introduction of unsworn testimony may conceivably violate

Federal Rule of Criminal Procedure 6(c)'s requirement that the grand jury swear in its own witnesses. *See id.* (identifying Rule 6 violations as a possible basis for dismissing an indictment). But other forms of misconduct identified in *Hogan* and *Serubo*—such as the AUSA's attack on the target as a "hoodlum"—even if they might violate Department of Justice policy or standards of professional conduct, do not appear to provide a basis for dismissal after *Williams*. This is not to say that a prosecutor is immune from repercussions for certain types of misconduct before the grand jury. *See, e.g.*, *United States v. Myers*, 123 F.3d 350 (6th Cir. 2007) (holding that failure to provide grand jury witnesses with warnings required by DOJ policy could not result in dismissal, but noting that "federal prosecutors should not be surprised if, in future cases, the court refers violators of the Department's internal policy to the Department's Office of Professional Responsibility"). But it does mean that many forms of arguable misconduct are not the type of conduct for which a court may dismiss an indictment. *Williams* "severely curtailed the ability of federal courts to fashion remedies," such as dismissal of an indictment, "based upon their supervisory powers," *Myers*, 123 F.3d at 356, and to the extent that aspects of cases like *Hogan* might survive *Williams*, it should be obvious that the conduct in this case does not begin to approach the egregious conduct in *Hogan*. References to Gregory were instead tied to a legitimate matter of inquiry before the grand jury. Dismissal is therefore unwarranted.

### ii. The AUSA's references to Gregory Fisher did not intrude on the grand jury's independence.

Fisher's second argument why the AUSA's references to Gregory warrant dismissal is that those references, according to Fisher, "caused irreparable damage to the Grand Jury's independent role." Docket No. 146 at 4 (quotation marks omitted).

Specifically, Fisher argues that the AUSA's references to Gregory's "fraud proceeds" "hijacked the case, changed the Grand Jury's focus of inquiry and fueled their discussion." *Id.*

This argument is based on the premise that, "underlying the Fifth Amendment guarantee is that in order for an indictment to be recognized as actually issuing from a grand jury, it must be the product of an investigative deliberation that is *independent* of both the prosecuting attorney and the court." *United States v. Leeper*, No. 06-CR-58A, 2006 WL 1455485, at *2 (W.D.N.Y. May 22, 2016) (quoting *United States v. Sigma Int'l, Inc.*, 244 F.3d 841, 856 (11th Cir. 2001), *rehearing en banc granted and opinion vacated by* 287 F.3d 1325 (citations omitted and emphasis in original)). The Court assumes that, even after *Williams*, a court may dismiss an indictment for prosecutorial misconduct that impairs the grand jury's independence as a way of enforcing the Fifth Amendment's guarantee of an independent grand jury. *See* Sara S. Beale, et al., *Grand Jury Law and Practice* § 9.32 (2d ed. 2015) ("Supervisory power may be exercised if the prosecutor's conduct threatens the impartiality or independence of the grand jury's processes" because "supervisory power cases can be seen as simply enforcing the requirements of the grand jury clause, rather than as defining new nonconstitutional standards for prosecutorial conduct.")

In assessing a claim that a prosecutor's conduct overcame the grand jury's independence, the court must carefully identify the alleged misconduct so that Court does not, in the guise of protecting the Fifth Amendment's guarantee of an independent grand jury, prescribe (rather than proscribe) prosecutorial conduct. *Cf. Williams*, 504 U.S. at 54-55. The Court is similarly mindful that "independence" must be viewed in

27

light of the traditional relationship between the grand jury and the U.S. Attorney. The grand jury, as noted, necessarily relies on the U.S. Attorney to provide it with evidence and legal instructions. In other words, because the grand jury cannot meaningfully perform its duties without the assistance of the U.S. Attorney, a court facing a claim that a prosecutor impaired the grand jury's independence must carefully analyze whether the prosecutor's conduct went beyond the prosecutor's traditional role vis-à-vis the grand jury.

