**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

UNITED STATES OF AMERICA,

        v.                                        15-CR-19-A
                                                  **DECISION AND ORDER**

GEORGINA FISHER,

          Defendant.
_____

The Defendant, Georgina Fisher, is charged with eight counts of structuring, in violation of 31 U.S.C. § 5324(a)(1). She has made a number of arguments for dismissal, based primarily on the Government's conduct before the grand jury, as well as the Government's efforts to forfeit her home in the event of a conviction. In a previous Decision and Order (the "December 2016 Decision and Order," Docket No. 149), the Court declined to adopt Magistrate Judge Scott's Report and Recommendation (Docket No. 107) to the extent it recommended dismissing the superseding indictment for alleged grand jury misconduct. The Court noted, however, that "Judge Scott identified the Sixth Amendment as an alternate ground for dismissal." Docket No. 149 at 16. Thus, the Court requested additional briefing on whether Fisher's motion to dismiss on Sixth Amendment grounds had any continuing validity in light of the Court's December 2016 Decision and Order.

As discussed below, the Court assumes for purposes of this Decision and Order that the Government's conduct—namely, seeking to protect its claimed interest in Fisher's home—violated the Sixth Amendment's Counsel Clause. At bottom, however, that assumed violation resulted from advocating the incorrect (but reasonable) legal position that Fisher's home is, in its entirety, subject to forfeiture. Thus, the most

appropriate remedy for the assumed violation would be to direct the Government to lift its *lis pendens* on Fisher's home so that she could access her home equity and fund her defense. But the Government lifted its *lis pendens* long ago. And Fisher has not shown how the more drastic remedy she seeks—dismissal—is necessary to "restore [her] to the circumstances that would have existed had there been no constitutional error." *United States v. Stein*, 541 F.3d 130, 144 (2d Cir. 2008) (quotation marks and brackets omitted). Fisher has, therefore, not shown that she is entitled to dismissal for an alleged Sixth Amendment violation.

## BACKGROUND

The Court assumes familiarity with its December 2016 Decision and Order, which detailed the grand jury proceedings in this case, and which rejected Fisher's argument that the AUSA's conduct before the grand jury required dismissal. The Court also assumes familiarity with this case's lengthy and complicated procedural history. That procedural history is central to Fisher's motion to dismiss on Sixth Amendment grounds. The Court has carefully reviewed the record and, therefore, only briefly summarizes those parts of the record that are relevant to Fisher's Sixth Amendment claim.

Fisher, as noted, is charged with eight counts of causing a financial institution to fail to file transaction reports—i.e., structuring—in violation of 31 U.S.C. § 5324(a)(1). The superseding indictment alleges that Fisher structured $74,000 in money orders over a ten-day period.

The basis for Fisher's Sixth Amendment claim is the superseding indictment's forfeiture allegation, as well as the Government's efforts to defend that allegation and

the *lis pendens* it placed on Fisher's home.[1]  The forfeiture allegation states that, in the event of a conviction, the Government will seek forfeiture in the form of a $74,000 money judgment, as well as real property located at Theresa Lane, in Niagara Falls, New York.  *See* Docket No. 20 at 10 (Superseding Indictment).  That property is titled in Fisher's name.  *Id.*  As the Government proffered before Judge Scott (Docket No. 34 at 7:9 – 9:13), and as the investigating IRS Special Agent testified before the grand jury (A-97:9 – A-99:16), the Government claims that Fisher purchased over $300,000 in structured money orders, which she used to pay off her mortgage.  Fisher then, according to the Government, took out a line of credit secured by her home, used the line of credit to buy the Theresa Lane home, sold her first home, and used the proceeds to pay off the line of credit.

The superseding indictment alleges, and the Government maintains, that in the event of a conviction the Theresa Lane property is forfeitable pursuant to 31 U.S.C. § 5317(c)(1)(A).  *See* Docket No. 20 at 10; Docket No. 29 at 6-8; Docket No. 60 at 4-5.  The parties strenuously disagree, however, over the degree (if any) to which the Theresa Lane property is subject to forfeiture.  This is because a significant portion of Fisher's alleged structuring was barred by the statute of limitations.  Thus, although the Government presented the grand jury with evidence that Fisher structured over $300,000 in money orders (which, according to the Government, she ultimately used to purchase the Theresa Lane property), the superseding indictment, as noted, alleges that Fisher structured only $74,000 in money orders.

---

[1] The original indictment contained an identical forfeiture allegation.

The Government's efforts to protect its interest in the Theresa Lane property began when the Government filed a notice of *lis pendens* on the property, two weeks after the grand jury handed up the original indictment. *See* Docket No. 7.[2]

After an exchange of letters between the AUSA and Fisher's counsel regarding Fisher's desire to use her equity in the Theresa Lane property to fund her legal defense—an effort the Government stated it would oppose—Fisher filed a motion seeking a hearing pursuant to *United States v. Monsanto*, 924 F.2d 1186 (2d Cir. 1991) (*en banc*). *See* Docket No. 21. In *Monsanto*, the Second Circuit "concluded that the Fifth and Sixth Amendments entitle a presumably innocent criminal defendant to an adversarial, pre-trial hearing to address two questions: (1) whether there is probable cause to believe that the defendant committed the crimes providing a basis for forfeiture; and (2) whether there is probable cause to believe that the properties are properly forfeitable." *United States v. Bonventre*, 720 F.3d 126, 130 (2d Cir. 2013) (citing *Monsanto*, 924 F.2d at 1203).

The Government opposed Fisher's *Monsanto* motion for two reasons. First, the Government argued, Fisher had not shown that she lacked funds with which she could fund her defense. *See* Docket No. 29 at 8-10. And second, the Government argued that Fisher had not shown that "there is a bona fide reason to believe that the grand jury or the court erred in finding probable cause to believe the [Theresa Lane] property was subject to forfeiture." *Id.* at 10. The Government also argued that Fisher could not prove that the Theresa Lane property was untainted because, according to the Government, "she fail[ed] to provide any explanation surrounding any and all of the

---

[2]  Judge Scott understood the *lis pendens* to be a restraint on the Theresa Lane property (Docket No. 34 Tr. 3:7-11), and the Court proceeds on that assumption as well.

financial activities that led to, are traceable to[,] and were involved in the purchase of the Theresa Lane property." *Id.* at 12.

Fisher replied that, contrary to the Government's suggestion, neither her husband nor her mother would fund her defense (Docket No. 31 at 10); that, absent a home equity loan, she lacked sufficient funds to pay for her defense, *id.*; and that she had a "*bona fide* reason to believe that the grand jury erred in finding probable cause to believe the [Theresa Lane] property was subject to forfeiture." *Id.* As to her last argument, Fisher noted that the superseding indictment alleged that she had structured $74,000. But, she argued, that allegation did not justify forfeiture of both a $74,000 money judgment *and* the entire approximate $170,000 value of the Theresa Lane property. *Id.* at 10-11.