Judged by that standard, the AUSA's references to Gregory Fisher did not overcome the grand jury's independence. To the contrary, as noted, references to Gregory came largely *in response* to grand jurors' questions about whether charges such as money laundering and conspiracy were appropriate. Thus, references to Gregory were, in fact, largely an *example of* the grand jury's independence.

This case is therefore far different from those on which Fisher relies. For instance, in *United States v. Leeper*, this Court dismissed an indictment after the AUSA asked a new grand jury to correct an "omission in paperwork." That "omission," however, turned out to be a failure to allege an essential element of the crime charged in the indictment. The fact that the new grand jury proceeding "lasted only about one hour," combined with the fact that the new grand jury had the prior grand jury's transcripts for "only about 10 minutes" before issuing a new indictment, led the Court to conclude that the new grand jury had been pressured into "rubber stamp[ing]" the new indictment. *United States v. Leeper*, No. 06-CR-58A, 2006 WL 1455485 (W.D.N.Y. May 22, 2006).

This case is also different than the other case on which Fisher relies, *United States v. Acquest Development, LLC*, 932 F. Supp. 2d 453 (W.D.N.Y. 2013).   In that case, an attorney representing a target of a grand jury investigation invoked the attorney-client privilege when she was subpoenaed to testify.   On the Government's motion, this Court compelled the attorney to testify after finding that the crime-fraud exception to the attorney-client privilege applied.   When the attorney returned to the grand jury, the AUSA asked the witness several questions in which he referred to the Court having found "probable cause to believe . . . that certain environmental crimes may have been committed."   *Id.* at 457.   *See also id.* ("Q: Are you aware that the court issued an order, in fact, compelling you to come and testify and provide certain documents and *the Court found that a crime fraud exception to the attorney/client privilege, in fact, was present*?") (emphasis in original).   The court concluded that dismissal was warranted because the AUSA's questioning had impaired the grand jury's independence: "The ultimate issue of fact before th[e] grand jury was whether or not there was probable cause to believe that crimes had been committed, and in [the] Order compelling [the attorney] to testify—which was both read to and provided to the grand jury—[this Court] expressly found the existence of probable cause as to several of the crimes which were subsequently included in the indictment.   Moreover, that Order expressly found that the government ha[d] met its burden of demonstrating that the crime fraud exception to the attorney/client privilege applies."   *Id.* at 460 (quotation marks omitted).

This case is very different from *Leeper* and *Acquest Development.*   In those cases, the grand jury's independence was compromised because the grand jury was

told, either directly or indirectly, that another decision-maker had already found probable cause to believe that a crime had been committed. In effect, the grand jury was told that it simply needed to sign off on the prior decision-maker's work. Thus, in both cases the prosecutor impaired the grand jury's independence by telling the grand jury that another decision-maker had already decided the *exact same question* the grand jury was charged with deciding: "whether there is probable cause to believe a crime has been committed." *Calandra*, 414 U.S. at 343. The grand jury's independence is not compromised, however, by the grand jury learning that the Government's investigation of the current target *arose* from an investigation of a prior target. Nor is the grand jury's independence compromised by learning that the prior target's conviction might bear on the grand jury's investigation of the current target. That is entirely consistent with the grand jury's "historic function of ferreting out crime and corruption." *Nunan*, 236 F.2d at 593. And it is particularly consistent with the grand jury's investigative function where, as here, a possible charge against the current target—money laundering—necessarily involves *separate* criminal conduct. Fisher's argument that the AUSA impaired the grand jury's independence is, therefore, without merit.