The parties appeared before Judge Scott for oral argument on June 9, 2015. Among other things, the AUSA gave Judge Scott a brief summary of the evidence presented to the grand jury as to the structuring charges, as well as how Fisher's alleged structuring is traceable to the Theresa Lane property. Docket No. 34, Tr. 6:9 – 9:13. Fisher again replied that the superseding indictment alleged only $74,000 in structuring—not the more than $300,000 alleged by the Government. Tr. 11:22 – 12:13. Addressing this argument, the AUSA responded that, although the superseding indictment alleged only $74,000 in structuring, "[t]he overall relevant conduct is something that we're going to ask the sentencing court to consider in the event of a conviction." Tr. 20:1-3. Moreover, the AUSA argued, the Government's *lis pendens* was intended to "preserv[e] [the Government's] interest in that property in the event [the Defendant] is convicted," at which time the Government would "turn to the issue of

whether or not the property, Theresa Lane, is involved in or traceable to her criminal activity." Tr. 21:10-14. *See also* Tr. 28:10-14 ("We would have a relevant conduct hearing showing that this conduct began before what's set forth in the indictment. It was a pattern. It was a scheme and, accordingly, that it involved $300,000.")

Several weeks later, Judge Scott filed an order finding that Fisher was entitled to a *Monsanto* hearing. Docket No. 37. Relying on the Second Circuit's decision in *United States v. Bonventre*, 720 F.3d 126 (2d Cir. 2013), Judge Scott concluded that Fisher had met the low burden necessary to warrant a hearing. *See id.* at 3 (quoting *Bonventre*'s holding that the Second Circuit "do[es] not believe that the defendant must make a formal prima facie showing that the funds were illegitimately restrained . . . beyond providing a basis for bringing a motion for a *Monsanto* or *Monsanto*-like hearing in the moving papers").

The Government appealed Judge Scott's order. *See* Docket No. 41. At the Government's request, Judge Scott stayed the *Monsanto* hearing until this Court resolved the Government's appeal. *See* Docket Nos. 47 & 48. Shortly after oral argument, the Court summarily affirmed Judge Scott's order. Docket No. 51.

Two days before the scheduled *Monsanto* hearing, the Government filed a pre-hearing brief stating that it intended to proceed at the hearing by proffer. *See* Docket No. 54 at 3. That same day, the Government also moved for reconsideration of Judge Scott's *Monsanto* order in light of *United States v. Cosme*, 796 F.3d 226 (2d Cir. 2015), which the Second Circuit had decided eight days earlier. *See* Docket No. 55. The Government argued that *Cosme* stood for the proposition that, "where a probable cause finding relative to forfeiture has already been made, *i.e.*, by the grand jury, the

defendant is not entitled to a *Monsanto* hearing." *Id.* at 2. The Government concluded that, "[i]n voting on the indictment in th[is] case . . . the grand jury also voted on the forfeiture allegations. As such, there has been a finding of probable cause to believe that the assets in dispute are traceable or otherwise sufficiently related to the crimes charged in the indictment." *Id.* at 3-4. Thus, the Government argued, based on both the Supreme Court's decision in *Kaley v. United States*, 134 S. Ct. 1090 (2014), and the Second Circuit's decision in *Cosme*, Fisher was not entitled to a *Monsanto* hearing.

Judge Scott denied the Government's motion for reconsideration the next day. *See* Docket No. 56. In his Decision and Order, Judge Scott distinguished *Cosme* and concluded that the Government's motion for reconsideration "is a total *non-sequitur* whose only purpose is to delay Fisher's *Monsanto* hearing further." *Id.* at 4.

Fisher then responded to the Government's pre-hearing brief, arguing primarily that a *Monsanto* hearing must be an adversarial one "limited" to the question "whether the government can establish probable cause of a factual nexus between [the charges in the superseding indictment] and Ms. Fisher's entire home." Docket No. 57 at 2. Fisher also argued that there was no merit to either of the theories by which the Government claimed the ability to forfeit the entire Theresa Lane property in the event of a conviction. *Id.* at 4.

At the *Monsanto* hearing, the Government began by noting that it had moved for reconsideration in light of *Cosme* after "review[ing] [the case] with appellate counsel in our office, with the forfeiture people." Docket No. 59 Tr. 3:13-15. In an effort to "cut through this," Judge Scott then asked the AUSA whether it was her position "that the grand jury was actually presented the question whether there was probable cause,

there was a nexus between the activity and the assets?"  Tr. 5:12-17.  The AUSA responded that "the nexus between the property sought to be forfeited and the crimes charged was presented to the grand jury.  I was the person who presented the evidence in the grand jury and as an officer of the court I made the representation that that evidence, the connection . . . between Theresa Lane and the structuring of the money orders was presented to the grand jury."  Tr. 6:9-20.  Judge Scott and the AUSA then discussed the proper interpretation and impact of *Cosme*, after which the AUSA volunteered to provide Judge Scott with the relevant portions of the grand jury transcripts for his *in camera* review.  Tr. 9:6-8.

After further argument about whether the grand jury was instructed "[o]n nexus," Tr. 14:11, Judge Scott concluded that he would review the grand jury transcripts *in camera* to determine "whether that was presented the grand jury."  Tr. 17:15.  After the hearing, the parties filed supplemental briefs addressing questions raised at the hearing, and the Government filed transcripts of the grand jury proceedings for Judge Scott's *in camera* review.

Several weeks later, Judge Scott filed a Decision and Order (Docket No. 64) addressing arguments made both at the hearing and in the parties' post-hearing briefs. In addition, Judge Scott *sua sponte* disclosed "points of information" found in the grand jury transcripts, which he believed were "pertinent to the ongoing issues in this case." *Id.* at 9.  Specifically, Judge Scott provided a four-page summary of certain aspects of the grand jury proceedings, some of which involved forfeiture of the Theresa Lane property, and some of which involved references to Fisher's ex-husband's fraud

conviction.[3]  Judge Scott concluded that these materials "go a long way toward explaining what actually happened before the grand jury regarding forfeiture," and he noted that, "at no time during the grand jury proceedings did the Government tell the grand jurors that a general vote on the entire indictment would be construed as both probable cause for the underlying offense and probable cause for a factual nexus."  *Id* at 16-17.  Judge Scott further concluded that "the grand jury materials finally make clear why the Government has been so passionate about the grand jury vote and about refusing to explain the origin of the funds that it wants to seize.  Simply put, the Government has no idea where the funds in question came from, but it has a hunch that the funds ultimately traced back to unaccounted fraud proceeds from Fisher's ex-husband Gregory.  In that context, the Government seeks forfeiture because it has unfinished business with [Fisher's ex-husband,] Gregory."  *Id.* at 20.  Finally, Judge Scott *sua sponte* invited four national legal organizations to appear as *amici curiae* and to file briefs addressing a number of questions raised by the Government's arguments and Judge Scott's interpretation of the grand jury proceedings.