### c. The AUSA's discussion of, and the Special Agent's testimony about, forfeiture does not warrant dismissal.

The second way in which Fisher claims the AUSA violated one of the "few, clear rules" regulating grand jury proceedings is by, in Fisher's words, "present[ing] false theories of forfeiture to the Grand Jury" and "g[iving] false assurances on Ms. Fisher's remedies regarding the forfeiture of her home." Docket No. 146 at 7. Specifically, Fisher argues that the AUSA "presented a false theory of forfeiture based on 'relevant conduct' that she knew was wrong." *Id.* at 5. According to Fisher, the AUSA "allowed

her Special Agent witness to justify forfeiture by describing the house as a substitute asset, when she knew full well that substitute assets are assets not directly forfeitable nor are they subject to pre-trial restraint and that the Indictment did not treat the house as a substitute asset." *Id.*  This argument is part of Fisher's broader claim that "[t]he government wanted forfeiture of the only asset Ms. Fisher could use to fund her defense—her Theresa Lane home" and that, to that end, the Government strongarmed the grand jury into listing Fisher's Theresa Lane home as a forfeitable asset. *See* Docket No. 131 at 4.

As an initial matter, Fisher's argument is not on solid footing because the grand jury plays a limited role in criminal forfeiture.  Forfeiture "operate[s] as punishment for criminal conduct." *Libretti v. United States*, 516 U.S. 29, 39 (1995).  It is, therefore, "an element of the sentence imposed *following* conviction." *Id.* at 38-39 (emphasis in original).  Forfeiture is "not . . . a separate substantive offense." *Id.* at 39. *See also* Fed. R. Crim. P. 32.2.(a) ("The [forfeiture] notice should not be designated as a count of the indictment or information.")  Rather, a forfeiture allegation only serves as "notice to the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute." Fed. R. Crim. P. 32.2(a). *See also United States v. Grammatikos*, 633 F.2d 1013, 1024 (2d Cir. 1980) (interpreting the predecessor to Rule 32.2(a) and noting that "its principle objective is to provide persons . . . with notice that forfeiture will be sought").  It is not until *after* a verdict or plea that the court "must determine what property is subject to forfeiture under the applicable statute" and whether "the government has established the requisite nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1)(A).  To be sure, the grand jury's

finding of probable cause is "conclusive" as to at least some questions surrounding pretrial restraint of forfeitable assets. *Kaley v. United States*, 134 S. Ct. 1090, 1099 (2014). *See also United States v. Cosme*, 796 F.3d 226, 234-35 (2d Cir. 2015) (identifying the limits of *Kaley*'s holding). But the grand jury's role in forfeiture is still limited. For this reason, it is unclear how, if at all, alleged misconduct before the grand jury concerning questions of *forfeiture*, rather than the target's possible guilt, may result in dismissal.

Thus, the Court assumes Fisher's argument to be that the AUSA's purportedly incorrect discussion of forfeiture affected the grand jury's deliberations on whether Fisher committed the crimes alleged in the superseding indictment. Even with that assumption, however, the record does not support Fisher's claims.

The relevance of the Special Agent's references to the Theresa Lane home as a "substitute asset" requires brief explanation. As part of its sentence for a violation of the structuring statute charged in the superseding indictment, a court is required to "order the defendant to forfeit all property, real or personal, involved in the offense and any property traceable thereto." 31 U.S.C. § 5317(c)(1)(A). The Government may restrain or seize such property prior to trial. *See* 21 U.S.C. §§ 853(e), (f). But if property involved in, or traceable to, a crime is for some reason unavailable to satisfy § 5317(c)'s forfeiture requirement, a sentencing court may instead order that "substitute property" be forfeited. 21 U.S.C. § 853(p). *See also* 31 U.S.C. § 5317(c)(1)(B) (providing that forfeiture under § 5317 "shall be governed by the procedures established in section 413 of the Controlled Substances Act," i.e., 21 U.S.C. § 853). In contrast to directly forfeitable property and its traceable proceeds, the Government "may not obtain a pre-

trial restraint on potential substitute property." *United States v. Queri*, 679 F. Supp. 2d 295, 296 (N.D.N.Y. 2010).   Thus, if the Theresa Lane home were either directly forfeitable or traceable to forfeitable property, the Government was entitled to encumber it after indictment and before trial.   If, in contrast, the Theresa Lane home were *substitute* property, the Government's ability to encumber the home prior to trial would be, at best, questionable.[7]