After Judge Scott filed his Decision and Order, the Government filed a notice stating that "the government was (and remains) willing and prepared to run a *Monsanto* hearing."  Docket No. 65 at 1.  However, "so that there is no ambiguity or uncertainty," the Government stated that it "consent[ed] to [Fisher's] request for a *Monsanto* hearing and will present witness testimony at that hearing."  *Id.*  In light of its concession, the Government requested that Judge Scott withdraw his Decision and Order, noting that it "touches upon wide-ranging issues which far exceed the limited relief sought by the defendant, *i.e.*, that a *Monsanto* hearing be conducted."  *Id.* at 2.

---

[3]  The Court summarized the grand jury proceedings in its December 2016 Decision and Order.

Before Fisher responded to the Government's motion, the Government also released its *lis pendens* on the Theresa Lane property. Docket No. 76. The Government noted that its decision to lift the *lis pendens* mooted Fisher's motion for a *Monsanto* hearing. Docket No. 77 at 1. The Government also asked Judge Scott to cancel his invitation for *amici* in light of the Government's efforts to return this case to a normal pre-trial track. *Id.* at 2. Finally, the Government asked Judge Scott to put a scheduling order in place. *Id.* at 3. Fisher then filed a response to the Government's motion, as well as her own motion seeking dismissal of the superseding indictment and reimbursement of legal fees. *See* Docket No. 80.

Judge Scott denied the Government's motion to withdraw his Decision and Order soliciting *amici*, but he noted that the Government's decision to release the *lis pendens* mooted several of the questions he had posed for *amici*. Judge Scott also set a schedule for the filing of *amicus* briefs. *See* Docket No. 81.

The Government then appealed Judge Scott's Decision and Order denying the Government's motion to withdraw his Decision and Order soliciting *amici*. Docket No. 83. After hearing from Fisher, this Court vacated Judge Scott's Decision and Order, noting that the forfeiture statute at issue in this case, 31 U.S.C. § 5317(c)(1)(A),[4] "unequivocally" answered the extant questions for *amici*. Docket No. 97 at 3-4. Also noting that both parties are ably represented, the Court concluded that it could find no

---

[4] The structuring statute at issue in this case, § 5317(c)(1)(A), is a criminal forfeiture statute. In its Decision and Order vacating Judge Scott's call for *amici*, the Court inadvertently cited 31 U.S.C. § 5317(c)(2), which is a civil forfeiture statute. Both the criminal and civil forfeiture statutes, however, permit forfeiture of property "involved in" or "traceable to" a structuring offense. Section 5317(c)(1)(A), unlike § 5317(c)(2), expressly permits forfeiture of real property, but the statutes are otherwise substantively identical.

"sound reason for the Magistrate Judge to solicit assistance from non-parties." Docket No. 97 at 4.

Judge Scott ultimately filed the Report and Recommendation that is before the Court. *See* Docket No. 107. Judge Scott recommends dismissing the superseding indictment without prejudice or, in the alternative, striking the forfeiture allegation. The Government objected, and the Court largely declined to adopt the Report and Recommendation in its December 2016 Decision and Order. The Court then directed Fisher to file additional briefing addressing her Sixth Amendment argument.

## DISCUSSION

Fisher's briefing primarily disputes certain parts of the Court's December 2016 Decision and Order. The Court addresses those arguments at the end of this Decision and Order. Before doing so, however, the Court addresses Fisher's Sixth Amendment interference-with-counsel claim.[5]

---

[5] Both in her briefing and at oral argument, Fisher offered to provide the Court with billing records to support her claim for attorneys' fees under the Hyde Amendment. As relevant here, the Hyde Amendment allows a court, in a criminal case, to "award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust." *See* statutory note following 18 U.S.C. § 3006A. The plain language of the Hyde Amendment resolves Fisher's motion: it allows a fees award *only* when a criminal defendant is a "prevailing party." "The Court is unaware of any other court"—nor has Fisher identified one—"that has ever awarded relief under the Hyde Amendment to a criminal defendant who was not, at a minimum, acquitted at trial." *United States v. Sash*, No. 02 CR. 1519(RCC), 2006 WL 156475, at *1 (S.D.N.Y. Jan. 18, 2006). Fisher, of course, has not been acquitted, nor has she obtained any other relief that might reasonably be characterized as "prevailing." Fisher is, therefore, not a "prevailing party" within the meaning of the Hyde Amendment, and her motion for attorneys' fees is denied.

## A. Fisher's Sixth Amendment Counsel Clause argument

### 1. Government interference with a defendant's Sixth Amendment right to counsel of her choice

Fisher moves to dismiss the superseding indictment because of the Government's efforts to restrain the Theresa Lane property and the effects she claims those efforts had on her ability to retain the counsel of her choice.

The Sixth Amendment provides in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for [her] defence." The Sixth Amendment right to counsel includes, as a general matter, "the right to select and be represented by one's preferred attorney." *Wheat v. United States*, 486 U.S. 153, 159 (1988). And that right includes "the individual's right to spend [her] own money to obtain the advice and assistance of counsel." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989) (quotations and ellipsis omitted). The right to counsel of one's choice is, of course, not without limits, nor is it completely immune from government interference—the Government may, for instance, move to disqualify conflicted counsel—but, "[i]n a nutshell, the Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain." *United States v. Stein*, 541 F.3d 130, 156 (2d Cir. 2008).

Fisher seeks dismissal based on what she contends is improper government interference with her ability to retain the counsel of her choice. The core of Fisher's argument is that, by seeking forfeiture of the entire value of the Theresa Lane property, filing a notice of *lis pendens* on that property, and then vigorously opposing her *Monsanto* motion, the Government engaged in "unjustified . . . interference with

[Fisher's] right to defend [her]self using whatever assets [she] has or might reasonably and lawfully obtain." *Id.* In other words, Fisher argues, the Government improperly prevented her from accessing equity in her home with which she could have funded her defense in this case.