Fisher argues that dismissal is warranted because the Special Agent incorrectly referred to Fisher's Theresa Lane home as a "substitute asset."   During her testimony, the AUSA asked the Special Agent whether Fisher's Theresa Lane home is "subject to forfeiture because it was ultimately purchased with funds obtained as a result of structuring activity?"   A-98:11:14.   The Special Agent responded: "Correct.   She paid off the Ashwood Lane with the structured funds, then obtained a loan from that house, the line of credit, secured it, bought another house, then sold the Ashwood house and paid off the line of credit, so it was *like a substitute asset.*"   A-98:15-19 (emphasis added). Shortly after that statement, in response to the AUSA's question whether the funds used to purchase the Theresa Lane home were "*traceable* to the structured purchases of money orders," the Special Agent responded: "Yes because Theresa Lane is a *substitute asset* that as she went through the process of what she did, it ends up in Theresa Lane, mortgage free."   A-99:12-16 (emphasis added).

---

[7]   If the Theresa Lane home were substitute property, it is unclear whether the Government's notice of *lis pendens* would be impermissible.   *See United States v. Kramer*, 2006 WL 3545026, at *10 (E.D.N.Y. Dec. 8, 2006) ("Courts to address this issue, that is, where the Government seeks to file a notice of *lis pendens* on substitute assets, have . . . concluded that *lis pendens* does not constitute the type of pretrial restraint that the Second Circuit held was unauthorized in [*United States v.*] *Gotti*[, 155 F.3d 144 (2d Cir. 1998)]. Those courts have apparently reasoned that an effective restraint as a matter of fact is not the equivalent of a restraint obtaining as a matter of law.")   (citations omitted).   *See also United States v. Miller*, 26 F. Supp. 2d 415, 432 n.15 (N.D.N.Y. 1998).

There is no serious question that the evidence introduced before the grand jury supports the conclusion that the Theresa Lane home is not substitute property but is, instead, "property traceable" to the allegedly structured money orders at issue in the superseding indictment.   31 U.S.C. § 5317(c)(1)(A).   The Government acknowledges that the Special Agent's use of the term "substitute asset" to describe the Theresa Lane home was "inartful."  Docket No. 116 at 36.

The Special Agent's "inartful" phrasing, however, does not warrant dismissal.  A witness's fleeting misstatement of a legal concept—especially one concerning technical and somewhat arcane forfeiture concepts—does not intrude on the grand jury's independence.  Similarly, Fisher has identified no rule regulating grand jury proceedings that the Special Agent's misstatement might violate.  And even if Fisher could identify such a rule, the Court is confident that two isolated references to "substitute assets"—a legal term of art with which the Court doubts few, if any, grand jurors were familiar— viewed in the context of "the record as a whole," did not "substantially influence[] the grand jury's decision to indict." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988).   In other words, even if the Special Agent's incorrect references to substitute assets were the type of error for which an indictment may be dismissed, the error was harmless.

Finally, Fisher claims that dismissal is warranted because, Fisher argues, the AUSA "presented [the grand jury with] a false theory of forfeiture based on 'relevant conduct' that she knew was wrong."  Docket No. 146 at 5.  This argument stems from questions some grand jurors asked concerning the difference between the amount of allegedly structured funds listed in the superseding indictment and the approximate

value of the Theresa Lane home.[8]  In response to these questions, the AUSA indicated

that the legal basis for forfeiture was not straightforward, and she offered the grand

jurors the opportunity to consult with an attorney from the Asset Forfeiture and Financial

Litigation Unit of the U.S. Attorney's Office; the grand jurors did not ask for assistance.