In support of her argument Fisher relies exclusively on a series of decisions from the Second Circuit and District Judge Lewis A. Kaplan in *United States v. Stein*. *See* 541 F.3d 130, 151 (2d Cir. 2008); 495 F. Supp. 2d 390 (S.D.N.Y. 2007); 435 F. Supp. 2d 330 (S.D.N.Y. 2006). *See also* Docket No. 80 at 19-23 (Fisher's reliance on *Stein*). *Stein* arose out of the Government's investigation of the accounting firm KPMG and several of the firm's employees. In brief, the AUSAs responsible for the investigation "deliberately reinforced," 541 F.3d at 143, certain aspects of the Department of Justice's Thompson Memorandum, which set forth what were, at the time, "principles to guide Department prosecutors as they make the decision whether to seek charges against a business organization." Memorandum from Larry D. Thompson, Dep. Att'y Gen. (Jan. 20, 2003) at 1. Among the charging factors the Thompson Memorandum advised prosecutors to consider was whether a corporation "appears to be protecting its culpable employees." *Id.* at 7. In the view of the AUSAs in *Stein* (a view encouraged by the Thompson Memorandum), such "protect[ion]" could include a corporation's decision to pay the legal fees of its potentially-culpable employees. Thus, the AUSAs in *Stein* pressured KPMG to withhold payment of legal fees for its employees—despite such payment having been "common practice" at KPMG, 541 F.3d at 137 (quotation marks omitted)—as a way of showing that KPMG intended to fully cooperate with the Government. For example, the AUSAs proposed language for a letter from KPMG to its

employees, which advised the employees that they "may deal directly with government representatives without counsel." *Id.* at 138. Likewise, the AUSAs "regularly" informed KPMG's outside counsel "whenever a KPMG employee refused to cooperate fully, such as by refusing to proffer or by proffering incompletely." *Id.* The result of such non-cooperation was that "[t]he employees either knuckled under and submitted to interviews, or . . . were fired and KPMG ceased advancing their fees." *Id.* at 139. In short, and as Judge Kaplan found (a finding the Second Circuit affirmed), "the government conducted itself in a manner that evidenced a desire to minimize the involvement of defense attorneys." 435 F. Supp. 2d at 353. The Second Circuit ultimately affirmed Judge Kaplan's holding that the Government violated the defendant-employees' Sixth Amendment right to counsel, given that "absent the Thompson Memorandum and the prosecutors' conduct KPMG would have advanced fees without condition or cap." 541 F.3d at 143.

Fisher's Sixth Amendment argument, as noted, relies entirely on *Stein*. This is certainly a difficult argument to make: That "*Stein* tested the outer limits of the Sixth Amendment's protection," *United States v. Fattah*, --- F.3d ---, 2017 WL 2385270, at *4 (3d Cir. 2017), is demonstrated by the fact that, since the Second Circuit decided *Stein* nearly nine years ago, no court appears to have relied on the case to find a Sixth Amendment violation. A *Stein* claim is also difficult to make because *Stein*'s unique facts make it challenging to extract a rule from the case. Nonetheless, both the Second Circuit and Judge Kaplan seem to suggest that, when a defendant claims that the Government violated the Sixth Amendment by interfering with her ability to retain the counsel of her choice, a court's analysis should proceed in three steps.

The first two steps of a *Stein* analysis ask whether the Government's conduct did, in fact, violate the Sixth Amendment. First, a court must determine whether the Government's conduct "impinged on [the defendant's] Sixth Amendment rights to counsel and to present a complete defense." *Stein*, 435 F. Supp. 2d at 367. This requires a court to decide whether the Government's actions "were part[] of an effort to limit [the] defendant['s] access to funds for [her] defense," something that may not depend on a prosecutor's "conscious motives," but may, instead, be based on "circumstances in which that result was known to be exceptionally likely." *Id.* at 366. *See also id.* at 366-67 ("The government here acted with the purpose of minimizing these defendants' access to resources necessary to mount their defenses or, at least, in reckless disregard that this would be the likely result of its actions.") *See also Stein*, 541 F.3d at 153 ("endors[ing] this analysis"). Second, if the Government's conduct "impinged on" a defendant's access to funds or assets needed to fund her defense, a court must then decide whether "justification exists" for the Government's actions. *Stein*, 435 F. Supp. 2d at 367. *See also Stein*, 541 F.3d at 156 ("In a nutshell, the Sixth Amendment protects against *unjustified* governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain. . . . [U]nless the government's interference was *justified*, it violated the Sixth Amendment.") (emphases added).

If the Government's conduct violated the Sixth Amendment, the third and final step of a *Stein* analysis is to decide the appropriate remedy. *Stein*, 435 F. Supp. 2d at 373-80. The remedies available for a Sixth Amendment violation of the sort alleged

here depend on the nature of the violation.[6]  In other words, "[c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests," such as "society's interest in the administration of criminal justice."  *United States v. Morrison*, 449 U.S. 361, 364 (1981). This means that, to fashion a Sixth Amendment remedy, a court must "identify and then neutralize the [Sixth Amendment] taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial."  *Id.* at 365.  As part of "identify[ing]" a Sixth Amendment violation, a court should consider, among other things whether the Government's conduct was part of "an effort . . . to interfere in any way with [a defendant's] ability to defend [her]self."  *United States v. Guild*, 341 F. App'x 879, 884 (4th Cir. 2009) (O'Connor, J.).  *See also Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 253 (3d Cir. 2005) ("*Morrison* . . . teaches that the intentional character of the government's misconduct affects the appropriate remedy.")

This tailoring requirement means that dismissal is not an automatic sanction for a Sixth Amendment interference-with-counsel violation.  Dismissal is instead "a remedy of last resort, and is appropriate only where necessary to restore the defendant to the

---

[6]  Fisher argues that the alleged Sixth Amendment violation in this case is structural error.  *See* Docket No. 80 at 23.  But Fisher does not show why a claim for *interference* with counsel—rather than *denial* of counsel—should be subject to the harsh remedy of structural error.  Indeed, *Stein* considered (but rejected) the possibility that a remedy short of dismissal might be warranted on the facts of that case. *See Stein*, 541 F.3d at 144-46.  Moreover, to determine the correct remedy for a Sixth Amendment interference-with-counsel claim, other cases draw a distinction between a claim for interference with counsel and a claim for deprivation of counsel; Fisher makes only the former argument.  *See United States v. Gordon*, 710 F.3d 1124, 1139 n.19 (10th Cir. 2013) ("Where the right to counsel of choice is not fully denied, but rather the situation is that counsel's representation may have been constrained or limited by some external governmental factor . . ., the crux of the defendant's claim is really that he has been denied the right to constitutionally effective representation.  Ordinarily, a defendant cannot establish a Sixth Amendment violation based upon deficient performance 'until the defendant is prejudiced.'") (citation omitted, quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006)).

circumstances that would have existed had there been no constitutional error." *Stein*, 541 F.3d at 144 (citations, quotation marks, and brackets omitted).