The AUSA ultimately reassured the grand jurors that, even if Fisher might have a post-

conviction argument about forfeiture of the entire Theresa Lane home, "because we can

show that that asset was purchased with $74,000 worth of money orders, we can forfeit

it."[9]

Fisher argues that these statements gave the grand jurors "false assurances on

[her] remedies regarding the forfeiture of her home."  Docket No. 146 at 7.  Specifically,

---

[8]  The grand jury heard evidence that Fisher structured more than the $74,000 charged in the superseding indictment.  Much of that alleged structuring, however, was barred by the statute of limitations.

[9]  In relevant part, the AUSA told the grand jurors that "Because we can show—it's kind of complicated. Even though she's charged with these specific counts, the rest of her conduct is relevant conduct for purposes of a prosecution, but you know what?  If you bear with me I can ask.  There's people in our office who do forfeiture and know these questions better."  A-117:23 – A-118:4.  After receiving a follow-up question from a grand juror, the AUSA told the grand jury that, "what we can say is that the $74,000 charged in this indictment went to purchase that house, so we can take the house.  Now, does she have a claim to anything above $74,000?  Probably.  That's a forfeiture thing that—that's why I can't answer that because I'm not sure about all the rules and regulations, but she would certainly be able to make a claim that you only have $74,000, so if you take my house and it's worth $174,000, then you have to give me $100,000 or get a money judgment for $74,000 or whatever.  There's different things you can do, but yes, there are equitable issues there that would have to be resolved but because we can show that that asset was purchased with $74,000 worth of money orders, we can forfeit it."  A-118:10-23.

A grand juror asked a similar question during the superseding presentation.  The AUSA responded: "The forfeiture is only for what's specifically listed.  So it's for the house that she currently lives in and the total number—money—a money judgment or money totaling $74,000 . . . .  [Y]ou're saying if there was extra money, we're limited by what's alleged in the indictment or the superseding indictment in terms of what we forfeit.  So, if that answers your question.  Okay.  And again, we have—well, in order to forfeit we have to be able to trace the money, and so—and I think you're referencing the fact that the first house she had on Ashwood was $300,000, and eventually she sold that.  Remember she had the house on Ashwood.  Grand Juror: She sold it.  [AUSA]: Well, paid it off with the money orders, got a line of credit, used a line of credit to buy the Theresa Lane house, and then eventually sold Ashwood and paid off the line of credit.  So I don't know how much extra money she had when she paid off the line of credit.  But if we can—like we could trace the purchase of Theresa Lane, and that's why we're seeking to forfeit that, okay?"  A-165:23 - A-166:21.

Fisher notes, the Second Circuit has held that, in a case involving a criminal statute prohibiting discrete acts (as opposed to "schemes, conspiracies, or enterprises"), the "violation on which the forfeiture is based must be the specific violations of which [the defendant] was convicted, not some other, separate . . . violations." *United States v. Capoccia*, 503 F.3d 103, 116-17 (2d Cir. 2007) (Sotomayor, J.).[10]  Applied to this case, Fisher argues that the Government cannot seek forfeiture of funds tied to uncharged structuring violations, even if those violations might be part of the same pattern of behavior charged in the superseding indictment.   Thus, Fisher argues, when some grand jurors questioned whether the Government could forfeit a house and funds worth more than the $74,000 charged in the superseding indictment, the AUSA "vouched, and told [the grand jurors] to take her word for it and not worry because Ms. Fisher would have a claim for the balance of the equity in her home."  Docket No. 131 at 20.  But, Fisher claims, the AUSA "knew all along that she was not going to allow that to happen; that she was going to forfeit both Ms. Fisher's home and the $74,000."  *Id.*  The AUSA, according to Fisher, "never gave the Grand Jury the 'requisite nexus'" between the crimes charged and the forfeiture sought "because there is none."  *Id.  See* Fed. R. Crim. P. 32.2(b)(1)(A) ("If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense.")