Finally, a defendant bears the burden of showing a Sixth Amendment violation, *see United States v. Blount*, 291 F.3d 201, 212 (2d Cir. 2002), as well as the propriety of any remedy. *See Guild*, 341 F. App'x at 884 ("As dismissal is the only remedy [the defendant] sought below, and the only remedy he seeks before us, we need discuss his argument no further.") The only remedy Fisher seeks is dismissal.[7] *See* Docket No. 80 at 1, 19, 25.

### 2. If a Sixth Amendment violation occurred in this case, that violation does not warrant dismissal

Dismissal of the superseding indictment is not warranted in this case because, even if the Court assumes that the Government violated the Sixth Amendment's Counsel Clause, dismissal is not appropriately tailored to the unique facts of that assumed violation.

If the Court assumes—only for purposes of this Decision and Order—that the Government violated the Sixth Amendment's Counsel Clause by seeking to protect its claimed interest in the Theresa Lane property, the Government did so by filing a notice of *lis pendens* and then vigorously opposing Fisher's motion for a *Monsanto* hearing.[8]

---

[7] Fisher also seeks reimbursement of the fees and costs she incurred in bringing and litigating her *Monsanto* motion. Sovereign immunity bars such relief. *See Stein*, 435 F. Supp. 2d at 374-76 (collecting and analyzing cases). And, as explained above, *see* note 5, the only waiver of sovereign immunity that appears to allow an award of attorneys' fees against the United States in a criminal case—the Hyde Amendment—does not apply on the facts of this case.

[8] In considering the Government conduct that gave rise to the assumed Sixth Amendment violation in this case, the Court has only considered conduct from the date the Government filed a *lis pendens* until the date it released the *lis pendens*. The Court does so because it was only during *that* time that the Theresa Lane property was restrained in such a way that might affect Fisher's ability to use her assets to hire counsel. Fisher has not shown how any forfeiture-related conduct before the grand jury might affect her ability to use her assets to hire counsel. Moreover, it is, at most, speculative to argue that, by merely

17

In other words, the Court assumes that Fisher has satisfied the first two steps of a *Stein* analysis. On the facts of this case, that would mean that the Government persisted in advocating the incorrect legal position that the Theresa Lane property is, in its entirety, subject to forfeiture. The issue, then, is whether dismissal is the appropriate remedy for that assumed violation.

As noted earlier, the Court must first "identify" the assumed Sixth Amendment violation in this case so that it can order a remedy that is appropriately tailored to the violation. *See Morrison*, 449 U.S. at 365. Identifying the Sixth Amendment violation is, as a general matter, simple: The assumed violation was incorrectly advocating the pretrial restraint of the Theresa Lane property. But properly "identify[ing]" the assumed violation in this case also requires the Court to consider several factors that limit the violation's scope and severity.

First, the assumed Sixth Amendment violation began when the Government filed its notice of *lis pendens* on February 12, 2015, and the assumed violation ended when the Government released its *lis pendens* on November 17, 2015. *See* Docket Nos. 7 & 76. As described above, *see* note 8, it is speculative to argue that the Government's forfeiture-related conduct before the grand jury would affect Fisher's ability to use the Theresa Lane property to fund her defense. For that same reason, Fisher's arguments regarding other alleged grand jury misconduct, such as grand jury discussion of Fisher's ex-husband, have nothing to do with Fisher's Sixth Amendment interference-with-counsel claim.

---

including an improper forfeiture notice in the indictment, the Government interfered with Fisher's ability to access equity in the Theresa Lane property.

The second factor affecting the "identi[t]y" of the assumed Sixth Amendment violation is the type of conduct that gave rise to the violation. That conduct was legal advocacy. It was not, as in *Stein*, something entirely antithetical to the Sixth Amendment, such as attempting to remove defense counsel from an investigation. And it was not, as in *Morrison*, something unethical, such as engaging in contact with a person represented by counsel in an effort to dissuade that person from engaging counsel. It was, instead, legal advocacy—aggressive advocacy, to be sure—in defense of the Government's legal position. Simply put, Fisher seeks dismissal because the Government strenuously opposed her *Monsanto* motion.

The final factor affecting the "identi[t]y" of the assumed Sixth Amendment violation is that the Government's position regarding the forfeitability of the Theresa Lane property is not unreasonable. The forfeiture statute in this case, 31 U.S.C. § 5317(c)(1)(A), requires a sentencing court to order the forfeiture of "all property, real or personal, involved in the offense and any property traceable thereto." This language is, at the very least, susceptible to the Government's proposed interpretation. The statute "does not provide for forfeiture of the proceeds [structured]; it provides for forfeiture of '[all] property, real or personal, *involved in*' [structuring] or 'any property traceable to such property." *In re 650 Fifth Ave. and Related Properties*, 777 F. Supp. 2d 529, 566 n.11 (S.D.N.Y. 2011) (interpreting nearly identical language in 18 U.S.C. § 981(a)(1)(A)) (emphasis added). And the term "'involved in' has consistently been interpreted broadly by courts to include any property involved in, used to commit, or used to facilitate the . . . offense." *United States v. Schlesinger*, 396 F. Supp. 2d 267, 271 (E.D.N.Y. 2005) (interpreting language similar to § 5317(c)(1)(A) in 18 U.S.C. § 982

and collecting cases). *See also United States v. Varrone*, 554 F.3d 327, 330-31 (2d Cir. 2009) (Sotomayor, J.) (citing *Schlesinger* with approval when interpreting § 5317(c)(1)(A)). Indeed, when interpreting a federal money laundering statute that employs language nearly identical to § 5317(c)(1)(A)'s, "the Second Circuit appears to have embraced the 'facilitation approach,' and has affirmed forfeiture of property as 'involved in' money laundering transactions when it has 'served as a conduit for the proceeds of the illegal transactions.'" *In re 650 Fifth Ave.*, 777 F. Supp. 2d at 563 (brackets, citation, and some quotation marks omitted) (quoting *United States v. Schlesinger*, 261 F. App'x 355, 361 (2d Cir. 2008)). When § 5317(c)(1)(A) is interpreted this way, it is far from obvious (as Fisher argues) that the term "involved in" in § 5317(c)(1)(A) does not require forfeiture of an entire piece of real property that "served as a conduit for the proceeds of . . . illegal transactions," *id.* (quotation marks omitted), even when only part of that property was paid for with allegedly-structured funds.[9] *Cf. id.* at 565 (collecting cases for the proposition that "'real property is involved in a money laundering offense if laundered funds are used . . . to pay for improvements'") (quoting *United States v. 10.10 Acres Located on Squires Rd.*, 386 F. Supp. 2d 613, 616 (M.D.N.C. 2005)). *See also United States v. Real Property Located at 6415 N. Harrison Ave.*, No. 1:11-cv-00304-OWW-SKO, 2011 WL 2580335, at *4-5 (E.D. Cal. June 28, 2011); *United States v. Real Property and Premises*, 657 F. Supp. 2d 1060, 1069 (D. Minn. 2009); *United States v. Certain Accounts, Together with All Monies on Deposit Therein*, 795 F. Supp. 391, 397 (S.D. Fla. 1992).