Fisher essentially argues that the Government cannot seek forfeiture of both $74,000 and the entire value of the Theresa Lane home.  But whether the Government can *seek* forfeiture of all property identified in the superseding indictment, and whether

---

[10]  Because this case is still in the pre-trial stage, the Court offers no opinion on how *Capoccia* applies to the structuring statute charged in this case.

the Government is ultimately *able* to forfeit that property, are separate questions.  It is well-settled that a forfeiture allegation serves only to put a defendant on notice "that the government . . . will be seeking forfeiture in accordance with the applicable statute." 2000 Advisory Committee Note to Federal Rule of Criminal Procedure 32.2(a).  In other words, that the superseding indictment's forfeiture allegation lists both a $74,000 monetary judgment and the Theresa Lane home does not necessarily mean that the Government will be able to forfeit all of that property in the event of a conviction; it simply means that the Government is complying with its obligation to notify Fisher that it will "seek forfeiture of property . . . in accordance with the applicable statute."  Fed. R. Crim. P. 32.2(a).   And the statute authorizing forfeiture in this case, 31 U.S.C. § 5317(c)(1)(A), "affords no leeway: *All* property involved in the [offense] is forfeited as well as *all* property traceable to that offense."  *United States v. Castello*, 611 F.3d 116, 120 (2d Cir. 2010) (emphases in original).

That the "broad forfeiture provision" in § 5317(c) "is limited by the Excessive Fines Clause," *id.*, does not mean that the Government was incorrect to list all potentially-forfeitable property in the superseding indictment.  Instead, it simply means that this case must proceed one step at a time.  If Fisher is convicted, she may of course argue that forfeiture of both $74,000 and the entire value of the Theresa Lane home is constitutionally excessive.  But at this early stage, the Government need only give Fisher notice that it will seek forfeiture "in accordance with the applicable statute," Fed. R. Crim. P. 32.2(a), and the broad language of that statute "mandates forfeiture of 'all property, real or personal, *involved in* the offense and any property *traceable* thereto.'"   *United States v. Varrone*, 554 F.3d 327, 330 (2d Cir. 2009) (quoting

37

§ 5317(c)(1)(A)) (emphases in original).  A claim that the Government cannot forfeit both the Theresa Lane residence and $74,000 is, therefore, premature: "[I]t would be speculative for the Court to engage in a proportionality analysis" under the Excessive Fines Clause "when the facts underlying the forfeiture liability have not been established." *United States v. Montour*, No. CR09-0214 MJP, 2010 WL 1417797, at *2 (W.D. Wa. Apr. 6, 2010).

For these reasons, the AUSA and the Special Agent's discussion of forfeiture during grand jury proceedings does not warrant dismissal.

## CONCLUSION

For the reasons stated above, the Court does not adopt Judge Scott's recommendation to dismiss the superseding indictment, nor does the Court adopt his recommendation to strike the superseding indictment's forfeiture notice.  Fisher's motion to dismiss for grand jury misconduct is therefore denied.

Judge Scott identified the Sixth Amendment as an alternate ground for dismissal. Docket No. 107 at 32.  To the extent that recommendation is premised on the AUSA's conduct before the grand jury (*see id.* at 32-35), for the reasons stated in this Decision and Order, the Court declines to adopt the recommendation.  On or before January 18, 2017, Fisher shall either (1) file a brief addressing whether her motion to dismiss on Sixth Amendment grounds has any continuing validity in light of this Decision and Order, or (2) notify the Court that she no longer intends to pursue the motion.

Because pretrial motions remain pending, time is excluded from the Speedy Trial Act clock from today's date through and including January 18, 2017.  *See* 18 U.S.C. § 3161(h)(1)(D).

**SO ORDERED.**

Dated: December  21, 2016          ___s/Richard J. Arcara_____
      Buffalo, New York          HONORABLE RICHARD J. ARCARA
                              UNITED STATES DISTRICT JUDGE