---

[9] The Court assumes for purposes of this Decision and Order that, in the event of a conviction, neither a jury nor the Court may consider time-barred structuring allegations to decide the degree to which the Theresa Lane property is subject to forfeiture.

At the same time, however, Fisher's argument is not at all unreasonable. The Court readily acknowledges that well-reasoned case law supports Fisher's interpretation of § 5317(c)(1)(A), and the corresponding position that the Government may only forfeit (and, thus, seek pretrial restraint of) $74,000 in value from the Theresa Lane property. *See, e.g.*, *United States v. Loe*, 49 F. Supp. 2d 514, 521-24 (E.D. Tex. 1999); *United States v. All Funds on Deposit in Great Eastern Bank Account Number 11008117*, 804 F. Supp. 444, 447-48 (E.D.N.Y. 1992).

The Court, of course, does not decide at this juncture whether the Government or Fisher has offered the correct interpretation of § 5317(c)(1)(A). The Court notes only that, because the assumed Sixth Amendment violation in this case came by way of advocating an incorrect legal position, and because the Government's intent to interfere with counsel is relevant to the propriety of dismissal, *see Guild*, 341 F. App'x at 884, the reasonableness of the Government's position is relevant to deciding the appropriate remedy. In other words, if the Government's position is entirely unreasonable, its conduct could be described, at the very least, as reckless interference with a defendant's right to hire the counsel of her choice. That is not the case here, however.

Taken together, these three factors limit the scope and severity of the assumed Sixth Amendment violation in this case. This is important because, as noted, to fashion a Sixth Amendment remedy, a court must "identify and then neutralize the [Sixth Amendment] taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial." *Morrison*, 449 U.S. at 365. Put differently, the remedy must be tied to the violation, and where the violation is not egregious, the remedy need not (and may not) be drastic.

Dismissal is not the proper remedy for the assumed Sixth Amendment violation in this case. It bears repeating that the assumed Sixth Amendment violation was (1) the Government's assumed-incorrect legal position that the entire value of the Theresa Lane property is subject to forfeiture; and (2) the Government's efforts to protect its claimed interest in that property. If the Court's choice of remedy is to be informed by, among other things, "deterrence," *Fahie*, 419 F.3d at 253, then the Government should not be punished for seeking to protect property in which it reasonably believed it had an interest. To the contrary, the steps the Government took to protect its interest in this case were what one would expect the Government to do to protect a piece of potentially-forfeitable property. In other words, the Government's goal was entirely legitimate, and no conduct needs to be deterred. *See United States v. Emor*, 794 F. Supp. 2d 143, 147-48 (D.D.C. 2011) ("[U]nlike the choice of the prosecutors in *Stein* . . ., the pretrial restraint of likely forfeitable assets is legally and factually justified by goals unrelated to any desire by the government to interfere with the payment of the legal fees of criminal defendants. [The defendant's] unconvincing attempts to attribute bad motives to the prosecutors in his case do nothing to undermine the conclusion that those prosecutors had reasonable and legitimate grounds for arranging the pretrial seizure of the assets in question.") Moreover, as noted, the Government's legal position in support of its goal was not at all unreasonable.[10] If dismissal is ever an appropriate remedy for improperly restraining a criminal defendant's property, it should be reserved for cases far more egregious than this one.

---

[10] By suggesting that the Government has reasonably argued that the Theresa Lane property is, in its entirety, subject to forfeiture, the Court does not also suggest that each of the Government's arguments in opposition to Fisher's *Monsanto* motion was correct.

Relatedly, in reaching the conclusion that dismissal is inappropriate, the Court also gives significant weight to the fact that nothing in the record suggests, as in *Stein*, that "the government conducted itself in a manner that evidenced a desire to minimize the involvement of defense attorneys." *Stein*, 541 F.3d at 143 (quotation marks omitted). As discussed earlier, *Stein* involved the Government's egregious attempt to remove defense counsel from an investigation simply because the Government believed that defense counsel would interfere with the investigation. Addressing a related constitutional violation, Judge Kaplan found that "this behavior shocks the conscience." *Stein*, 495 F. Supp.2d at 415.

Here, by contrast, nothing in the record suggests that the Government sought to interfere with Fisher's ability to access equity in the Theresa Lane property because the Government saw skilled defense counsel as an impediment to its investigation and prosecution. Instead, as noted earlier, any interference with Fisher's ability to access equity in her property was incidental to the entirely proper goal of protecting the Government's interest in property that, in the Government's view, is subject to forfeiture. That is, the Government believed that Fisher's entire property was subject to forfeiture pursuant to 31 U.S.C. § 5317(c)(1)(A). *See* Docket No. 29 (Gov't Resp. to *Monsanto* Mtn.) at 7 ("There is nothing complicated about what constitutes the 'property involved' in a currency reporting violation."); Docket No. 92 (Gov't Resp. to Def. Mot. to Dismiss) at 3 ("[T]he government opposed defendant's motion for a *Monsanto* hearing in good faith based on its interpretation of the governing case law.") Believing the property to be forfeitable under that statute, the Government's conduct in this case was motivated by the desire to protect its interest in the property in the event of a conviction. *See* Docket

No. 34 at 21:10-14 ("Your Honor, we're preserving our interest in that property in the event that she's convicted. . . . We will then turn to the issue of whether or not the property . . . is involved in or traceable to her criminal activity.") That interest is "strong." *Caplin & Drysdale, Chartered*, 491 U.S. at 631. And it is an interest that, without question, the Government may seek to protect. The assumed Sixth Amendment violation in this case is, therefore, far different than in *Stein*, where the Government's goal was to establish a system by which "defense counsel could be controlled by the government or vetoed without good reason." *Stein*, 541 F.3d at 154. That difference is relevant here because the question whether dismissal is an appropriate remedy should be informed by, among other things, whether the Government's conduct was intended "to interfere in any way with [a defendant's] ability to defend [her]self." *Guild*, 341 F. App'x at 884. In this case, it was not.

A remedy short of dismissal might be appropriate for the assumed Sixth Amendment violation in this case.[11] It bears recalling what Fisher originally sought in her *Monsanto* motion: an order from the Court "direct[ing] removal of the *lis pendens* on [her] home." Docket No. 21-1 at 7.[12] Thus, the most logical and appropriately-tailored

---

[11] Indeed, *Stein* suggests that the Government may cure a Sixth Amendment violation by removing the Government-induced restraint that led to the Sixth Amendment violation. *See Stein*, 541 F.3d at 144-46. On the facts of *Stein*—where the AUSA made an "isolated and ambiguous statement" arguably removing the Sixth Amendment taint, but only after nearly 16 months of "legal limbo"—the Second Circuit concluded that the government had not "restore[d] defendants to the status quo ante." *Id.* at 145. Nonetheless, the Second Circuit's analysis strongly suggests that the Government may neutralize a Sixth Amendment violation by no longer pressing positions that caused the Sixth Amendment violation in the first place.

[12] In her *Monsanto* motion, Fisher also requested that the Court "strike from the indictment the forfeiture allegation with respect to [the Theresa Lane] property." *Id.* The Court does not consider this request as part of Fisher's motion to dismiss on Sixth Amendment grounds. It is, as noted, Fisher's burden to propose an appropriate remedy for a Sixth Amendment violation, and in her "Motion for Remedies and Relief," Fisher only seeks dismissal and attorneys' fees. Further, in her brief filed pursuant to the Court's December 2016 Decision and Order, Fisher only seeks the remedies that she sought in her Motion for Remedies and Relief. *See* Docket No. 157 at 1 (Fisher "hereby submits her brief confirming that her

remedy would be to do as Fisher sought and direct the Government to lift its *lis pendens* on the Theresa Lane property. But the Government has already lifted the *lis pendens*.[13] And Fisher seeks no remedy, other than dismissal, that the Court may grant. It is her burden to identify a Sixth Amendment remedy, but she points to no remedy (nor is any apparent) that could "neutralize the [assumed Sixth Amendment] taint," *Morrison*, 449 U.S. at 365, any more than lifting the *lis pendens*. *See also Guild*, 341 F. App'x at 884 (after concluding that dismissal was an "inappropriate" remedy for a Sixth Amendment violation, observing that, because "dismissal is the only remedy [the defendant] sought below, and the only remedy he seeks before us, we need discuss his argument no further"). Any further relief, such as dismissal, would do much more than is necessary to put Fisher in the position she would have been in had the violation not occurred.

In the end, Fisher seeks dismissal because the Government aggressively opposed her *Monsanto* motion. If, as the Court assumes here, that conduct interfered with Fisher's right to counsel in violation of the Sixth Amendment, then dismissal is a heavy-handed remedy.

In addition, Fisher points to nothing suggesting that the Sixth Amendment protects a criminal defendant from having to expend her resources to oppose legal positions taken by the Government that, while reasonable, are ultimately found to be incorrect. There is no question that such a result is unfortunate, nor is there any

Motion for Remedies and Relief and each specific form of relief requested therein (including, but not limited to, dismissal of this case on Sixth Amendment grounds) has continued validity in light of the [December 2016 Decision and Order").

[13]   The Government stated that it lifted its *lis pendens* "believing that such action would end the *amici curiae* side show, eliminate the *Monsanto* issue, and lead to moving the case forward on the merits. In lifting the *lis pendens*, the government has confessed no wrongdoing and reversed no wrongdoing." Docket No. 92 at 3. By suggesting that removing the *lis pendens* is an appropriate remedy for the assumed Sixth Amendment violation in this case, the Court does not suggest that the Government admitted wrongdoing by lifting the *lis pendens*.

question that a defendant's frustration at expending her resources in such a fight is both reasonable and understandable. This is likely why Fisher argues that dismissal is warranted in light of the legal bills "[s]he has accumulated . . . fighting for her right to these assets." Docket No. 80 at 23. She argues that those bills come close to or exceed "the value of the assets she was fighting for." *Id.* But accepting Fisher's argument would appear to require dismissal *every time* a criminal defendant obtained *Monsanto* relief. Fisher points to no authority supporting this categorical result, which would be contrary to "the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *Morrison*, 449 U.S. at 364. If dismissal were ever warranted under such circumstances, it should be reserved for a case in which the Government's position about the forfeitability of a piece of property was entirely unreasonable or otherwise somehow culpable.

Moreover, Fisher does not, other than in a conclusory fashion, show how the expenditure of fees has prejudiced her in a way that interfered with her Sixth Amendment right to counsel. She makes the conclusory statement that the Government's assumed interference with the Theresa Lane property "affected innumerable decisions with respect to her defense" and that "[s]he *may* have made substantially different choices with respect to the defense of her case but for the government's actions." Docket No. 80 at 22-23 (first emphasis added; emphasis in text omitted). But Fisher does nothing more than suggest that this is the case. And in any event, the record does not bear out her claim. Despite making the statement over 18 months ago, Fisher has been very capably—and quite actively—represented by

unquestionably skilled counsel for over two years. In addition, although Fisher is not wealthy, she is not indigent. *See* Docket No. 21-4 ¶ 4 (noting that Fisher's annual salary in 2015 was approximately $90,000).[14] The Court in no way suggests that paying counsel is in any way easy, especially in this case, where multiple attorneys have appeared at every court hearing and signed every brief on Fisher's behalf. But because Fisher has not been able to show an impact on her defense, Fisher's claims of prejudice do not rise to the level of a Sixth Amendment violation. *See United States v. Clark*, 717 F.3d 790, 804 (10th Cir. 2013) ("[The defendant's] claim of prejudice [based on his *Stein* claim] is nigh eviscerated (if not completely so) by his ongoing, active representation throughout his trial by the counsel that he initially retained.")

For these reasons, the Court denies Fisher's motion to dismiss on Sixth Amendment grounds. In doing so, the Court reemphasizes several points. First, the Court has assumed a Sixth Amendment violation only for purposes of this Decision and Order; nothing in this Decision and Order is, or should be construed as, a finding that a Sixth Amendment violation occurred. Relatedly, nothing in this Decision and Order should be construed as an opinion on the proper interpretation of § 5317(c)(1)(A) and, thus, the portion of the Theresa Lane home that is subject to forfeiture in the event of a conviction. And finally, nothing in this Decision and Order should be construed as an endorsement of the arguments made by either party throughout the course of this litigation.

---

[14] Fisher does not appear to have contested the Government's claim that her husband's annual salary "exceeded $85,000 per year from 2011 to 2014." Docket No. 29 at 9. Rather, Fisher argued before Judge Scott that, given her husband's "expenses and financial obligations, including substantial maintenance payments to his ex-wife, . . . he will not fund [her] litigation." Docket No. 31-1 ¶ 4.

**B. The Defendant's arguments concerning the Court's December 2016 Decision and Order**

In her brief filed pursuant to the Court's December 2016 Decision and Order, Fisher argues that she "has identified certain fundamental factual errors that form the basis for the Court's conclusions." Docket No. 157 at 1. Specifically, Fisher identifies three "errors" that she asks the Court to "consider . . . while it is considering the Sixth Amendment argument." *Id.* Each seeks to refute aspects of the Court's summary of the grand jury proceedings.[15]

First, Fisher argues that "[t]he AUSA misrepresented to the Grand Jury that Ms. Fisher confessed to the IRS Special Agent that she was following her incarcerated husband's instructions to purchase money orders with his fraud proceeds."[16] Docket No. 157 at 8. Fisher argues that she "made no such admission to the Special Agent in her interview, and the Special Agent never mentioned such an admission when she testified before the Grand Jury." *Id.* at 9. Thus, Fisher alleges, "[t]he AUSA concocted this 'admission' to mislead the Grand Jury to believe that Ms. Fisher admitted to working with her ex-husband to hide the proceeds of his fraud. The Grand Jury believed it then, and the Court believes it now." *Id.*

Second, Fisher argues that the Court incorrectly "concluded that Ms. Fisher lied to the Special Agent that the funds used to purchase the subject money orders were from her life savings and that the Special Agent disproved her lie." Docket No. 157 at

---

[15]  Fisher's suggestion that the Court made factual findings (*see, e.g.*, Docket No. 157 at 12) in its December 2016 Decision and Order is incorrect. The Court's December 2016 Decision and Order drew legal conclusions from the facts contained in the grand jury transcripts, but it found no facts. Rather, it simply recited the facts in the grand jury transcripts as fairly and as neutrally as possible.

[16]  The Court makes limited reference to grand jury proceedings in this section of its opinion. To the extent the Court quotes portions of the grand jury transcripts that have not already been publicly disclosed, those disclosures are authorized for the same reasons far more extensive disclosures were authorized in the Court's December 2016 Decision and Order. *See* Docket No. 149 at 3 n.3.

10. Fisher notes that the Special Agent testified before the grand jury that Fisher had said that she allegedly structured her "life savings." *Id.* at 10. Fisher argues that the AUSA then began referring to Fisher's "life earnings" (a different concept than "life savings") and began to use the terms "interchangeably." *Id.* This, Fisher argues, allowed the AUSA to bring the Special Agent to testify that the Special Agent disproved Fisher's claim that the allegedly structured funds were her life *earnings.* *Id.* at 11. Fisher states that she "never made such a claim." *Id.*

And third, Fisher argues that the AUSA "misled the Grand Jury and the Court to believe that there remain unrecovered proceeds from Gregory Fisher's crimes." *Id.* Specifically, Fisher points to the AUSA's statement, early in grand jury proceedings, that the allegedly structured funds were "probably the ill-gotten gains of her husband's criminal activity." *Id.* quoting (A-3:25 – A-4:1). When questioning the Special Agent, however, Fisher argues that the AUSA "couched her inquiry in terms of 'untraced' fraud proceeds rather than unrecovered fraud proceeds." *Id.* (emphasis omitted). Noting that the Special Agent referred to "'about $500,000 or so that we couldn't trace,'" Fisher argues that "[b]ased on the AUSA's representation to the Grand Jury at the beginning of the proceedings, the Grand Jury construed this testimony to mean that there were still unrecovered fraud proceeds out there that were probably the source of the allegedly structured funds." *Id.* at 12 (quoting A-39:2-3). But, Fisher argues, the judgment in Gregory Fisher's case shows that each of his victims has been paid in full, which, Fisher claims, shows that "there are no unrecovered ill-gotten gains at all which could serve as a 'potential source of Georgina's allegedly structured cash.'" *Id.* at 12 (quoting December 2016 Decision and Order at 21).

None of these arguments is responsive to the Court's December 2016 request for briefing, nor do they have anything to do with Fisher's claim that the Government's conduct violated the Sixth Amendment. Assuming these arguments are not properly construed as motions for reconsideration (and should, therefore, be subject to a strict standard of review), they should still, nonetheless, be denied.

The Court assumes—only for purposes of this Decision and Order—that each of the "errors" Fisher identifies violates "one of those few, clear rules which were carefully drafted and approved by [the Supreme Court] and by Congress to ensure the integrity of the grand jury's functions," *United States v. Williams*, 504 U.S. 36, 46 (1992) (quotation marks omitted). But even with that assumption, the Court's careful review of the grand jury transcript does not show how each assumed violation, viewed in relation to "the record as a whole," "substantially influenced the grand jury's decision to indict," nor is it clear how each "error" gives rise to "grave doubt that the decision to indict was free from the substantial influence of such [assumed] violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (quotation marks omitted). In light of the Special Agent's testimony about Fisher's alleged statement to the Special Agent—"you don't have to show ID if it's less than $3,000," A-35:25 – A-36:1—and given evidence about Fisher's extended pattern of money order purchases, it is difficult to conclude how any of the "factual errors" Fisher identifies could have "substantially influenced" the grand jury's finding that probable cause existed to believe that Fisher violated 31 U.S.C § 5324(a)(1).

This is particularly true for the second and third "errors" Fisher identifies. Fisher does not show how what appear to be, at best, semantic quibbles could have

realistically affected the grand jury's decision to indict, given that both "errors" concern the source of the allegedly-structured funds—something that has no legal relevance to the structuring charges in this case.

And, in any event, it appears that Fisher has withdrawn her third argument. In response to Fisher's claim, the Government stated that, in fact, "approximately $438,000 in restitution to [Fisher's ex-husband's] non-government victims" remains unpaid. Docket No. 166 at 9.[17] Fisher does not contest this.

## CONCLUSION

For the reasons stated above, Fisher's motion to dismiss based on the Sixth Amendment is denied. The Court's December 2016 Decision and Order denied Fisher's motion to dismiss based on the Fifth Amendment's Grand Jury clause. Thus, for the reasons stated in this Decision and Order, as well as the Court's December 2016 Decision and Order, Fisher's Motion for Remedies and Relief (Docket No. 80) is denied.

This case has effectively been halted for several months short of two years. The Court will therefore endeavor to move this case forward in a way that is both expeditious and respectful of Fisher and the Government's rights. To that end, the parties shall appear on July 7, 2017 at 9:00 a.m. for a status conference regarding whether (as appears to be the case) any additional pretrial motions remain outstanding. To expedite proceedings, the parties are directed to discuss these issues with each other before their appearance. Further, the parties should appear on July 7 prepared to set a trial date.

---

[17] The Court has confirmed with the Clerk's Office that, as of June 19, 2017, Gregory Fisher's outstanding restitution balance is $437,898.46.

Because, from the Court's review of the docket, several motions appear to remain outstanding (Docket Nos. 77, 79, & 91), time is excluded from the Speedy Trial Act clock from today's date through and including July 7, 2017 pursuant to 18 U.S.C. § 3161(h)(1)(D).

**SO ORDERED.**


Dated: June 28, 2017                    _s/Richard J. Arcara_
    Buffalo, New York                    HONORABLE RICHARD J. ARCARA
                                  UNITED STATES DISTRICT JUDGE